SEALED

# EXHIBIT A

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

https://www.wsj.com/articles/star-island-miami-homes-11599767119



**HOMES**

# Star Island Is Reliving Its Glory Days, Thanks to Buyers Like Ken Griffin and Jennifer Lopez

The ultraexclusive enclave in Miami has been quiet in recent years, but a number of big-ticket deals have put the island back on the map

*By [Katherine Clarke](#)*
Sept. 10, 2020 3:45 pm ET

Star Island—a small spit of sand connected to South Beach via a causeway—has always lived up to its name. Past and current residents of its roughly 30 homes include NBA commentator Shaquille O'Neal, hip-hop artist Sean "Diddy" Combs, singer Gloria Estefan and comedian Rosie O'Donnell.

And, after several years of slow sales and price cuts reflecting a lagging luxury market, Star Island is experiencing a boom in real-estate sales as the wealthy flock to Florida for its lower tax rates and, more recently, its balmy weather and open

spaces amid the Covid-19 pandemic. Close to a third of the homes on the tiny island have either traded since the beginning of 2019 or are in the process of trading, according to public records and listings databases.



Jennifer Lopez and her fiancé, former Yankees slugger Alex Rodriguez, recently bought a 10-bedroom mansion for $32.5 million.

PHOTO: EVAN AGOSTINI/INVISION/ASSOCIATED PRESS

A few weeks ago, singer and actress Jennifer Lopez and her fiancé, former Yankees slugger Alex Rodriguez, closed on a deal to buy a 10-bedroom mansion for $32.5 million, according to records and people familiar with the deal. Sold by Roustam Tariko, a Russian vodka billionaire, the roughly 15,000-square-foot Mediterranean-style mansion has a wood-paneled wine room, a Jacuzzi and a dock, according to the listing and property records.

Like many recent Star Island buyers, Ms. Lopez and Mr. Rodriguez snagged the house for less: The house was asking $40 million, according to listings website Zillow.

Also in August, hedge-fund billionaire Ken Griffin picked up an empty lot on the island for $37 million, records show. Mr. Griffin has recently been on an international real-estate spending spree totaling close to $1 billion. The seller was Stuart Miller, executive chairman of home-building giant Lennar, who owns numerous lots there.

Other recent deals include a purchase by Aaron Rollins, a Los Angeles-based doctor and the creator of a cosmetic fat removal procedure who paid $17.5 million for his property. A trust tied to Mexican hotelier Carlos Gosselin and his wife Elisa Verstegui Gosselin also recently struck a deal to sell their home on the island for $24 million, records show.

## A Who's Who of Miami's Star Island

Jennifer Lopez and Alex Rodriguez recently joined this ultra-exclusive club—a tiny island of around 30 homes.



Jennifer Lopez and Alex Rodriguez recently purchased this Star Island home.  ANTONY KEANE ALVAREZ FOR THE WALL STREET JOURNAL

**1 of 8**



"There has never been a year that we've seen this many luxury uber sales on that small island," said Jill Hertzberg of Coldwell Banker Global Luxury, who was involved in some of the transactions.

Ms. Hertzberg and her business partner Jill Eber said they have seen an uptick in interest from home buyers coming from New York and California in search of lower taxes. More recently, the pandemic has convinced wealthy buyers that they can work remotely, meaning they don't have to live on the doorsteps of the New York office towers, they said. "We're really in a new reality," said Ms. Eber.

While many of the deals closed for numbers far short of the properties' initial asking prices, many of which were dreamed up when the market was hotter, they were still pricey.

In July, Mr. Miller sold one of his properties on the island, a massive estate comprising a recently built contemporary mansion and a 1920s-era guesthouse, for $49.46 million, records show. Appraiser Jonathan Miller said he believed the sale was a record for the island.

Oren Alexander, a local agent with Douglas Elliman who has also done deals on the island over the past year, said the sale showed buyers that now might be the time to buy. "As soon as people heard that it was under contract, there was a domino effect," he said.



They have listed a sprawling guest property near the entrance to the island.
PHOTO: ASSOCIATED PRESS

Roughly half the size of an average golf course, Star Island is a flat sandy oval bisected by a road lined with towering palm trees. The roughly 30 compounds that line the island's perimeter, facing onto Biscayne Bay, each has its own personality; ultramodern mansions are interspersed with historic Mediterranean style villas, some of which date to the construction of the island in the 1920s.

Star Island's secluded location means celebrities are largely spared from the glare of the paparazzi, aside from those shutterbugs who take to the water for a better vantage point. While the island is technically accessible to the public, a security guard mans the gatehouse at the single road's entrance at all times and jots down license plate numbers.

The island is also just a few minutes' drive from downtown Miami and South Beach and, for owners with boats too large to fit on their private docks, there is a string of nearby marinas in which to keep their yachts. Each of the island's lots spans about 40,000 square feet, with about 100 feet of frontage on the bay. Some residents have opted to buy two or even three consecutive lots to expand their footprint.

The island was originally conceptualized not long after the 1918 pandemic by Miami developer Carl Fisher, who discovered that he could create his own island by dredging sand. The island was completed in 1922.

"I grew up in Miami Beach, and even as a little kid I'd love to read the stories of the

people who built the homes on Star Island," said Daniel Ciraldo, the executive director at the Miami Design Preservation League. "In many ways, it reflects the American story. A lot of these people are living their American dream."

Stories like how, in the 1980s, actor Don Johnson lived on the island while playing detective Sonny Crockett on "Miami Vice." And how Ms. O'Donnell's former home was once occupied by a marijuana-smoking religious organization known as the Ethiopian Zion Coptic Church that declared the house their "embassy." In the 1970s, neighbors complained about the smell of dense marijuana smoke wafting around the island.

## Star Island: Miami's High-Powered Hideaway
A small spit of manmade land that packs the rich and famous among a few dozen homes



A home owned by Sean 'Diddy' Combs on Star Island.  ANTONY KEANE ALVAREZ FOR THE WALL STREET JOURNAL

**1 of 9**                                     ● ● ● ● ∙

Real-estate developer Thomas Kramer, who made a fortune in South Florida real estate in the 1990s and used to own a property on the island, was known for throwing extravagant parties and for handing out T-shirts that read "Good girls go to heaven. Bad girls go to 5 Star Island," according to the book "Fool's Paradise:

Players, Poseurs, and the Culture of Excess in South Beach."

When he lost the home to creditors a few years ago, Mr. Kramer left behind possessions like a custom-made coffin and a dining table with two stripper poles on top, which were subsequently auctioned off, The Wall Street Journal reported. He previously told the Journal that he had the coffin on hand because he "wanted to die like Elvis Presley on overdose in party mode—being the king of party in Miami."



Hip-hop artist Sean 'Diddy' Combs bought his home from music producer Tommy Mottola.

PHOTO: AGENCE FRANCE-PRESSE/GETTY IMAGES

Other notable residents include Russia-born hospitality magnate Vladislav Doronin; the owner of the resort brand Aman bought Shaquille O'Neal's property for $16 million in 2009, and extensively renovated it.

Phillip Frost, a billionaire chief executive of pharmaceutical and medical diagnostics company Opko Health, and his wife Patricia Frost have lived there since the 1990s, records show. The island also counts two former "Real Housewives of Miami" stars—Lea Black and Lisa Hochstein—among its residents.

"I got to Miami in 1995," said Leonard Hochstein, Ms. Hochstein's husband and a prominent plastic surgeon. "Back then, Star Island was always considered one of those places where the rich and famous live. I never envisioned being able to live there myself, but it's funny how things work out."

Dr. Hochstein later became known for his breast enhancements—he describes himself as a "boob god"—and bought the site of their home for $7.6 million in 2012.

The Hochsteins then ran afoul of Mr. Ciraldo's preservation group, which wanted to protect an existing home on the site. They sued him and he sued the group, but the suits were both eventually dropped.

"It wasn't special at all, a regular old home that wasn't built particularly well,"



In August, hedge-fund billionaire Ken Griffin picked up an empty lot on the island for $37 million.

PHOTO: ZUMA PRESS

SHARE YOUR THOUGHTS

*Would you live on an island packed with wealthy and famous residents?*

said Dr. Hochstein of the home that formerly sat on the property, which dated back to the 1920s. "It was an unfortunate situation." Mr. Ciraldo said the group had launched the campaign in part to raise awareness of the significance of the homes on the island, which fall outside of any historic preservation zone.

While the tussle quickly ended, it was emblematic of the growing tension between old and new architecture on the island, which has resulted in Star Island's latest trend: Moving an older home to the corner of the lot, and building a new one where it once stood.

Dr. Hochstein's neighbor, dental-products entrepreneur John Jansheski, moved a 1920s-era Mediterranean-revival style mansion on his Star Island property to another part of his lot so he could build a new modern house in its place. Mr. Jansheski couldn't be reached for comment.

The property has housed visiting celebrities like Cher and Ricky Martin, Mr. Estefan told The Wall Street Journal earlier this year. He noted that his daughter had been christened there, with Quincy Jones and Oprah Winfrey in attendance. Mr. Estefan said he originally bought the house for his mother, who has since died, and had hoped his children would live there, but the home is too large for them. The Estefans allowed Ms. Lopez to host her 50th birthday celebration at the island last year.

**Write to** Katherine Clarke at katherine.clarke@wsj.com

*Appeared in the September 11, 2020, print edition as 'Miami's High-Powered Hideaway.'*

Copyright © 2022 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

# EXHIBIT B

**The New York Times** | https://www.nytimes.com/2012/03/04/realestate/the-sun-shines-again-in-miami.html

**BIG DEAL**

# *The Sun Shines Again in Miami*

**By Alexei Barrionuevo**
March 1, 2012

MIAMI

POWERBOAT tours of Star Island here offer a pretty good bang for the buck, especially if you love hearing about celebrities and their homes on the renowned enclave for the jet set, or if you want to feel like Sonny Crockett for a day, bouncing over the waves, reliving some "Miami Vice" moment.

If you're looking for reliable information? Not so much.

Yes, Gloria Estefan, Rosie O'Donnell and Sean Combs do, in fact, all own stunning homes there.

But other claims from the tour guide don't hold up. Sylvester Stallone never had a house on Star Island, nor did Madonna, Elizabeth Taylor, Julio Iglesias or Al Capone (he had a house on neighboring Palm Island). And Phillip Frost, the pharmaceutical billionaire who does live on Star, did not actually invent Viagra. But that inconvenient truth would get in the way of Manny, a guide for Thriller Miami tours, telling his joke about Mr. Frost being the "biggest drug dealer in Miami."

Given the long-running hype machine of the Miami real estate market, perhaps it is only fitting that visitors should be subjected to such bow sprays of misinformation. If they had more current intel, the Thriller folks might have noted that sales picked up sharply in 2011 on the man-made Star Island, which added its second Russian billionaire in three years.

As in New York, the very high end of Miami's market is surging. The buzz among top brokers here is of big-ticket sales to deep-pocketed international buyers, rather than foreclosures, painful lessons from easy credit and unrestrained speculation.

After sitting on the sidelines during the crash, rich buyers started piling back in last year. "They realized that if they were going to buy they had better do it now," said Jill Hertzberg, a broker with Coldwell Banker.

Six homes sold on Star in 2011, Ms. Hertzberg said. The cheapest sale was a piece of land that went for about $6 million, and the most expensive was a 9-bedroom 11-bath home to Roustam Tariko, the founder of Russian Standard vodka, for $25.5 million.

Case 1:21-mc-23332-BB   Document 13-1   Entered on FLSD Docket 02/28/2022   Page 12 of 240



A 14,000-square-foot unit at the St. Regis sold for $20 million.  Oscar Hidalgo for The New York Times

Throughout Miami, about 15 single-family homes sold for more than $6 million apiece in 2011, Ms. Hertzberg said. Of those, about 40 percent were sold to Russians, with the remainder split about evenly between Americans and South Americans, brokers said.

Mr. Tariko's purchase followed the sale of Shaquille O'Neal's Star Island home in 2009, during the housing crisis, for $16 million (at one point Mr. O'Neal was asking $35 million), to the construction magnate Vladislav Doronin, who is dating the model Naomi Campbell. (Manny told Thriller passengers that Ms. Campbell was the owner.) Neighbors and brokers say Mr. Doronin has sunk more than $20 million into renovating the house.

The buying spree at the high end is not just for single-family residences. Driven by demand for more spectacular homes, developers of luxury condominium projects have scrambled to combine units, and have even sold entire floors.

The St. Regis, a luxury development in Bal Harbour that opened last year with 245 condo units and a hotel, sold 5 units together, combined into a full floor of 14,400 square feet, for $20 million, said John Manrique, the vice president for sales and marketing.

"Several buyers have been requesting bigger units," he said. "About 14 months ago we went back and looked at what we could combine."

About 70 percent of the St. Regis's sales — with an average price of $3.8 million for about 3,300 square feet — have been to international buyers, most from South America but also some Italians, Britons and Canadians, said Jim Cohen, the vice president for residential sales.

Thomas Kramer, a German real estate developer who lives on Star Island, said buyers had recently signed contracts on two penthouses in Bal Harbour that are each in the $20 million range. "You are going to see a market explosion," he said. "And not one of the buyers is American."

Case 1:21-mc-23332-BB   Document 13-1   Entered on FLSD Docket 02/28/2022   Page 13 of 240



A gate to an estate on Star Island, home to celebrities and the ultrarich.  Oscar Hidalgo for The New York Times

Developers, still struggling to get bank loans for new projects, are generally unable to offer any financing options for buyers.

They "are expressly telling the buyers that it is an 'all-cash' purchase and if you choose to take financing after you close, that is at your option," said Vanessa Grout, the chief executive of Douglas Elliman Florida. "But they are not going to have any contingency or delay at the closing for inability to get financing."

Some buildings are asking for 60 percent deposits, a practice more typical in a country like Brazil, Ms. Grout said.

Some developers are also "trying to test the waters" of buyers' appetite for risk by taking deposits and putting them toward construction, rather than placing them in escrow accounts, Mr. Manrique said.

How far they get with that remains to be seen. As Ms. Grout noted, "a lot of people were burned a few years back, and their memories aren't so short."

**Most Recent: Real Estate Guide**

- How to Wake Up Your Staircase
  You may not spend a lot of time there, but if you've got a staircase, it shouldn't be 'tired and dull.' Here's how to give it some personality.
  Feb. 1, 2022

- $1.9 Million Homes in California
  A Mission Revival house in San Francisco, a mountain estate in Ojai and a 1918 bungalow in San Jose. Jan. 31, 2022

- When Life Changed, Reiki, Tarot and a Home Redo Were There to Help
  Helen Ho was laid off from her urban planning job at the beginning of the pandemic. She saw it as a chance to focus on the things she really liked doing. Jan. 31, 2022

Mr. Kramer, a 20-year resident of Star Island who has bought and sold 14 properties on the island, said that in the past six months four other Russian billionaires, all friends of Mr. Doronin's, had toured his 13-bedroom home, complete with a fingerprint-scanner panic room and a wine cellar, which is now on the market for $60 million. "These are serious buyers," Mr. Kramer said. "These guys buy high-end properties and customize them."

Mr. Kramer is famous for the parties and philanthropic events at his home, where he has a couple of fog machines in the backyard that he says he uses to shield his sometimes-naked guests from the passing tourist boats.



Star Island is home to celebrities and the ultrarich. Oscar Hidalgo for The New York Times

Created by dredging around 1920, Star Island is, for all its exclusivity, actually a public neighborhood connected to the causeway into South Beach by a bridge. A guard house at the entrance gives the illusion of being a private community, but anyone can enter after stopping at the gate. Some tourists passing by in boats heckle homeowners.

Despite the privacy challenges, the island remains one of Miami's premier neighborhoods, a place filled with colorful people and colorful stories.

Carol and Marco Iacovelli have lived in the island's original house since 1988. Built in 1924, it was once owned by Hetty Green, "the witch of Wall Street," who was one of the richest women in the world. Her one-legged son, Edward Green, used some of the 20 rooms to house young girls and had "one of the most extensive collections of pornography" of the time, Ms. Iacovelli said in an interview.

Don Johnson himself lived on the island during the "Miami Vice" years. He got helicopter visits from Barbra Streisand when they were dating, and the television show filmed parts of episodes in the Iacovellis' home.

One day a "crazy lunatic" swam under the bridge and ran through the island trying to get into Mr. Johnson's house, Mrs. Iacovelli said.

Thomas Morgan, a Denver oilman, sometimes rented his 15,000-square-foot home on the island for as much as $25,000 a day, to hedge funds, film crews — and to the singer Usher, who rented it for the Video Music Awards and hosted a raucous party, Mr. Morgan said.

Last April Mr. Morgan sold his home to Mr. Tariko, a longtime renter of the home who also owns the Miss Russia pageant and is close to Donald J. Trump.

As the powerboat pulled away from Star Island one recent sunny afternoon, I couldn't help thinking there were plenty of interesting stories for Thriller Miami to tell passengers that also had the benefit of being true. When I asked Charles Keith, the owner of the tour boat service, about this, he acknowledged that there were some "nontruths" in his tour. "But if you don't have a story to tell," he said, "whether it is true or not, it becomes a boring old boat ride."

# EXHIBIT C

# Russians Write Big Checks for Luxury U.S. Real Estate



**Vladislav Doronin, a construction magnate and boyfriend of Naomi Campbell, bought Shaquille O'Neal's home on Star Island in Miami Beach for $16 million in 2009.**

Marion Curtis/STARPIX, via Associated Press




View All                                           AD                                           3 / 15

# EXHIBIT D

# Naomi Campbell sued her billionaire ex months before he sued her

*Sara Nathan*

This week, it was revealed that Naomi Campbell's billionaire ex-lover Vladislav Doronin is suing her for millions of dollars. But, it turns out, the fiery supermodel had already sued the Russian real estate developer months earlier.

Campbell filed papers in London in February and is currently in arbitration "to get some of her things back that are in his possession," a source who knows the model told The Post. "She's been asking for these things back for years, but they've had no recent conversation. And then he went and did this."

Campbell, who is currently in Europe, is not furious about her former beau's actions, the source added. "It's really the other way around." (A rep for Campbell had no comment.)

In documents filed in New York's Supreme Court on Sept. 4, seen by The Post, Doronin claimed that Campbell has refused to return his personal property, which he valued at more than $3 million. It's not clear yet how much money he claims to have loaned her.

Paul M. O'Connor III, a partner at Kasowitz Benson Torres LLP, which represents Doronin, said in a statement that his client tried to resolve "a series of ongoing disputes" with Campbell in private. "Unfortunately, despite our client's best efforts that was not possible, and seeking resolution through the legal system is the only option remaining."

What more could a jet-setting billionaire need? A friend of the former couple, who dated for five years starting in 2008, said, "it can't be just about the cash, it's about the game. It's a power thing."

Campbell, now 50, has always had a thing for power.

The supermodel has been involved with some of the richest men in the world, including Italian businessman Flavio Briatore, oil magnate Badr Jafar and Egyptian tobacco businessman Louis Camilleri. She has also been linked to Saudi businessman Hassan Jameel, who went on to date Rihanna. She was engaged to U2's Adam Clayton and connected to Robert De Niro.



Doronin heads out on the town with Luo Zilin, the model who led to his split with Campbell.Richie Buxo/Splash News

But friends said that Doronin, who she met at the Cannes Film Festival in 2008, was the man who finally grounded her.

"Things were ordered when Naomi was with him," one said. "I felt her life had a bit more balance, a bit more discipline."

Doronin, 57, made his money in the trading world and went on to build a real estate empire as founder of the Moscow-based development firm Capital Group, and as chairman and CEO of OKO Group, a U.S.-based real estate company. He met Campbell at the Cannes Film Festival in 2008, and a passionate — and expensive — courtship commenced.

"The party that she threw for his 50th was just incredible," their pal said.

The model gave Doronin a lavish three-day bash in India to celebrate his 50th birthday in 2012, with A-list guests including Demi Moore and Kate Moss. For a bit of music, Diana Ross was flown in by private jet to perform. During their relationship, no expense was spared.

Despite reports he built Campbell a futuristic multi-million-dollar love nest in a Moscow forest — the only home ever designed by the late architect Zaha Hadid, sources close to Doronin denied he commissioned the property as a gift. The source also denied that it was on the market.

"I'm sure that Naomi would say that Vlad is the worst bastard in the world," the friend of both said. "I'm not sure that's the case."

However, another confidante added, "Vlad did not want her to work. And she knew that if she continued to work, it would come down to work or her personal life. And her personal life seems to have taken the toll."

The luxe adventure ended in 2013 when, according to friends, Doronin was spotted frolicking on the beach with another fashionista.

> Look, she's busy working and she knows whom she's dealing with . . . She doesn't want to turn this into some big storm. She just would love her things back.
>
>  - A friend of Naomi Campbell

He and Campbell were on the brink of splitting, sources said, and then Doronin was pictured passionately embracing Chinese model Luo Zilin on the Spanish party isle of Ibiza in June of that year.

"That's when it went horribly wrong," a British TV source told The Post. "To my recollection, they were on the rocks at the time, but I don't think they had formerly parted at that stage. Then he popped up with Luo and that was the point of no return."

Making matters worse, Campbell had mentored Zilin, a former Miss Universe China, on her British reality TV show "The Face." She was irate because, as a source said at the time, "it's fair to say they met through Naomi."

However another friend insisted Doronin met Zilin before the show.

Whether or not Campbell had a hand in it, Zilin was promptly fired by her modeling agency, MIX Model Management NYC for "unprofessional conduct" and an "unacceptable work ethic," to which insiders subsequently accused Campbell of "bullying" the younger model.

Doronin has since moved on with Russian model Kristina Romanova, with whom he has two young daughters. He is now mainly based in Miami, where he lives on Star Island, home to big names including J.Lo and A.Rod, but has said in interviews that he commutes around the world.

In 2014, he bought the luxury Aman hotel group, becoming chairman and CEO, and he plans to open Aman New York after buying Manhattan's landmarked Crown Building, with 22 condos and 83 hotel rooms and suites.

All the while, the magnate has managed to stay shrouded in mystery. It's not even known whether Doronin has ever actually divorced his estranged wife Ekaterina, with whom he has a grown-up daughter named Katya. The Post could not find records of any divorce.



Campbell had a rumored fling with One Direction band member Liam Payne, who is 23 years her junior.Getty Images for Laureus

Although Doronin may not have wed again, his girlfriend Romanova — best known for starring in the music video for the late Swedish DJ Avicii's 2013 hit song "Wake Me Up" — has been spotted wearing a massive diamond engagement ring on Instagram.

As for Campbell, she was last year said to be dating former One Direction heartthrob Liam Payne,

who at 27 is 23 years younger than she is.

A source who knows Campbell threw water on the rumored fling, however, saying, "I know that the entire Liam Payne thing was a fiasco, he just used her name for publicity and it felt like some PR stunt on his part.

"Something that was mildly flattering just became a joke that eventually really annoyed her… I think if you get in the middle of her relationships, you just get squashed. It's not a good place to be!"

Asked if she's currently dating, the friend said: "I would say that she seems very happy with where she is in her life. She doesn't need a guy to fulfill her, it's the work that's fueling her. She's getting serious.

Campbell has been focusing on her YouTube show "No Filter With Naomi," where she's chatted with stars from Lee Daniels to Kate Hudson, and is building her own new media company. Despite her notorious temper, she's not shaken by the Doronin fracas.

"Look, she's busy working and she knows who she's dealing with," a source said. "She doesn't want to turn this into some big storm. She just would love her things back."

# EXHIBIT E

CFN 2015R0245195
OR Bk 29580 Pgs 3164 - 3198; (35pgs)
RECORDED 04/16/2015 15:15:27
MTG DOC TAX 78,750.00
INTANG TAX 45,000.00
HARVEY RUVIN, CLERK OF COURT
MIAMI-DADE COUNTY, FLORIDA

PREPARED BY AND UPON
RECORDATION RETURN TO:
Chris Delson
Morrison & Foerster LLP
250 West 55th Street
New York, New York 10019

---

**GARDEN ISLANDS INTERNATIONAL, LLC,** a Florida limited liability company,

as mortgagor

(Mortgagor)

to

**GOLDMAN SACHS BANK USA,** as mortgagee

(Lender)

### MORTGAGE AND
### SECURITY AGREEMENT

---

Dated:       As of April 14, 2015

Location:    Real Property described on Exhibit A attached hereto
             26 Star Island Dr.
             Miami Beach, Miami-Dade County, Florida

---

ny-1184023

15047814v1 0961855

35 Pages

## MORTGAGE AND SECURITY AGREEMENT

THIS MORTGAGE AND SECURITY AGREEMENT (this "**Security Instrument**") is made and entered into as of April 14, 2015, by and among **GARDEN ISLANDS INTERNATIONAL, LLC**, a Florida limited liability company, having its principal place of business at c/o Hinshaw & Culbertson LLP, 2525 Ponce de Leon Boulevard, Fourth Floor, Coral Gables, Florida 33134, as mortgagors (collectively, the "**Mortgagor**") to **GOLDMAN SACHS BANK USA**, having an address at 200 West Street, New York, New York 10282, as mortgagee ("**Lender**").

## W̲I̲T̲N̲E̲S̲S̲E̲T̲H̲ :

WHEREAS, this Security Instrument is given to secure a loan (the "**Loan**") in the principal sum of TWENTY-TWO MILLION FIVE HUNDRED THOUSAND AND 00/100 DOLLARS ($22,500,000.00) or so much thereof as may be advanced pursuant to that certain Term (Committed) Loan Agreement dated as of the date hereof among Mortgagor and Lender (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Loan Agreement**") and evidenced by that certain Note or Notes dated the date hereof made by Mortgagor to Lender (such Note or Notes, together with all extensions, renewals, replacements, restatements or modifications thereof being hereinafter referred to collectively as the "**Note**");

WHEREAS, Mortgagor owns that certain real property more particularly described on Exhibit A attached hereto and made a part hereof;

WHEREAS, Mortgagor desires to secure the payment and the performance of the Obligations (as defined in the Loan Agreement); and

WHEREAS, this Security Instrument is given pursuant to the Loan Agreement, and payment, fulfillment, and performance of the Obligations are secured hereby, and each and every term and provision of the Loan Agreement and the Note, including the rights, remedies, obligations, covenants, conditions, agreements, indemnities, representations and warranties of the parties therein, are hereby incorporated by reference herein as though set forth in full and shall be considered a part of this Security Instrument (the Loan Agreement, the Note, this Security Instrument, that certain Assignment of Leases and Rents of even date herewith made by Mortgagor in favor of Lender (the "**Assignment of Leases**") and all other documents evidencing or securing the Obligations or delivered in connection with the making of the Loan are hereinafter referred to collectively as the "**Loan Documents**").

NOW THEREFORE, in consideration of the making of the Loan by Lender and the covenants, agreements, representations and warranties set forth in this Security Instrument:

### ARTICLE 1 - GRANTS OF SECURITY

Section 1.1. PROPERTY MORTGAGED. Mortgagor does hereby irrevocably mortgage, grant, bargain, sell, pledge, assign, warrant, transfer and convey to Lender and its successors and assigns the following property, rights, interests and estates now owned, or hereafter acquired by Mortgagor (collectively, the "**Property**"):

*ny-1184023*

15047814v1 0961855

(a)     Real Property. The real property described on Exhibit A attached hereto and made a part hereof (the "**Real Property**");

(b)     Easements. All easements, rights-of-way or use, rights, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, air rights and development rights, submerged lands, and all estates, rights, titles, interests, privileges, liberties, servitudes, tenements, hereditaments and appurtenances of any nature whatsoever, in any way now or hereafter belonging, relating or pertaining to the Real Property and the reversion and reversions, remainder and remainders, and all land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the Real Property, to the center line thereof and all the estates, rights, titles, interests, dower and rights of dower, curtesy and rights of curtesy, property, possession, claim and demand whatsoever, both at law and in equity, of Mortgagor of, in and to the Real Property and every part and parcel thereof, with the appurtenances thereto;

(c)     Equipment. All "equipment," as such term is defined in Article 9 of the Uniform Commercial Code (as hereinafter defined), now owned or hereafter acquired by Mortgagor, which is used at or in connection with the Real Property or is located thereon or therein (including, but not limited to, all machinery, equipment, furnishings, and electronic data processing and other office equipment now owned or hereafter acquired by Mortgagor and any and all additions, substitutions and replacements of any of the foregoing), together with all attachments, components, parts, equipment and accessories installed thereon or affixed thereto (collectively, the "**Equipment**"). Notwithstanding the foregoing, Equipment shall not include any property belonging to tenants under leases except to the extent that Mortgagor shall have any right or interest therein;

(d)     Fixtures. All Equipment now owned, or the ownership of which is hereafter acquired, by Mortgagor which is so related to the Real Property forming part of the Property that it is deemed fixtures or real property under the law of the particular state in which the Equipment is located, including, without limitation, all building or construction materials intended for construction, reconstruction, alteration or repair of or installation on the Property, construction equipment, appliances, machinery, plant equipment, fittings, apparatuses, fixtures and other items now or hereafter attached to, installed in or used in connection with (temporarily or permanently) the Real Property, including, but not limited to, engines, devices for the operation of pumps, pipes, plumbing, cleaning, call and sprinkler systems, fire extinguishing apparatuses and equipment, heating, ventilating, plumbing, laundry, incinerating, electrical, air conditioning and air cooling equipment and systems, gas and electric machinery, appurtenances and equipment, pollution control equipment, security systems, disposals, dishwashers, refrigerators and ranges, recreational equipment and facilities of all kinds, and water, gas, electrical, storm and sanitary sewer facilities, utility lines and equipment (whether owned individually or jointly with others, and, if owned jointly, to the extent of Mortgagor's interest therein) and all other utilities whether or not situated in easements, all water tanks, water supply, water power sites, fuel stations, fuel tanks, fuel supply, and all other structures, together with all accessions, appurtenances, additions, replacements, betterments and substitutions for any of the foregoing and the proceeds thereof (collectively, the "**Fixtures**"). Notwithstanding the foregoing, "Fixtures" shall not include any property which tenants are entitled to remove pursuant to leases except to the extent that Mortgagor shall have any right or interest therein;

*ny-1184023*                                    2

15047814v1 0961855

(e)    Personal Property. All furniture, furnishings, machinery, goods, tools, supplies, appliances, general intangibles, contract rights, accounts, accounts receivable, franchises, licenses, certificates and permits, and all other personal property of any kind or character whatsoever (as defined in and subject to the provisions of the Uniform Commercial Code as hereinafter defined), which are now or hereafter owned by Mortgagor and which are located within or about the Real Property, together with all accessories, replacements and substitutions thereto or therefor and the proceeds thereof (collectively, the "**Personal Property**"), and the right, title and interest of Mortgagor in and to any of the Personal Property which may be subject to any security interests, as defined in the Uniform Commercial Code, as adopted and enacted by the state or states where any of the Property is located (the "**Uniform Commercial Code**"), superior in lien to the lien of this Security Instrument and all proceeds and products of the above;

(f)    Leases and Rents. All leases, subleases and other agreements affecting the use, enjoyment or occupancy of the Real Property heretofore or hereafter entered into (including, without limitation, any and all security interests, contractual liens and security deposits) whether before or after the filing by or against Mortgagor of any petition for relief under 11 U.S.C. §101 et seq. as the same may be amended from time to time (the "**Bankruptcy Code**") (individually, a "**Lease**", collectively, the "**Leases**") and all right, title and interest of Mortgagor, its successors and assigns therein and thereunder (including, without limitation, cash or securities deposited thereunder to secure the performance by the lessees of their obligations thereunder and all rents, additional rents, revenues, issues, profits and revenues (including all oil and gas or other mineral royalties and bonuses) from the Real Property whether paid or accruing before or after the filing by or against Mortgagor of any petition for relief under the Bankruptcy Code (collectively, the "**Rents**") and all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Obligations;

(g)    Condemnation Awards. All awards or payments, including interest thereon, which may heretofore and hereafter be made with respect to the Property, whether from the exercise of the right of eminent domain (including but not limited to any transfer made in lieu of or in anticipation of the exercise of the right), or for a change of grade, or for any other injury to or decrease in the value of the Property;

(h)    Insurance Proceeds. All proceeds in respect of the Property under any insurance policies covering the Property, including, without limitation, the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Property;

(i)    Tax Certiorari. All refunds, rebates or credits in connection with reduction in real estate taxes and assessments charged against the Property as a result of tax certiorari or any applications or proceedings for reduction;

(j)    Rights. The right, in the name and on behalf of Mortgagor, to appear in and defend any action or proceeding brought with respect to the Property and to commence any action or proceeding to protect the interest of Lender in the Property;

(k)   Agreements.   All agreements, contracts, certificates, instruments, franchises, franchise agreements, permits, licenses, plans, specifications and other documents, now or hereafter entered into, and all rights therein and thereto, respecting or pertaining to the use, occupation, construction, management or operation of the Real Property and any part thereof, and all right, title and interest of Mortgagor therein and thereunder, including, without limitation, the right, upon the happening of any default hereunder, to receive and collect any sums payable to Mortgagor thereunder;

(l)   Intangibles.   All accounts, accounts receivable, escrows (including, without limitation, all escrows, deposits, reserves and impounds established pursuant to this Security Instrument), documents, instruments, chattel paper, claims, reserves (including deposits) representations, warranties and general intangibles, as one or more of the foregoing terms may be defined in the Uniform Commercial Code, and all contract rights, franchises, books, records, plans, specifications, permits, licenses (to extent assignable), approvals, actions, choses, claims, suits, proofs of claims in bankruptcy and causes of action which now or hereafter relate to, are derived from or are used in connection with the Property, all receivables, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of property or rendering of services by Mortgagor or any operator or manager of the commercial space located in the Real Property or acquired from others, license, lease, sublease and concession fees and rentals, food and beverage wholesale and retail sales, service charges, vending machine sales and proceeds, if any, from business interruption or other loss of income insurance, or arising from the sale of any Property or the rendition of services in the ordinary course of business or otherwise (whether or not earned by performance), together with any Property returned by or reclaimed from customers wherever such Property is located, or the use, operation, maintenance, occupancy or enjoyment thereof or the conduct of any business activities thereon (collectively called the "**Intangibles**");

(m)   Proceeds.   All proceeds of any of the foregoing, including, without limitation, proceeds of insurance and condemnation awards, whether cash, liquidation or other claims or otherwise;

(n)   Other Rights.   Any and all other rights of Mortgagor in and to the items set forth in Subsections (a) through (m) above.

AND without limiting any of the other provisions of this Security Instrument, to the extent permitted by applicable law, Mortgagor expressly grants to Lender, as secured party, a security interest in the portion of the Property which is or may be subject to the provisions of the Uniform Commercial Code which are applicable to secured transactions; it being understood and agreed that the Fixtures are part and parcel of the Real Property (the Real Property and the Fixtures collectively referred to as the "**Premises**") appropriated to the use thereof and, whether affixed or annexed to the Premises or not, shall for the purposes of this Security Instrument be deemed conclusively to be real estate and mortgaged hereby.

Section 1.2.   ASSIGNMENT OF RENTS.   Mortgagor hereby absolutely and unconditionally assigns to Lender all of Mortgagor's right, title and interest in and to all current and future Leases and Rents; it being intended by Mortgagor that this assignment constitutes a present,

*ny-1184023*                                                           4

absolute assignment and not an assignment for additional security only. Nevertheless, subject to the terms of the Assignment of Leases and Section 7.1(h) of this Security Instrument, Lender grants to Mortgagor a revocable license to collect, receive, use and enjoy the Rents. Mortgagor shall hold the Rents, or a portion thereof sufficient to discharge all current sums due on the Obligations, for use in the payment of such sums.

Section 1.3.   SECURITY AGREEMENT.   This Security Instrument is both a real property mortgage and a "security agreement" within the meaning of the Uniform Commercial Code. The Property includes both real and personal property and all other rights and interests, whether tangible or intangible in nature, of Mortgagor in the Property. By executing and delivering this Security Instrument, Mortgagor hereby grants to Lender, as security for the Obligations, a security interest in the Fixtures, the Equipment, the Personal Property and other property constituting the Property to the full extent that the Fixtures, the Equipment, the Personal Property and such other property may be subject to the Uniform Commercial Code (said portion of the Property so subject to the Uniform Commercial Code being called the "**Collateral**"). If an Event of Default shall occur and be continuing, Lender, in addition to any other rights and remedies which it may have, shall have and may exercise immediately and without demand, any and all rights and remedies granted to a secured party upon default under the Uniform Commercial Code, including, without limiting the generality of the foregoing, the right to take possession of the Collateral or any part thereof, and to take such other measures as Lender may deem necessary for the care, protection and preservation of the Collateral. Upon request or demand of Lender after the occurrence and during the continuance of an Event of Default, Mortgagor shall, at its expense, assemble the Collateral and make it available to Lender at a convenient place (at the Real Property if tangible property) acceptable to Lender. Mortgagor shall pay to Lender on demand any and all expenses, including legal expenses and attorneys' fees, incurred or paid by Lender in protecting its interest in the Collateral and in enforcing its right hereunder with respect to the Collateral upon the occurrence of an Event of Default. Any notice of sale, disposition or other intended action by Lender with respect to the Collateral sent to Mortgagor in accordance with the provisions hereof at least five (5) business days prior to such action, shall, except as otherwise provided by applicable law, constitute reasonable notice to Mortgagor. The proceeds of any disposition of the Collateral, or any part thereof, may, except as otherwise required by applicable law, be applied by Lender to the payment of the Obligations in such priority and proportions as Lender in its discretion shall deem proper. The principal place of business of Mortgagor (Debtor) is as set forth on page one (1) hereof and the address of Lender (Secured Party) is as set forth on page one (1) hereof.

Section 1.4.   FIXTURE FILING.   Certain of the Property is or will become "fixtures" (as that term is defined in the Uniform Commercial Code) on the Real Property, described or referred to in this Security Instrument, and this Security Instrument, upon being filed for record in the real estate records of the city or county wherein such fixtures are situated, shall operate also as a financing statement naming Mortgagor as the Debtor and Lender as the Secured Party filed as a fixture filing in accordance with the applicable provisions of said Uniform Commercial Code upon such of the Property that is or may become fixtures.

Section 1.5.   PLEDGES OF MONIES HELD.   Mortgagor hereby pledges to Lender any and all monies now or hereafter held by Lender or on behalf of Lender in connection with the Loan, including, without limitation, any sums held in escrow, including, but not limited to, the Tax and

*ny-1184023*                                      5

Insurance Impound (as hereinafter defined), as additional security for the Obligations until expended or applied as provided in the Loan Agreement or this Security Instrument.

## CONDITIONS TO GRANT

TO HAVE AND TO HOLD the above granted and described Property unto and to the use and benefit of Lender and its successors and assigns, forever;

PROVIDED, HOWEVER, these presents are upon the express condition that, if Mortgagor shall pay to Lender and perform the Obligations at the time and in the manner provided in the Loan Agreement, the Note, this Security Instrument and the other Loan Documents and shall abide by and comply with each and every covenant and condition set forth herein and in the Note, the Loan Agreement, this Security Agreement and the other Loan Documents, these presents and the estate hereby granted shall cease, terminate and be void; provided, however, that Mortgagor's obligation to indemnify and hold harmless Lender pursuant to the provisions hereof shall survive any such payment or release.

## ARTICLE 2 - - OBLIGATIONS SECURED

Section 2.1. OBLIGATIONS. This Security Instrument and the grants, assignments and transfers made in Article 1 are given for the purpose of securing the Obligations.

## ARTICLE 3 - - MORTGAGOR COVENANTS

Mortgagor covenants and agrees that:

Section 3.1. PAYMENT AND PERFORMANCE OF OBLIGATIONS. Mortgagor will pay and perform the Obligations at the time and in the manner provided in the Loan Agreement, the Note, this Security Instrument and the other Loan Documents.

Section 3.2. INCORPORATION BY REFERENCE. All the covenants, conditions and agreements contained in (a) the Loan Agreement , (b) the Note and (c) all and any of the other Loan Documents, are hereby made a part of this Security Instrument to the same extent and with the same force as if fully set forth herein.

Section 3.3. INSURANCE. Mortgagor, at its sole cost and expense, for the mutual benefit of Mortgagor and Lender, shall obtain and maintain, or cause to be obtained and maintained, during the entire term of this Security Instrument (the "**Term**") flood, property, casualty, liability, and other such insurance, in such coverage, amounts, deductibles, forms and providers as is currently in place for the Property, or such other insurance (including coverages, amounts, deductibles, form and providers) coverage as may hereafter be required by Lender in its sole discretion.

(a) Additionally, without limiting the above, flood insurance will be required if any portion of the Premises is situated in a federally designated "special flood hazard area" (for example, Zones A and V) as designated by the Federal Emergency Management Agency, or any successor thereto, as an area having special flood hazards pursuant to the National Flood Insurance Act of 1968, The Flood Disaster Protection Act of 1973, or the National

Flood Insurance Reform Act of 1994, as each may be amended, (collectively the "Flood Insurance Acts"). The minimum amount of flood insurance required is the lesser of one hundred percent (100%) of the full replacement cost of the improvements on the Premises (plus business income interruption coverage) for those portions of such improvements located in such special flood hazard area, the maximum limit of coverage available for the Real Property under the Flood Insurance Acts, or the maximum amount permitted by applicable law, $250,000. Deductibles shall not exceed $25,000.00. Such policies shall be endorsed to list Lender as 1st Mortgagee/Lenders Loss Payable on the Premises.

All policies of insurance (the "**Policies**") required pursuant to this Paragraph 3.3 shall (i) be issued by companies approved by Lender and licensed to do business in the state in which the Property is located, with a claims paying ability rating of "A" (or its equivalent) or better by Standard & Poor's Ratings and Moody's or a rating of "A: IX" or better in the current Best's Insurance Reports, (ii) with respect to the Policies described above, name Lender and its successors and/or assigns as their interest may appear as the lender or mortgagee, Loss Payee and Additional Insured, as applicable, provided however, Mortgagor shall have ten (10) days from the date hereof to provide copies of the Policies that show Lender as being so named, (iii) contain a non-contributory standard mortgagee clause and a lender's loss payable endorsement, or their equivalents, naming Lender as the Person to which all payments made by such insurance company shall be paid, (iv) contain a waiver of subrogation against Lender, (v) be maintained throughout the Term without cost to Lender, (vi) be assigned to Lender, (vii) contain such provisions as Lender deems reasonably necessary or desirable to protect its interest including, without limitation, endorsements providing that Lender shall not be liable for the payment of any of the Insurance Premiums (as hereinafter defined), that neither Mortgagor, Lender nor any other party shall be a co-insurer under said Policies, that no act or negligence of Mortgagor, or anyone acting for Mortgagor, or of any tenant under any Lease or other occupant, or failure to comply with the provisions of any Policy which might otherwise result in a forfeiture of the insurance or any part thereof, shall in any way affect the validity or enforceability of the insurance insofar as Lender is concerned, and that Lender shall receive at least thirty (30) days prior written notice of any modification, reduction or cancellation, and (viii) be reasonably satisfactory in form and substance to Lender and shall be reasonably approved by Lender as to amounts, form, risk coverage, deductibles, loss payees and insureds if any of the same do not meet the criteria set forth in this Section 3.3, such approval not to be unreasonably withheld, delayed or conditioned. On or prior to the date hereof, Mortgagor shall deliver to Lender either (1) certified copies of the Policies in effect on the date hereof (the "**Current Policies**") or (2) ACORD Form 25-S, Certificate of Liability Insurance and ACORD Form 28, Evidence of Commercial Property Insurance (provided that if ACORD Form 28 is unavailable, Lender will accept ACORD Form 27 so long as ACORD Form 27 provides sufficient information in Lender's reasonable determination for it to evaluate the Policies) (collectively the "**ACORD Certificates**") with respect to the Current Policies (and each ACORD Certificate must specify the Lender, loss payee and additional insured status and/or waivers of subrogation, state the amounts of all deductibles and self-insured retentions, if any, set forth notice requirements for cancellation, material change, or non-renewal of insurance and be accompanied by copies of all required endorsements), provided that Mortgagor shall deliver to Lender certified copies of the Current Policies not more than thirty (30) days after the date hereof or upon actual issuance of the Current Policies. At least fifteen (15) days prior to the expiration

*ny-1184023*

7

15047814v1 0961855

of the Policies, Mortgagor shall deliver to Lender either the original policies (or copies of the same certified by the issuers thereof) issued in renewal of each of the expiring Policies or ACORD Certificates with respect thereto, provided that Mortgagor shall deliver to Lender the original policies (or copies of the same certified by the issuers thereof) issued in renewal of the expired Policies not more than thirty (30) days after the expiration of the subject Policies or upon actual issuance of the renewal policies. Subject to Section 3.9 below, Mortgagor shall pay the premiums for such Policies (collectively the "**Insurance Premiums**") as the same become due and payable and shall furnish to Lender evidence of the renewal of each of the Policies with receipts for the payment of the Insurance Premiums or other evidence of such payment reasonably satisfactory to Lender (provided, however, that Mortgagor is not required to furnish such receipts for payment of Insurance Premiums if no Event of Default exists and Mortgagor has previously deposited with Lender sufficient funds to pay all such Insurance Premiums from the Tax and Insurance Impound). If Mortgagor does not furnish such evidence and receipts at least thirty (30) days prior to the expiration of any expiring Policy, then Lender may, but shall not be obligated to, purchase such Policy and pay the Insurance Premiums therefor, and Mortgagor agrees to reimburse Lender for the cost of such Insurance Premiums promptly upon written demand therefor. Mortgagor covenants and agrees to promptly forward to Lender a copy of each written notice received by Mortgagor of any modification, reduction or cancellation of any of the Policies or of any of the coverages afforded under any of the Policies. Within thirty (30) days after written request by Lender, Mortgagor shall obtain such increases in the amounts of coverage required hereunder as may be reasonably requested by Lender, taking into consideration changes in the value of money over time, changes in liability laws, changes in prudent customs and practices, and the like.

Section 3.4. MAINTENANCE OF PROPERTY. Mortgagor shall cause the Property to be maintained in a good and safe condition and repair. The Premises, the Equipment and the Personal Property shall not be removed, demolished or materially altered (except for normal replacement of the Fixtures, the Equipment or the Personal Property, tenant finish and refurbishment of the Premises) without the consent of Lender. Mortgagor shall promptly repair, replace or rebuild any part of the Property which may be destroyed by any Casualty or become damaged, worn or dilapidated or which may be affected by any Condemnation, and shall complete and pay for any structure at any time in the process of construction or repair on the Real Property.

Section 3.5. WASTE. Mortgagor shall not permit, commit or suffer any waste of the Property or make or permit any change in the use of the Property which will in any way materially increase the risk of fire or other hazard arising out of the operation of the Property, or take or permit any action that might invalidate or allow the cancellation of any Policy, or do or permit to be done thereon anything that may in any way materially impair the value of the Property or the security of this Security Instrument. Mortgagor will not, without the prior written consent of Lender, permit any drilling or exploration for or extraction, removal, or production of any minerals from the surface or the subsurface of the Real Property, regardless of the depth thereof or the method of mining or extraction thereof.

Section 3.6. PAYMENT FOR LABOR AND MATERIALS. (a) Mortgagor will promptly pay when due, or cause to be paid when due, all bills and costs for labor, materials, and specifically fabricated materials ("**Labor and Material Costs**") incurred in connection with the Property and

*ny-1184023*

8

15047814v1 0961855

never permit to exist beyond the due date thereof in respect of the Property or any part thereof any lien or security interest, even though inferior to the liens and the security interests hereof, and in any event never permit to be created or exist in respect of the Property or any part thereof any other or additional lien or security interest other than the liens or security interests hereof except for the Permitted Exceptions.

(b)  After prior written notice to Lender, Mortgagor, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any of the Labor and Material Costs, provided that (i) no Event of Default has occurred and is continuing under the Loan Agreement, the Note, this Security Instrument or any of the other Loan Documents, (ii) Mortgagor is permitted to do so under the provisions of any other mortgage, deed of trust or deed to secure debt affecting the Property, (iii) such proceeding shall suspend the collection of the Labor and Material Costs from Mortgagor and from the Property or Mortgagor shall have paid all of the Labor and Material Costs under protest, (iv) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Mortgagor is subject and shall not constitute a default thereunder, (v) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, canceled or lost, and (vi) Mortgagor shall have furnished the security as may be required in the proceeding, or as may be reasonably requested by Lender to insure the payment of any contested Labor and Material Costs, together with all interest and penalties thereon.

Section 3.7.  PERFORMANCE OF OTHER AGREEMENTS.  Mortgagor shall observe and perform each and every term, covenant and provision to be observed or performed by Mortgagor pursuant to the Loan Agreement, any other Loan Document and any other agreement or recorded instrument affecting or pertaining to the Property and any amendments, modifications or changes thereto.

Section 3.8.  CHANGE OF NAME, IDENTITY OR STRUCTURE.  Mortgagor shall not change Mortgagor's name, identity (including its trade name or names) or, if not an individual, Mortgagor's corporate, partnership or other structure without first (a) notifying Lender of such change in writing at least thirty (30) days prior to the effective date of such change, (b) taking all action required by Lender for the purpose of perfecting or protecting the lien and security interest of Lender and (c) in the case of a change in Mortgagor's structure, without first obtaining the prior written consent of Lender.  Mortgagor shall promptly notify Lender in writing of any change in its organizational identification number.  If Mortgagor does not now have an organizational identification number and later obtains one, Mortgagor shall promptly notify Lender in writing of such organizational identification number.  Mortgagor shall execute and deliver to Lender, prior to or contemporaneously with the effective date of any such change, any financing statement or financing statement change required by Lender to establish or maintain the validity, perfection and priority of the security interests granted herein.  At the request of Lender, Mortgagor shall execute a certificate in form satisfactory to Lender listing the trade names under which Mortgagor intends to operate the Property, and representing and warranting that Mortgager does business under no other trade name with respect to the Property.

Section 3.9.  TAX AND INSURANCE IMPOUND.  Upon no less than thirty (30) calendar days' notice at any time during the term of the Loan, Mortgagor shall pay to Lender for deposit

*ny-1184023*

9

into the Tax and Insurance Impound (as hereinafter defined) an amount equal to (i) one-twelfth of the Taxes (as such term is defined in the Loan Agreement) that Lender reasonably estimates will be due to the applicable taxing authorities as of the date such Taxes are first due and payable without penalty or interest after the date hereof multiplied by the number of months elapsed from and including the first month for which such Taxes have been assessed to and including the first month occurring after the month in which this Security Instrument becomes effective, and (ii) one-twelfth of the Insurance Premiums that Lender reasonably estimates will be payable for the renewal of the coverage afforded by the Policies upon the expiration thereof multiplied by the number of months elapsed from and including the first month in which the currently effective Policies became effective to and including the first month occurring after the month in which this Security Instrument becomes effective. Thereafter, Mortgagor shall pay to Lender on the tenth $(10^{th})$ day of each calendar month an amount equal to (a) one-twelfth of the Taxes that Lender reasonably estimates will be payable during the next ensuing twelve (12) months in order to accumulate with Lender sufficient funds to pay all such Taxes at least thirty (30) days prior to the earlier of the date on which the Taxes would become delinquent if not paid or the date on which penalties and/or interest would commence to accrue on the Taxes due to non-payment and (b) one-twelfth of the Insurance Premiums that Lender reasonably estimates will be payable for the renewal of the coverage afforded by the Policies upon the expiration thereof in order to accumulate with Lender sufficient funds to pay all such Insurance Premiums at least thirty (30) days prior to the expiration of the Policies (the fund into which said amounts provided in clauses (a) and (b) above shall be deposited is called the "**Tax and Insurance Impound**"). The monthly payment into the Tax and Insurance Impound and the monthly payment payable pursuant to the Note shall be added together and shall be paid as an aggregate sum by Mortgagor to Lender. Mortgagor agrees to notify Lender immediately of any changes to the amounts, schedules and instructions for payment of any Taxes and Insurance Premiums of which it has or obtains knowledge and authorizes Lender or its agent to obtain the bills for Taxes directly from the appropriate taxing authority. Mortgagor hereby pledges to Lender and grants to Lender a security interest in any and all monies now or hereafter deposited in the Tax and Insurance Impound as additional security for the payment of the Obligations. Provided that there are sufficient amounts on deposit in the Tax and Insurance Impound and no Event of Default exists, Lender will apply the Tax and Insurance Impound to payments of Taxes and Insurance Premiums required to be made by Mortgagor pursuant hereto. In making any payment relating to the Tax and Insurance Impound, Lender may do so according to any bill, statement or estimate procured from the appropriate public office (with respect to Taxes) or insurer or agent (with respect to Insurance Premiums), without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax, assessment, sale, forfeiture, tax lien or title or claim thereof. If the amounts on deposit in the Tax and Insurance Impound shall exceed the amounts due for Taxes and Insurance Premiums, Lender may at its election either return any excess to Mortgagor or credit such excess against future payments to be made to the Tax and Insurance Impound. In allocating such excess, Lender may deal with the person shown on the records of Lender to be the owner of the Property. If, after commencing payments into the Tax and Insurance Impound, at any time thereafter Lender determines that the amounts on deposit in the Tax and Insurance Impound are not or will not be sufficient to pay the Taxes and Insurance Premiums, Lender shall notify Mortgagor of such determination and Mortgagor shall increase its monthly payments to Lender by the amount that Lender reasonably estimates is sufficient to make up the deficiency at least thirty (30) days prior to (x) the earlier of the date on which the

*ny-1184023*

10

15047814v1 0961855

Taxes would become delinquent if not paid or the date on which penalties and/or interest would commence to accrue on the Taxes due to non-payment of the Taxes and/or (y) the date any of the Policies would expire, as the case may be. Whenever an Event of Default exists, Lender may apply any sums then present in the Tax and Insurance Impound to the payment of the Obligations in any order in its sole discretion. Until expended or applied as above provided, all amounts in the Tax and Insurance Impound shall constitute additional security for the Obligations. The Tax and Insurance Impound shall not constitute a trust fund and may be commingled with other monies held by Lender. Unless otherwise required by applicable law, Mortgagor shall not receive interest or other earnings on the Tax and Insurance Impound, which shall be held in Lender's name at a financial institution selected by Lender in its sole discretion. Following the delivery and recording of a satisfaction, release, reconveyance or discharge of this Security Instrument duly executed by Lender, any funds remaining on deposit in the Tax and Insurance Impound will be disbursed to Mortgagor. If Lender so elects at any time, Mortgagor shall provide, at Mortgagor's reasonable expense, a tax service contract for the Term issued by a tax reporting agency acceptable to Lender. If Lender does not so elect, Mortgagor shall reimburse Lender for the reasonable cost of making annual tax searches throughout the Term.

## ARTICLE 4 - - OBLIGATIONS AND RELIANCES

Section 4.1. RELATIONSHIP OF MORTGAGOR AND LENDER. The relationship between Mortgagor and Lender is solely that of debtor and creditor, and Lender has no fiduciary or other special relationship with Mortgagor, and no term or condition of any of the Loan Agreement, the Note, this Security Instrument and the other Loan Documents shall be construed so as to deem the relationship between Mortgagor and Lender to be other than that of debtor and creditor.

Section 4.2. NO RELIANCE ON LENDER. The general partners, members, managers, principals and (if Mortgagor is a trust) beneficial owners of Mortgagor are experienced in the ownership and operation of properties similar to the Property, and Mortgagor and Lender are relying solely upon such expertise and business plan in connection with the ownership and operation of the Property. Mortgagor is not relying on Lender's expertise, business acumen or advice in connection with the Property.

Section 4.3. NO LENDER OBLIGATIONS. (a) Notwithstanding the provisions of Subsections 1.1(h) and (l) or Section 1.2, Lender is not undertaking the performance of (i) any obligations under the Leases; or (ii) any obligations with respect to such agreements, contracts, certificates, instruments, franchises, permits, trademarks, licenses and other documents.

(b) By accepting or approving anything required to be observed, performed or fulfilled or to be given to Lender pursuant to this Security Instrument, the Loan Agreement, the Note or the other Loan Documents, including, without limitation, any officer's certificate, balance sheet, statement of profit and loss or other financial statement, survey, appraisal, or insurance policy, Lender shall not be deemed to have warranted, consented to, or affirmed the sufficiency, the legality or effectiveness of same, and such acceptance or approval thereof shall not constitute any warranty or affirmation with respect thereto by Lender.

*ny-1184023*

11

15047814v1 0961855

Section 4.4. RELIANCE. Mortgagor recognizes and acknowledges that in accepting the Loan Agreement, the Note, this Security Instrument and the other Loan Documents, Lender is expressly and primarily relying on the truth and accuracy of the warranties and representations set forth in Article 4 of the Loan Agreement without any obligation to investigate the Property and notwithstanding any investigation of the Property by Lender; that such reliance existed on the part of Lender prior to the date hereof, that the warranties and representations are a material inducement to Lender in making the Loan; and that Lender would not be willing to make the Loan and accept this Security Instrument in the absence of the warranties and representations as set forth in Article 4 of the Loan Agreement.

## ARTICLE 5 - - FURTHER ASSURANCES

Section 5.1. RECORDING OF SECURITY INSTRUMENT, ETC. Mortgagor forthwith upon the execution and delivery of this Security Instrument and thereafter, from time to time, will cause this Security Instrument and any of the other Loan Documents creating a lien or security interest or evidencing the lien hereof upon the Property and each instrument of further assurance to be filed, registered or recorded in such manner and in such places as may be required by any present or future law in order to publish notice of and fully to protect and perfect the lien or security interest hereof upon, and the interest of Lender in, the Property. Mortgagor will pay all taxes, filing, registration or recording fees, and all expenses incident to the preparation, execution, acknowledgment and/or recording of the Note, this Security Instrument, the other Loan Documents, any note, deed of trust or mortgage supplemental hereto, any security instrument with respect to the Property and any instrument of further assurance, and any modification or amendment of the foregoing documents, and all federal, state, county and municipal taxes, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of this Security Instrument, any deed of trust or mortgage supplemental hereto, any security instrument with respect to the Property or any instrument of further assurance, and any modification or amendment of the foregoing documents, except where prohibited by law so to do.

Section 5.2. FURTHER ACTS, ETC. Mortgagor will, at the cost of Mortgagor, and without expense to Lender, do, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, deeds of trust, mortgages, assignments, notices of assignments, transfers and assurances as Lender shall, from time to time, reasonably require, for the better assuring, conveying, assigning, transferring, and confirming unto Lender the property and rights hereby mortgaged, deeded, granted, bargained, sold, conveyed, confirmed, pledged, assigned, warranted and transferred or intended now or hereafter so to be, or which Mortgagor may be or may hereafter become bound to convey or assign to Lender, or for carrying out the intention or facilitating the performance of the terms of this Security Instrument or for filing, registering or recording this Security Instrument, or for complying with all Legal Requirements. Mortgagor, on demand from Lender, will execute and deliver, and in the event Mortgagor shall fail to so execute and deliver within five (5) calendar days after Lender's written demand, hereby authorizes Lender to execute in the name of Mortgagor or without the signature of Mortgagor to the extent Lender may lawfully do so, one or more financing statements (including, without limitation, initial financing statements and amendments thereto and continuation statements) with or without the signature of Mortgagor as authorized by applicable law, to evidence more effectively the security interest of Lender in the Property. Mortgagor also ratifies its

authorization for Lender to have filed any like initial financing statements, amendments thereto and continuation statements, if filed prior to the date of this Security Instrument. Mortgagor grants to Lender an irrevocable power of attorney coupled with an interest for the purpose of exercising and perfecting any and all rights and remedies available to Lender at law and in equity, including without limitation such rights and remedies available to Lender pursuant to this Section 5.2. To the extent not prohibited by applicable law, Mortgagor hereby ratifies all acts Lender has lawfully done in the past or shall lawfully do or cause to be done in the future by virtue of such power of attorney.

Section 5.3.    CHANGES IN TAX, OBLIGATIONS, CREDIT AND DOCUMENTARY    STAMP LAWS.  (a) If any law is enacted or adopted or amended after the date of this Security Instrument which deducts the Obligations from the value of the Property for the purpose of taxation or which imposes a tax, either directly or indirectly, on the Obligations or Lender's interest in the Property, Mortgagor will pay the tax, with interest and penalties thereon, if any, or at Lender's option, reimburse Lender for the payment of the tax, with interest and penalties thereon, if any. If Lender is advised by counsel chosen by it that the payment, or reimbursement to Lender (if paid by Lender), of the tax by Mortgagor or any other Loan Party would be unlawful or taxable to Lender or unenforceable or provide the basis for a defense of usury then Lender shall have the option by written notice of not less than sixty (60) days to declare the Obligations immediately due and payable.

(b)    Mortgagor will not (i) claim or demand or be entitled to any credit or credits on account of the Obligations for any part of the Taxes assessed against the Property, or any part thereof, or (ii) claim any deduction from the assessed value of the Property, or any part thereof, for real estate tax purposes by reason of this Security Instrument or the Obligations. If such claim, credit or deduction shall be required by law, Lender shall have the option, by written notice of not less than sixty (60) days, to declare the Obligations immediately due and payable.

(c)    If at any time the United States of America, any State thereof or any subdivision of any such State shall require revenue or other stamps to be affixed to the Note, this Security Instrument or any of the other Loan Documents or impose any other tax or charge on the same, Mortgagor shall immediately pay for the same, with interest and penalties thereon, if any.

Section 5.4.    SPLITTING OF MORTGAGE.  This Security Instrument and the Note shall, at any time until the same shall be indefeasibly paid in full and satisfied, at the sole election of Lender, be split or divided into two or more notes and two or more security instruments, each of which shall cover all or a portion of the Property to be more particularly described therein. To that end, Mortgagor, upon written request of Lender, shall promptly execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered by the then owner of the Property, to Lender and/or its designee or designees substitute notes and security instruments in such principal amounts, aggregating not more than the then unpaid principal amount of the Note, and containing terms, provisions and clauses similar to those contained herein and in the Note, and such other documents and instruments as may be required by Lender.

*ny-1184023*

13

15047814v1 0961855

Section 5.5.   REPLACEMENT DOCUMENTS.  Upon receipt of an affidavit of an officer of Lender as to the loss, theft, destruction or mutilation of the Note or any other Loan Document which is not of public record, and, in the case of any such mutilation, upon surrender and cancellation of such Note or other Loan Document, Mortgagor shall issue, in lieu thereof, a replacement Note or other Loan Document, dated the date of such lost, stolen, destroyed or mutilated Note or other Loan Document in the same principal amount thereof and otherwise of like tenor.

## ARTICLE 6 - - DUE ON SALE/ENCUMBRANCE

Section 6.1.   LENDER RELIANCE.  Mortgagor acknowledges that Lender has examined and relied on the experience of Mortgagor and its general partners, members, managers, principals and (if Mortgagor is a trust) beneficial owners in owning and operating properties such as the Property in agreeing to make the Loan, and will continue to rely on Mortgagor's ownership of the Property as a means of maintaining the value of the Property as security for payment and performance of the Obligations.  Mortgagor acknowledges that Lender has a valid interest in maintaining the value of the Property so as to ensure that, should Mortgagor default in the payment or the performance of the Obligations, Lender can recover the Obligations by a sale of the Property.

Section 6.2.   NO TRANSFER .  Mortgagor shall not permit or suffer any Transfer to occur unless Lender shall consent thereto in writing; provided, however, Mortgagor shall be permitted to contest Labor and Material Costs as set forth herein, and shall have the right to contest in good faith the amount or validity of any Lien by appropriate judicial proceedings conducted promptly and at the Mortgagor's sole expense, but such proceedings shall not relieve the Mortgagor of its covenant hereunder to pay such amounts related to such Liens at the time and in the manner herein provided, or to extend the time for such payment, unless such judicial proceedings operate to prevent or suspend the collection of the Liens so contested and the sale of the Property for or on account of their non-payment, but only upon posting, and concurrently supplying to Lender a certified copy of a statutory bond or other security sufficient under applicable law fully to protect any and all of the Property encumbered by such claim of Lien and otherwise sufficient in Lender's sole opinion to protect Lender against any judgment in favor of the lien claimant or assessor, as applicable.

Section 6.3.   TRANSFER DEFINED.  As used in this Article 6, "**Transfer**" shall mean any voluntary or involuntary sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment or transfer of: (a) all or any part of the Property or any estate or interest therein including, but not be limited to, (i) an installment sales agreement wherein Mortgagor agrees to sell the Property or any part thereof for a price to be paid in installments, (ii) an agreement by Mortgagor leasing all or a substantial part of the Property for other than actual occupancy by a space tenant thereunder and its affiliates or (iii) a sale, assignment or other transfer of, or the grant of a security interest in, Mortgagor's right, title and interest in and to any Leases or any Rents; or (b) any ownership interest in (i) Mortgagor or (ii) any indemnitor or guarantor of the Obligations or (iii) any corporation, partnership, limited liability company, limited partnership, trust or other entity owning, directly or indirectly, any interest in Mortgagor or any indemnitor or guarantor of any Obligations.

Section 6.4. LENDER'S RIGHTS. Without obligating Lender to grant any consent under Section 6.2 hereof, which Lender may grant or withhold in its sole discretion, Lender reserves the right to condition the consent required hereunder upon (a) a modification of the terms hereof and of the Loan Agreement, the Note or the other Loan Documents; (b) an assumption of the Loan Agreement, the Note, this Security Instrument and the other Loan Documents as so modified by the proposed transferee, subject to the provisions of the Loan Agreement; (c) payment of all of Lender's expenses incurred in connection with such Transfer; (d) the proposed transferee's continued compliance with the representations and covenants set forth in the Loan Agreement; (e) the proposed transferee's ability to satisfy Lender's then-current underwriting standards; or (f) such other conditions as Lender shall determine in its reasonable discretion to be in the interest of Lender, including, without limitation, the creditworthiness, reputation and qualifications of the transferee with respect to the Loan and the Property. Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of default hereunder in order to declare the Obligation immediately due and payable upon a Transfer without Lender's prior written consent. This provision shall apply to every Transfer, other than any Transfer permitted pursuant to the Loan Agreement, regardless of whether voluntary or not, or whether or not Lender has consented to any previous Transfer.

## ARTICLE 7 - - RIGHTS AND REMEDIES UPON DEFAULT

Section 7.1. REMEDIES. Upon the occurrence and during the continuance of any Event of Default, Mortgagor agrees that Lender may take such action, without notice or demand, as it deems advisable to protect and enforce its rights against Mortgagor and in and to the Property, including, but not limited to, the following actions, each of which may be pursued concurrently or otherwise, at such time and in such order as Lender may determine, in its sole discretion, without impairing or otherwise affecting the other rights and remedies of Lender:

     (a) declare the Obligations to be immediately due and payable;

     (b) institute proceedings, judicial or otherwise, for the complete foreclosure of this Security Instrument under any applicable provision of law, in which case the Property or any interest therein may be sold for cash or upon credit in one or more parcels or in several interests or portions and in any order or manner;

     (c) with or without entry, to the extent permitted and pursuant to the procedures provided by applicable law, institute proceedings for the partial foreclosure of this Security Instrument for the portion of the Obligations then due and payable, subject to the continuing lien and security interest of this Security Instrument for the balance of the Obligations not then due, unimpaired and without loss of priority;

     (d) sell for cash or upon credit the Property or any part thereof and all estate, claim, demand, right, title and interest of Mortgagor therein and rights of redemption thereof, pursuant to power of sale or otherwise, at one or more sales, as an entirety or in parcels, at such time and place, upon such terms and after such notice thereof as may be required or permitted by law;

*ny-1184023*

15

15047814v1 0961855

(e)     institute an action, suit or proceeding in equity for the specific performance of any covenant, condition or agreement contained herein, in the Note, in the Loan Agreement or in the other Loan Documents;

(f)     recover judgment on the Note either before, during or after any proceedings for the enforcement of this Security Instrument or the other Loan Documents;

(g)     apply for the appointment of a receiver, trustee, liquidator or conservator of the Property, without notice and without regard for the adequacy of the security for the Obligations and without regard for the solvency of Mortgagor, any guarantor, indemnitor with respect to the Loan or of any Person liable for the payment and performance of the Obligations;

(h)     the license granted to Mortgagor under Section 1.2 hereof shall automatically be revoked and Lender may enter into or upon the Property, either personally or by its agents, nominees or attorneys and dispossess Mortgagor and its agents and servants therefrom, without liability for trespass, damages or otherwise and exclude Mortgagor and its agents or servants wholly therefrom, and take possession of all books, records and accounts relating thereto and Mortgagor agrees to surrender possession of the Property and of such books, records and accounts to Lender upon demand, and thereupon Lender may (i) use, operate, manage, control, insure, maintain, repair, restore and otherwise deal with all and every part of the Property and conduct the business thereat; (ii) complete any construction on the Property in such manner and form as Lender deems advisable; (iii) make alterations, additions, renewals, replacements and improvements to or on the Property; (iv) exercise all rights and powers of Mortgagor with respect to the Property, whether in the name of Mortgagor or otherwise, including, without limitation, the right to make, cancel, enforce or modify Leases, obtain and evict tenants, and demand, sue for, collect and receive all Rents of the Property and every part thereof; (v) require Mortgagor to pay monthly in advance to Lender, or any receiver appointed to collect the Rents, the fair and reasonable rental value for the use and occupation of such part of the Property as may be occupied by Mortgagor; (vi) require Mortgagor to vacate and surrender possession of the Property to Lender or to such receiver and, in default thereof, Mortgagor may be evicted by summary proceedings or otherwise; and (vii) apply the receipts from the Property to the payment of the Obligations, in such order, priority and proportions as Lender shall deem appropriate in its sole discretion after deducting therefrom all expenses (including attorneys' fees) incurred in connection with the aforesaid operations and all amounts necessary to pay the Taxes, Insurance Premiums and other expenses in connection with the Property, as well as just and reasonable compensation for the services of Lender, its counsel, agents and employees;

(i)     exercise any and all rights and remedies granted to a secured party upon default under the Uniform Commercial Code, including, without limiting the generality of the foregoing: (i) the right to take possession of the Fixtures, the Equipment and the Personal Property, or any part thereof, and to take such other measures as Lender may deem necessary for the care, protection and preservation of the Fixtures, the Equipment and the Personal Property, and (ii) request Mortgagor at its expense to assemble the Fixtures, the Equipment and the Personal Property and make it available to Lender at a convenient place acceptable to Lender (at the Real Property if tangible property). Any notice of sale, disposition or other intended action by Lender with respect to the Fixtures, the Equipment and/or the Personal Property sent to Mortgagor in accordance with the provisions hereof at least five (5) business days prior to such

Book29580/Page3180    CFN#20150245195                          Page 17 of 35

action, shall constitute commercially reasonable notice to Mortgagor (unless a longer notice period is required by applicable law and such period cannot be waived);

(j)     apply any sums then deposited or held in escrow or otherwise by or on behalf of Lender in accordance with the terms of the Loan Agreement, this Security Instrument or any other Loan Document to the payment of the following items in any order in its uncontrolled discretion:

> (i)    Taxes;
>
> (ii)   Insurance Premiums;
>
> (iii)  Interest on the unpaid principal balance of the Note;
>
> (iv)   Amortization of the unpaid principal balance of the Note;

(v)     All other sums payable pursuant to the Note, the Loan Agreement, this Security Instrument and the other Loan Documents, including, without limitation, advances made by Lender pursuant to the terms of this Security Instrument;

(k)     pursue such other remedies as Lender may have under applicable law; or

(l)     apply the undisbursed balance of any deposit together with interest thereon, to the payment of the Obligations in such order, priority and proportions as Lender shall deem to be appropriate in its discretion.

In the event of a sale, by foreclosure, power of sale or otherwise, of less than all of the Property, this Security Instrument shall continue as a lien and security interest on the remaining portion of the Property unimpaired and without loss of priority.

Section 7.2.     APPLICATION OF PROCEEDS. The purchase money, proceeds and avails of any disposition of the Property, and or any part thereof, or any other sums collected by Lender pursuant to the Note, this Security Instrument or the other Loan Documents, may be applied by Lender to the payment of the Obligations in such priority and proportions as Lender in its discretion shall deem proper.

Section 7.3.     RIGHT TO CURE DEFAULTS. Upon the occurrence and during the continuance of any Event of Default or if Mortgagor fails to make any payment or to do any act as herein provided, Lender may, but without any obligation to do so and without notice to or demand on Mortgagor, and without releasing Mortgagor from any obligation hereunder, make or do the same in such manner and to such extent as Lender may deem necessary to protect the security hereof. Lender is authorized to enter upon the Property for such purposes, or appear in, defend, or bring any action or proceeding to protect its interest in the Property or to foreclose this Security Instrument or collect the Obligations, and the cost and expense thereof (including attorneys' fees to the extent permitted by law), with interest as provided in this Section 7.3, shall constitute a portion of the Obligations and shall be due and payable to Lender upon demand. All such costs and expenses incurred by Lender in remedying such Event of Default or such failed payment or act or in appearing in, defending, or bringing any such action or proceeding shall

*ny-1184023*

17

15047814v1 0961855

bear interest at the Default Rate, for the period after notice from Lender that such cost or expense was incurred to the date of payment to Lender. All such costs and expenses incurred by Lender together with interest thereon calculated at the Default Rate shall be deemed to constitute a portion of the Obligations and be secured by this Security Instrument and the other Loan Documents and shall be immediately due and payable upon demand by Lender therefor.

Section 7.4.    ACTIONS AND PROCEEDINGS. Lender has the right to appear in and defend any action or proceeding brought with respect to the Property and to bring any action or proceeding, in the name and on behalf of Mortgagor, which Lender, in its discretion, decides should be brought to protect its interest in the Property.

Section 7.5.    RECOVERY OF SUMS REQUIRED TO BE PAID. Lender shall have the right from time to time to take action to recover any sum or sums which constitute a part of the Obligations as the same become due, without regard to whether or not the balance of the Obligations shall be due, and without prejudice to the right of Lender thereafter to bring an action of foreclosure, or any other action, for a default or defaults by Mortgagor existing at the time such earlier action was commenced.

Section 7.6.    INTENTIONALLY OMITTED.

Section 7.7.    OTHER RIGHTS, ETC. (a) The failure of Lender to insist upon strict performance of any term hereof shall not be deemed to be a waiver of any term of this Security Instrument. Mortgagor shall not be relieved of Mortgagor's obligations hereunder by reason of (i) the failure of Lender to comply with any request of Mortgagor or any guarantor or indemnitor with respect to the Loan to take any action to foreclose this Security Instrument or otherwise enforce any of the provisions hereof or of the Note or the other Loan Documents, (ii) the release, regardless of consideration, of the whole or any part of the Property, or of any person liable for the Obligations or any portion thereof, or (iii) any agreement or stipulation by Lender extending the time of payment or otherwise modifying or supplementing the terms of the Note, this Security Instrument or the other Loan Documents.

(b)    It is agreed that the risk of loss or damage to the Property is on Mortgagor, and Lender shall have no liability whatsoever for decline in value of the Property, for failure to maintain the Policies, or for failure to determine whether insurance in force is adequate as to the amount of risks insured. Possession by Lender shall not be deemed an election of judicial relief, if any such possession is requested or obtained, with respect to any Property or collateral not in Lender's possession.

(c)    Lender may resort for the payment of the Obligations to any other security held by Lender in such order and manner as Lender, in its discretion, may elect. Lender may take action to recover the Obligations, or any portion thereof, or to enforce any covenant hereof without prejudice to the right of Lender thereafter to foreclose this Security Instrument. The rights of Lender under this Security Instrument shall be separate, distinct and cumulative and none shall be given effect to the exclusion of the others. No act of Lender shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision. Lender shall not be limited exclusively to the rights and remedies herein stated but shall be entitled to every right and remedy now or hereafter afforded at law or in equity.

*ny-1184023*

18

15047814v1 0961855

Section 7.8.    RIGHT TO RELEASE ANY PORTION OF THE PROPERTY.    Lender may release any portion of the Property for such consideration as Lender may require without, as to the remainder of the Property, in any way impairing or affecting the lien or priority of this Security Instrument, or improving the position of any subordinate lienholder with respect thereto, except to the extent that the Obligations shall have been reduced by the actual monetary consideration, if any, received by Lender for such release, and may accept by assignment, pledge or otherwise any other property in place thereof as Lender may require without being accountable for so doing to any other lienholder.  This Security Instrument shall continue as a lien and security interest in the remaining portion of the Property.

Section 7.9.    VIOLATION OF LAWS.    If the Property is not in material compliance with Legal Requirements, Lender may impose additional requirements upon Mortgagor in connection herewith including, without limitation, monetary reserves or financial equivalents.

Section 7.10.    RECOURSE AND CHOICE OF REMEDIES.    Notwithstanding    any    other provision of this Security Instrument or the Loan Agreement, Lender and other Indemnified Parties (as hereinafter defined) are entitled to enforce the obligations of Mortgagor and any guarantor and indemnitor without first resorting to or exhausting any security or collateral and without first having recourse to the Note or any of the Property, through foreclosure or acceptance of a deed in lieu of foreclosure or otherwise, and in the event Lender commences a foreclosure action against the Property, Lender is entitled to pursue a deficiency judgment with respect to such obligations against Mortgagor and any guarantor or indemnitor with respect to the Loan.  A separate action or actions may be brought and prosecuted against Mortgagor pursuant to Sections 9.2 and 9.3 herein, whether or not action is brought against any other Person or whether or not any other Person is joined in the action or actions.  In addition, Lender shall have the right but not the obligation to join and participate in, as a party if it so elects, any administrative or judicial proceedings or actions initiated in connection with any matter addressed in the Environmental Indemnity.

Section 7.11.    RIGHT OF ENTRY.    Upon reasonable notice to Mortgagor, Lender and its agents shall have the right to enter and inspect the Property at all reasonable times.

## ARTICLE 8 - – CASUALTY AND CONDEMNATION

Section 8.1.    Casualty and Condemnation.

(a)    If the Property shall be damaged or destroyed, in whole or in part, by fire or other casualty (a "**Casualty**") or if Mortgagor shall have knowledge of the actual or threatened commencement of any condemnation or eminent domain proceeding that would affect any portion of the Real Property (a "**Condemnation**"), Mortgagor shall give prompt written notice thereof to Lender and, with respect to a Condemnation, shall deliver to Lender copies of any and all papers served in connection with such Condemnation.

(b)    Lender may participate in any proceedings for any taking by any public or quasi-public authority accomplished through a Condemnation or any transfer made in lieu of or in anticipation of a Condemnation (which transfer in lieu and Condemnation are collectively referred to as a "**Taking**") to the extent permitted by law.  Upon Lender's written request,

*ny-1184023*                                    19

Mortgagor shall deliver to Lender all instruments requested by it to permit such participation. Mortgagor shall, at its expense, diligently prosecute any such proceedings, and shall consult with Lender, its attorneys and experts, and cooperate with them in the carrying on or defense of any such proceedings. Mortgagor shall not consent or agree to a Taking without the prior written consent of Lender in each instance.

(c)     Subject to the terms of Section 8.2, all insurance proceeds payable under the Policies, all insurance proceeds payable to Mortgagor under any Condominium Board Policy and all awards or payments payable on account of a Taking ("**Award**"), and all causes of action, claims, compensation, awards and recoveries for any other damage, injury, or loss or diminution in value of the Real Property, are hereby assigned, transferred and set over to and shall be paid to Lender. Mortgagor agrees to execute and deliver from time to time such further instruments as may be reasonably requested by Lender to confirm the foregoing assignment to Lender. Mortgagor hereby irrevocably constitutes and appoints Lender as the attorney-in-fact of Mortgagor (which power of attorney shall be irrevocable so long as any of the Obligations is outstanding, shall be deemed coupled with an interest, and shall survive the voluntary or involuntary dissolution of Mortgagor), with full power of substitution, subject to the terms of Section 8.2, to settle for, collect and receive all proceeds of insurance and any Award and any other awards, damages, insurance proceeds, payments or other compensation from the parties or authorities making the same, to appear in and prosecute any proceedings therefor and to give receipts and acquittance therefor; provided that Lender shall not exercise such power of attorney except either when an Event of Default exists or when Mortgagor has failed to take any of the actions described in this sentence after a reasonable period of time has passed following receipt of written notice from Lender of its intent to use such power to take the action.

(d)     If Lender applies an Award to the Obligations in accordance with Section 8.2, Lender shall be entitled to allocate out of the Award for the purpose of paying accrued unpaid interest on the Note interest at the rate or rates provided in the Note and shall not be limited to the interest paid on an Award by the condemning authority. Mortgagor shall use all commercially reasonable efforts to cause any Award that is payable to Mortgagor to be paid directly to Lender, and if any such Award is nevertheless paid to Mortgagor, Mortgagor shall promptly remit such Award to Lender to be held and applied in accordance with the terms of this Security Instrument. If the Real Property is sold, through foreclosure or deed-in-lieu thereof, prior to the receipt by Lender of the Award, Lender shall have the right, whether or not a deficiency judgment on the Note (to the extent permitted in the Note or herein) shall have been sought, recovered or denied, to receive the Award, or a portion thereof, to the extent sufficient to pay the unpaid portion, if any, of the Obligations.

(e)     The reasonable, actual out-of-pocket expenses incurred by Lender in the adjustment and collection of the proceeds of insurance or an Award shall become part of the Obligations and be secured hereby and shall be reimbursed by Mortgagor to Lender within ten (10) days after written demand or, at Lender's election, deducted by and reimbursed to Lender from such proceeds.

*ny-1184023*                                      20

Section 8.2.   USE OF PROCEEDS OF INSURANCE OR AWARD.   (a) In case of loss or damages covered by any of the Policies (and all insurance proceeds payable to Mortgagor under any Condominium Board Policy) and in case of an Award for any Taking, the following provisions shall apply:

(i)   In the event of a Casualty that does not exceed five percent (5%) of the FMV (as hereinafter defined) of the Real Property, Mortgagor may settle and adjust any claim without the consent of Lender and agree with the insurance company or companies on the amount to be paid upon the loss; provided that such adjustment is carried out in a competent and timely manner.  In such case, Mortgagor is hereby authorized to collect and receive any such insurance proceeds.  As used in this Section 8.2, the term "**FMV**" means the fair market value of the Real Property as set forth in the appraisal relied upon by Lender as of the date hereof or any subsequent Qualifying Appraisal.  As used in this Security Instrument, the term "**Qualifying Appraisal**" means an appraisal report of the Real Property prepared by an appraiser licensed in the State in which the Real Property is located and who has at least five (5) years' experience in appraising Land similar to the Real Property in the county in which the Real Property is located, which satisfies the criteria for appraisals that may be relied upon by national banks under applicable Federal laws, rules and regulations, which contains both an "as-is" and a "stabilized value" estimate, and which is otherwise reasonably satisfactory to Lender.

(ii)   In the event of a Casualty that exceeds five percent (5%) but does not exceed ten percent (10%) of the FMV of the Real Property, then and in that event Lender may settle and adjust any claim, provided, however, that any final agreement with the insurance company or companies of the amount to be paid for the Casualty shall be subject to the approval of Mortgagor as hereinafter provided, such approval not to be unreasonably withheld, delayed or conditioned.  In any such case, the proceeds under the Policies shall be due and payable solely to Lender and held in escrow by Lender in accordance with the terms of this Security Instrument.  Mortgagor shall have the right to participate in the settlement discussions with the applicable insurance company or companies, or applicable authorities, and Lender shall keep Mortgagor apprised of all material settlement offers and discussions and the results thereof.  Lender shall provide ten (10) business days advance written notice to Mortgagor of the terms and amount of any proposed final agreement on any such claim (such proposed final amount, the "**Lender Approved Settlement Amount**").  If Mortgagor disapproves of Lender's settlement of the claim on such terms and at such amount, Mortgagor must furnish written notice of such disapproval (any such notice, an "**Arbitration Notice**") to Lender within ten (10) business days after Mortgagor's receipt of Lender's notice, such notice of disapproval by Mortgagor to state Mortgagor's election to implement the arbitration procedure set forth in this Section 8.2.  Mortgagor's failure to furnish notice of disapproval prior to the expiration of such ten (10) business day period shall constitute and be deemed Mortgagor's consent and approval to Lender's settlement of the applicable claim for an amount not less than the Lender Approved Settlement Amount.

(iii)   In the event of a Casualty that exceeds ten percent (10%) of the FMV of the Real Property, Lender may settle and adjust any claim related thereto without the consent of Mortgagor and agree with the insurance company or companies on the amount to be paid on the loss, and the proceeds of any such policy shall be due and payable solely to Lender and held in escrow by Lender in accordance with the terms of this Security Instrument.

*ny-1184023*

21

15047814v1 0961855

(iv)    In the event of (A) a Taking for which the Award is equal to or less than fifteen percent (15%) of the FMV of the Real Property or the Taking renders fifteen percent (15%) or less of the rentable square feet of the Improvements untenantable or (B) in the event of a Casualty where the loss is in an aggregate amount equal to or less than thirty percent (30%) of the FMV of the Real Property or the Casualty renders thirty percent (30%) or less of the rentable square feet of the Improvements untenantable, and (1) no Event of Default or an event which with notice and/or the passage of time would constitute an Event of Default exists and (2) in the reasonable judgment of Lender (i) the Real Property can be restored in all material respects to the condition thereof that existed prior to the Casualty or Taking within the time period that business income interruption insurance will be payable under the coverage obtained by Mortgagor pursuant to Section 3.3 above and in all events not less than six (6) months prior to the stated Maturity Date, (ii)(x) as restored the FMV of and the net income (i.e., gross revenues less all customary and regular operating expenses, including debt service) from the Real Property will not be less than the FMV of and net income from the Real Property that existed immediately prior to the Casualty or Taking or (y) Leases covering in the aggregate not less than sixty-five percent (65%) of the rentable square feet of the Improvements will be in full force and effect during and upon completion of the Repair Work (as hereinafter defined), (iii) all necessary government approvals will be obtained to allow the rebuilding and reoccupancy of the Improvements, and (iv) there are sufficient sums available (through insurance proceeds, the Award and contributions by Mortgagor, the full amount of which contribution shall at Lender's option have been deposited with Lender) for the Repair Work (including, without limitation, for any reasonable costs and expenses of Lender to be incurred in administering the Repair Work) and for payment of the Obligations as it becomes due and payable during the Repair Work, then, and only then, the proceeds of insurance or of the Award (after reimbursement of any expenses incurred by Lender) shall be applied in the manner set forth below and disbursed to Mortgagor for the cost of restoring, repairing, replacing or rebuilding (collectively the "**Repair Work**") the Real Property or part thereof subject to the Casualty or Taking. Mortgagor hereby covenants and agrees to commence and diligently to prosecute the Repair Work; provided always, that Mortgagor shall pay all costs (and if required by Lender, Mortgagor shall deposit the total thereof with Lender in advance) of the Repair Work in excess of the net proceeds of insurance or Award made available pursuant to the terms hereof.

(v)     Except as otherwise provided in this Security Instrument, in the event of any Casualty or Taking Lender may elect in its absolute sole discretion and without regard to the adequacy of the security for the Obligations, to (A) apply the proceeds of insurance collected upon any Casualty or Award collected upon any Taking to the payment of the Obligations in accordance with the Note, and the Loan Agreement with or without accelerating the Maturity Date of the Note and declaring the entire outstanding Obligations to be immediately due and payable, or (B) hold the insurance proceeds or Award proceeds and make them available to Mortgagor for the cost of the Repair Work in the manner set forth below.

(vi)    In the event Mortgagor is either entitled to disbursements from the insurance proceeds or Award proceeds held by Lender or Lender elects to make such proceeds available to Mortgagor for the Repair Work, such proceeds shall be disbursed to Mortgagor for costs and expenses incurred by Mortgagor for the Repair Work following (A) the receipt by Lender of a written request from Mortgagor for disbursement and a certification by Mortgagor to Lender that the applicable portion of the Repair Work has been completed or will be completed

*ny-1184023*                                    22                                    15047814v1 0961855

with the proceeds of the subject disbursement, (B) the delivery to Lender of invoices, receipts or other evidence verifying the cost of performing the applicable portion of the Repair Work, and (C) for disbursement requests in excess of $10,000.00 with respect to any single portion of the Repair Work, or for any single portion of the Repair Work that is structural in nature, delivery to Lender of (1) affidavits, conditional lien waivers or other evidence reasonably satisfactory to Lender showing that all materialmen, laborers, subcontractors and any other parties who might or could claim statutory or common law liens and are furnishing or have furnished material or labor to the Real Property have been, or upon receipt of the payment described in such affidavit or conditional lien waiver will have been, paid all amounts due for labor and materials furnished to the Real Property through the date covered by such draw request, less any retainage, and (2) a certification from an inspecting architect or other third party reasonably acceptable to Lender describing the completed portion of the Repair Work and verifying its completion and cost. Lender shall not be required to make any such advances more frequently than one time in any calendar month. Lender may, in any event, require that all plans and specifications for the Repair Work be submitted to and approved by Lender prior to commencement of the Repair Work, which approval shall not be unreasonably withheld, delayed or conditioned. In no event shall Lender assume any duty or obligation for the adequacy, form or content of any such plans and specifications, nor for the performance, quality or workmanship of any Repair Work. With respect to disbursements to be made by Lender, no payment made prior to the final completion of the Repair Work shall exceed ninety percent (90%) of the cost of the Repair Work performed from time to time (except that a contractor or subcontractor may be paid its share of any retainage upon such contractor's or subcontractor's completion of its entire portion of the Repair Work and its execution and delivery to Mortgagor (with copies to Lender) of all applicable lien waivers and/or lien releases); funds other than proceeds of insurance or the Award shall be disbursed prior to disbursement of such proceeds; and at all times, the undisbursed balance of such proceeds remaining in the hands of Lender, together with funds deposited for that purpose or irrevocably committed to the satisfaction of Lender by or on behalf of Mortgagor for that purpose, shall be at least sufficient in the reasonable judgment of Lender to pay for the cost of completion of the Repair Work, free and clear of all liens or claims for lien. Any surplus which may remain out of the proceeds of insurance or Award held by Lender after payment of the costs of the Repair Work shall be paid to Mortgagor or, if an Event of Default exists, shall in the sole and absolute discretion of Lender, be retained by Lender and applied to payment of the Obligations or paid to the party or parties legally entitled to such surplus.

(vii)    If Mortgagor delivers an Arbitration Notice to Lender, Mortgagor and Lender shall, within five (5) business days after Lender's receipt of any such notice, jointly designate an independent and unaffiliated individual who has not less than ten (10) years experience with respect to settlement of claims resulting from casualties in respect of properties similar to the Real Property. Not later than five (5) business days after such joint designation of such individual, Mortgagor and Lender shall submit to such individual their separate determinations of the commercially reasonable settlement amount for the applicable Casualty together with any documentation and other backup therefor and shall simultaneously therewith provide a copy of such submission to the other party. The individual so appointed shall review the applicable submissions and within ten (10) days after such individual's designation either select one of the submitted settlement amounts or an amount in between the submitted settlement amounts as more accurately reflective of the commercially reasonable settlement amount. Notice of such selection shall be furnished to Mortgagor and Lender by the applicable individual

prior to the expiration of such ten-day period. Upon such selection, Lender shall be authorized to settle the applicable claim for an amount not less than the settlement amount so selected without any further right of consent of Mortgagor.

(viii)  In the event that Mortgagor and Lender are unable to agree on one individual to act as arbitrator within the five (5) business day period following Lender's receipt of the Arbitration Notice as contemplated under Section 8.2(a)(vii) above, then, in such case, the procedure set forth in this subsection (viii) shall be observed in lieu thereof. Not later than five (5) business days after Lender's receipt of an Arbitration Notice, Mortgagor and Lender shall each designate an independent and unaffiliated individual who has not less than ten (10) years experience with respect to settlement of claims resulting from casualties in respect of properties similar to the Real Property and notify the other party of such appointment by identifying the appointee. Not later than five (5) business days after both arbitrators are appointed, the two selected arbitrators shall select a third arbitrator who shall also be an independent and unaffiliated individual who has not less than ten (10) years experience with respect to settlement of claims resulting from casualties in respect of properties similar to the Real Property, such selection to take place within five (5) business days after such arbitrator's appointment. Mortgagor and Lender shall submit to such third arbitrator their separate determinations of the commercially reasonable settlement amount together with any documentation and other backup therefor and shall simultaneously therewith provide a copy of such submission to the other party. The third arbitrator so appointed shall review the applicable submissions and within ten (10) days after such individual's designation either select one of the submitted settlement amounts or an amount in between the submitted settlement amounts as more accurately reflective of the commercially reasonable settlement amount. Notice of such selection shall be furnished to Mortgagor and Lender by the applicable individual prior to the expiration of such ten-day period. Upon such selection, Lender shall be authorized to settle the applicable claim for an amount not less than the settlement amount so selected without any further right of consent of Mortgagor.

(ix)  Time shall be of the essence with respect to the performance of any and all rights and obligations under this Section 8.2. The decisions of the arbitrator(s), if any, engaged under this Section 8.2, shall be final and binding and may not be appealed to any court of competent jurisdiction or otherwise except upon a claim of fraud or corruption. All of the reasonable, actual costs and expenses of the arbitrator(s), if any, engaged under this Section 8.2, shall be the sole responsibility of Mortgagor.

(x)  Notwithstanding anything to the contrary contained herein, the proceeds of insurance or Award disbursed to Mortgagor in accordance with the terms and provisions of this Security Instrument shall be reduced by the reasonable costs (if any) incurred by Lender in the adjustment and collection thereof and by the reasonable costs incurred by Lender of paying out such proceeds (including, without limitation, reasonable attorneys' fees and costs paid to third parties for inspecting the Repair Work and reviewing the plans and specifications therefor).

(b)  If Mortgagor undertakes the Repair Work, Mortgagor shall promptly and diligently, at Mortgagor's sole cost and expense and regardless of whether the insurance proceeds or Award, as applicable, shall be sufficient for the purpose, complete the Repair Work

*ny-1184023*                                                  24

15047814v1 0961855

to restore the Real Property as nearly as possible to its value, condition and character immediately prior to the Casualty or Taking in accordance with the foregoing provisions.

(c)     Any partial reduction in the Obligations resulting from Lender's application of any sums received by it under this Section 8.2 shall take effect only when Lender actually receives such sums and elects to apply such sums to the Obligations and, in any event, the unpaid portion of the Obligations shall remain in full force and effect and Mortgagor shall not be excused in the payment thereof. Partial payments received by Lender, as described in the preceding sentence, shall be applied against the Note consistent with the prepayment provisions described therein for casualty or condemnation proceeds.

## ARTICLE 9 - - INDEMNIFICATION

Section 9.1.     GENERAL INDEMNIFICATION.     Mortgagor shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, costs, expenses, diminutions in value, fines, penalties, charges, fees, expenses, judgments, awards, amounts paid in settlement, punitive damages, foreseeable and unforeseeable consequential damages, of whatever kind or nature (including but not limited to reasonable attorneys' fees and other costs of defense) (collectively, the "**Losses**") imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any one or more of the following: (a) ownership of this Security Instrument, the Property or any interest therein or receipt of any Rents; (b) any amendment to, or restructuring of, the Obligations, and the Note, the Loan Agreement, this Security Instrument, or any other Loan Documents; (c) any and all lawful action that may be taken by Lender in connection with the enforcement of the provisions of this Security Instrument or the Loan Agreement or the Note or any of the other Loan Documents, whether or not suit is filed in connection with same, or in connection with Mortgagor, any guarantor or indemnitor and/or any partner, joint venturer or shareholder thereof becoming a party to a voluntary or involuntary federal or state bankruptcy, insolvency or similar proceeding; (d) any accident, injury to or death of persons or loss of or damage to property occurring in, on or about the Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (e) any use, nonuse or condition in, on or about the Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (f) any material failure on the part of Mortgagor to perform or be in compliance with any of the terms of this Security Instrument; (g) performance of any labor or services or the furnishing of any materials or other property in respect of the Property or any part thereof; (h) the failure of any person to file timely with the Internal Revenue Service an accurate Form 1099-B, Statement for Recipients of Proceeds from Real Estate, Broker and Barter Exchange Transactions, which may be required in connection with this Security Instrument, or to supply a copy thereof in a timely fashion to the recipient of the proceeds of the transaction in connection with which this Security Instrument is made; (i) any failure of the Property to be in compliance with any Legal Requirements; (j) the enforcement by any Indemnified Party of the provisions of this Article 9; (k) any and all claims and demands whatsoever which may be asserted against Lender by reason of any alleged obligations or undertakings on its part to perform or discharge any of the terms, covenants, or agreements contained in any Lease; (l) the payment of any commission, charge or brokerage fee to anyone claiming through Mortgagor

*ny-1184023*                                         25                                         15047814v1 0961855

which may be payable in connection with the funding of the Loan; or (m) any misrepresentation made by Mortgagor in this Security Instrument or any other Loan Document. Any amounts payable to Lender by reason of the application of this Section 9.1 shall become immediately due and payable and shall bear interest at the Default Rate from the date loss or damage is sustained by Lender until paid. For purposes of this Article 9, the term "**Indemnified Parties**" means Lender and any Person who is or will have been involved in the origination of the Loan, any Person who is or will have been involved in the servicing of the Loan secured hereby, any Person in whose name the encumbrance created by this Security Instrument is or will have been recorded, persons and entities who may hold or acquire or will have held a full or partial interest in the Loan secured hereby (including, but not limited to, investors or prospective investors in the Securities, as well as custodians, trustees and other fiduciaries who hold or have held a full or partial interest in the Loan secured hereby for the benefit of third parties) as well as the respective directors, officers, shareholders, partners, employees, agents, servants, representatives, contractors, subcontractors, affiliates, subsidiaries, participants, successors and assigns of any and all of the foregoing (including but not limited to any other Person who holds or acquires or will have held a participation or other full or partial interest in the Loan, whether during the term of the Loan or as a part of or following a foreclosure of the Loan and including, but not limited to, any successors by merger, consolidation or acquisition of all or a substantial portion of Lender's assets and business).

Section 9.2.    MORTGAGE AND/OR INTANGIBLE TAX.    Mortgagor shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any tax on the making and/or recording of this Security Instrument, the Note or any of the other Loan Documents, but excluding any income, franchise or other similar taxes.

Section 9.3.    ERISA INDEMNIFICATION.    Mortgagor shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses (including, without limitation, reasonable attorneys' fees and costs incurred in the investigation, defense, and settlement of Losses incurred in correcting any prohibited transaction or in the sale of a prohibited loan, and in obtaining any individual prohibited transaction exemption under ERISA that may be required, in Lender's sole discretion) that Lender may incur, directly or indirectly, as a result of a default under Section 4.12 of the Loan Agreement.

Section 9.4.    Intentionally Omitted

Section 9.5.    DUTY TO DEFEND; ATTORNEYS' FEES AND OTHER FEES AND     EXPENSES. Upon written request by any Indemnified Party, Mortgagor shall defend such Indemnified Party (if requested by any Indemnified Party, in the name of the Indemnified Party) by attorneys and other professionals approved by the Indemnified Parties. Notwithstanding the foregoing, if the defendants in any such claim or proceeding include both Mortgagor and any Indemnified Party and Mortgagor and such Indemnified Party shall have reasonably concluded that there are any legal defenses available to it and/or other Indemnified Parties that are different from or additional to those available to Mortgagor, such Indemnified Party shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such action on

*ny-1184023*

15047814v1 0961855

behalf of such Indemnified Party, provided that no compromise or settlement shall be entered without Mortgagor's consent, which consent shall not be unreasonably withheld. Upon demand, Mortgagor shall pay or, in the sole and absolute discretion of the Indemnified Parties, reimburse, the Indemnified Parties for the payment of reasonable fees and disbursements of attorneys, engineers, environmental consultants, laboratories and other professionals in connection therewith.

## ARTICLE 10 - - WAIVERS

Section 10.1. WAIVER OF COUNTERCLAIM. To the extent permitted by applicable law, Mortgagor hereby waives the right to assert a counterclaim, other than a mandatory or compulsory counterclaim, in any action or proceeding brought against it by Lender arising out of or in any way connected with this Security Instrument, the Loan Agreement, the Note, any of the other Loan Documents, or the Obligations.

Section 10.2. MARSHALLING AND OTHER MATTERS. To the extent permitted by applicable law, Mortgagor hereby waives the benefit of all appraisement, valuation, stay, extension, reinstatement and redemption laws now or hereafter in force and all rights of marshalling in the event of any sale hereunder of the Property or any part thereof or any interest therein. Further, Mortgagor hereby expressly waives any and all rights of redemption from sale under any order or decree of foreclosure of this Security Instrument on behalf of Mortgagor, and on behalf of each and every Person acquiring any interest in or title to the Property subsequent to the date of this Security Instrument and on behalf of all persons to the extent permitted by applicable law.

Section 10.3. WAIVER OF NOTICE. To the extent permitted by applicable law, Mortgagor shall not be entitled to any notices of any nature whatsoever from Lender except with respect to matters for which this Security Instrument or the other Loan Documents specifically and expressly provides for the giving of notice by Lender to Mortgagor and except with respect to matters for which Lender is required by applicable law to give notice, and Mortgagor hereby expressly waives the right to receive any notice from Lender with respect to any matter for which this Security Instrument does not specifically and expressly provide for the giving of notice by Lender to Mortgagor.

Section 10.4. WAIVER OF STATUTE OF LIMITATIONS. To the extent permitted by applicable law, Mortgagor hereby expressly waives and releases to the fullest extent permitted by law, the pleading of any statute of limitations as a defense to payment or performance of the Obligations.

Section 10.5. SURVIVAL. The indemnifications made pursuant to Section 9.3 herein and the representations and warranties, covenants, and other obligations arising under the Environmental Indemnity, shall continue indefinitely in full force and effect and shall survive and shall in no way be impaired by: any satisfaction, release or other termination of this Security Instrument, any assignment or other transfer of all or any portion of this Security Instrument, the Note or Lender's interest in the Property (but, in such case, shall benefit both Indemnified Parties and any assignee or transferee), any exercise of Lender's rights and remedies pursuant hereto, including, but not limited to, foreclosure or acceptance of a deed in lieu of foreclosure, any

*ny-1184023*                                  27                              15047814v1 0961855

exercise of any rights and remedies pursuant to the Loan Agreement, the Note or any of the other Loan Documents, any transfer of all or any portion of the Property (whether by Mortgagor or by Lender following foreclosure or acceptance of a deed in lieu of foreclosure or at any other time), any amendment to this Security Instrument, the Loan Agreement, the Note or the other Loan Documents, and any act or omission that might otherwise be construed as a release or discharge of Mortgagor from the obligations pursuant hereto.

## ARTICLE 11 - - INTENTIONALLY OMITTED

## ARTICLE 12 - - NOTICES

All notices or other written communications hereunder shall be delivered in accordance with Section 8.12 of the Loan Agreement.

## ARTICLE 13 - - APPLICABLE LAW

Section 13.1.  GOVERNING LAW.  (A) THIS SECURITY INSTRUMENT WAS NEGOTIATED IN THE STATE OF NEW YORK, AND ACCEPTED BY LENDER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE NOTE SECURED HEREBY WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS SECURITY INSTRUMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT LAWS OTHER THAN SECTION 5.1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION, AND ENFORCEMENT OF THE LIENS AND SECURITY INTERESTS CREATED PURSUANT HERETO AND PURSUANT TO THE OTHER LOAN DOCUMENTS WITH RESPECT TO THE PROPERTY SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE STATE IN WHICH THE PROPERTY IS LOCATED, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, THE LAW OF THE STATE OF NEW YORK SHALL GOVERN THE CONSTRUCTION, VALIDITY AND ENFORCEABILITY OF ALL LOAN DOCUMENTS AND ALL OF THE OBLIGATIONS ARISING HEREUNDER OR THEREUNDER.  TO THE FULLEST EXTENT PERMITTED BY LAW, MORTGAGOR HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS SECURITY INSTRUMENT OR THE OTHER LOAN DOCUMENTS.

(B)     ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR MORTGAGOR ARISING OUT OF OR RELATING TO THIS SECURITY INSTRUMENT MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL

*ny-1184023*

28

15047814v1 0961855

OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, AND MORTGAGOR WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND MORTGAGOR HEREBY IRREVOCABLY SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. NOTWITHSTANDING THE FOREGOING, HOWEVER, ANY ACTION TO FORECLOSE THIS MORTGAGE MAY ONLY BE FILED IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT, IN AND FOR MIAMI-DADE COUNTY, FLORIDA OR THE FEDERAL COURTS LOCATED IN MIAMI-DADE COUNTY, FLORIDA.

Section 13.2. USURY LAWS. Notwithstanding anything to the contrary, (a) all agreements and communications between Mortgagor and Lender are hereby and shall automatically be limited so that, after taking into account all amounts deemed interest, the interest contracted for, charged or received by Lender shall never exceed the maximum lawful rate or amount, (b) in calculating whether any interest exceeds the lawful maximum, all such interest shall be amortized, prorated, allocated and spread over the full amount and term of all principal Obligations of Mortgagor to Lender, and (c) if through any contingency or event, Lender receives or is deemed to receive interest in excess of the lawful maximum, any such excess shall be deemed to have been applied toward payment of the principal of any and all then outstanding Obligations of Mortgagor to Lender, or if there is no such Obligations, shall immediately be returned to Mortgagor.

Section 13.3. PROVISIONS SUBJECT TO APPLICABLE LAW. All rights, powers and remedies provided in this Security Instrument may be exercised only to the extent that the exercise thereof does not violate any applicable provisions of law and are intended to be limited to the extent necessary so that they will not render this Security Instrument invalid, unenforceable or not entitled to be recorded, registered or filed under the provisions of any applicable law. If any term of this Security Instrument or any application thereof shall be invalid or unenforceable, the remainder of this Security Instrument and any other application of the term shall not be affected thereby.

## ARTICLE 14 - - DEFINITIONS

All capitalized terms not defined herein shall have the respective meanings set forth in the Loan Agreement. Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, words used in this Security Instrument may be used interchangeably in singular or plural form and the word "**Mortgagor**" shall mean "each Mortgagor and any subsequent owner or owners of the Property or any part thereof or any interest therein," the word "**Lender**" shall mean "Lender and any subsequent holder of the Note," the word "**Note**" shall mean "the Note and any other evidence of the Obligations secured by this Security Instrument," the word "**Property**" shall include any portion of the Property and any interest therein, and the phrases "**attorneys' fees**", "**legal fees**" and "**counsel fees**" shall include any and all attorneys', paralegal and law clerk fees and disbursements, including, but not limited to, fees and

*ny-1184023*                                         29

15047814v1 0961855

disbursements at the pre-trial, trial and appellate levels incurred or paid by Lender in protecting its interest in the Property, the Leases and the Rents and enforcing its rights hereunder.

## ARTICLE 15 - - MISCELLANEOUS PROVISIONS

Section 15.1. No ORAL CHANGE. This Security Instrument, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Mortgagor or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

Section 15.2. SUCCESSORS AND ASSIGNS. This Security Instrument shall be binding upon and inure to the benefit of Mortgagor and Lender and their respective successors and assigns forever.

Section 15.3. INAPPLICABLE PROVISIONS. If any term, covenant or condition of the Loan Agreement, the Note, this Security Instrument or the other Loan Documents is held to be invalid, illegal or unenforceable in any respect, the Loan Agreement, the Note, this Security Instrument or the other Loan Documents shall be construed without such provision.

Section 15.4. HEADINGS, ETC. The headings and captions of various Sections of this Security Instrument are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

Section 15.5. NUMBER AND GENDER. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

Section 15.6. SUBROGATION. If any or all of the proceeds of the Note have been used to extinguish, extend or renew any obligations or indebtedness heretofore existing against the Property, then, to the extent of the funds so used, Lender shall be subrogated to all of the rights, claims, liens, titles, and interests existing against the Property heretofore held by, or in favor of, the holder of such obligations or indebtedness and such former rights, claims, liens, titles, and interests, if any, are not waived but rather are continued in full force and effect in favor of Lender and are merged with the lien and security interests created herein as cumulative security for the payment and performance of the Obligations.

Section 15.7. ENTIRE AGREEMENT. The Note, the Loan Agreement, this Security Instrument and the other Loan Documents constitute the entire understanding and agreement between Mortgagor and Lender with respect to the transactions arising in connection with the Obligations and supersede all prior written or oral understandings and agreements between Mortgagor and Lender with respect thereto. Mortgagor hereby acknowledges that, except as incorporated in writing in the Note, the Loan Agreement, this Security Instrument and the other Loan Documents, there are not, and were not, and no Persons are or were authorized by Lender to make, any representations, understandings, stipulations, agreements or promises, oral or written, with respect to the transaction which is the subject of the Note, the Loan Agreement, this Security Instrument and the other Loan Documents.

*ny-1184023*                                                    30                                    15047814v1 0961855

Section 15.8. LIMITATION ON LENDER'S RESPONSIBILITY. No provision of this Security Instrument shall operate to place any obligation or liability for the control, care, management or repair of the Property upon Lender, nor shall it operate to make Lender responsible or liable for any waste committed on the Property by the tenants or any other Person, or for any dangerous or defective condition of the Property, or for any negligence in the management, upkeep, repair or control of the Property resulting in loss or injury or death to any tenant, licensee, employee or stranger. Nothing herein contained shall be construed as constituting Lender a "mortgagee in possession."

Section 15.9. Liability. The obligations and liabilities of each Mortgagor hereunder shall be joint and several.

## ARTICLE 16 - - STATE-SPECIFIC PROVISIONS

Section 16.1   ASSIGNMENT OF RENTS. The following language is added to Section 1.2 of this Security Instrument:

> The assignment of rents contained in this Security Instrument, together with the assignment in the Assignment of Leases and Rents from Mortgagor to Lender executed simultaneously with this Security Instrument, are intended to and do constitute an assignment of rents as contemplated in Florida Statutes Section 697.07. Upon the occurrence of an Event of Default, Lender shall be entitled to the remedies provided in said Section 697.07, in addition to all rights and remedies, whether procedural or substantive, in effect at the time of execution or enforcement of this Security Instrument.

Section 16.2   INCORPORATION BY REFERENCE. The text of Section 3.2 is hereby deleted and replaced with the following:

All the covenants, conditions and agreements contained in any and all documents other than the Note or this Security Instrument now or hereafter executed by Mortgagor and/or others and by or in favor of Lender, which wholly or partially secure or guaranty payment of the Note, are hereby made a part of this Security Instrument to the same extent and with the same force as if fully set forth herein.

Section 16.3   INTANGIBLES TAX AND DOCUMENTARY STAMPS TAX. The words ", including, but not limited to, the Florida nonrecurring intangibles tax and the Florida documentary stamp tax" are hereby added to Section 9.2 immediately following the phrase "Loan Documents" and prior to the comma in the fifth line thereof.

Section 16.4   ATTORNEYS' FEES. Whenever attorneys' fees are provided to be paid, the term shall include any and all reasonable attorneys' fees, attorney's accountant fees, paralegal and law clerk (and similar person's) fees, including but not limited to, fees at the pretrial, trial and appellate levels, in bankruptcy proceedings, and in collection proceedings, incurred or paid by Lender in protecting its interest in the collateral and enforcing its rights hereunder.

Section 16.5   MATURITY DATE. The Maturity Date of the Note is October 17, 2015.

Section 16.6   FUTURE ADVANCES. This Security Instrument secures such future or additional advances as may be made by Lender or the holder hereof, at its exclusive option, to Mortgagor or its successors or assigns in title, for any purpose, provided that all such advances are made within twenty (20) years from the date of this Security Instrument or within such lesser period of time as may be provided by law as a prerequisite for the sufficiency of actual notice or record notice of such optional future or additional advances as against the rights of creditors or subsequent purchasers for valuable consideration to the same extent as if such future or additional advances were made on the date of the execution of this Security Instrument. The total amount of indebtedness secured by this Security Instrument may be increased or decreased from time to time, but the total unpaid balance so secured at any one time shall not exceed twice the face amount of the Note, plus interest thereon and any disbursements made under this Security Instrument for the payment of impositions, taxes, assessments, levies, insurance, or otherwise with interest on such disbursements, plus any increase in the principal balance as the result of negative amortization or deferred interest, if any. All such future advances shall be secured to the same extent as if made on the date of the execution of this Security Instrument and this Security Instrument shall secure the payment of the Note and any additional advances made from time to time pursuant thereto, all of said indebtedness being equally secured hereby and having the same priority as any amounts advanced as of the date of this Security Instrument. It is agreed that any additional sum or sums advanced by Lender shall be equally secured with and have the same priority as the original indebtedness and shall be subject to all of the terms, provisions and conditions of this Security Instrument, whether or not such additional loans or advances are evidenced by other notes or other guaranties of Mortgagor and whether or not identified by a recital that it or they are secured by this Security Instrument. It is further agreed that any additional note or guaranty or notes or guaranties executed and delivered pursuant to this paragraph shall automatically be deemed to be included in the term "Note" wherever it appears in the context of this Security Instrument. Without the prior written consent of Lender, which Lender may grant or withhold in its sole discretion, Mortgagor shall not file for record any notice limiting the maximum principal amount that may be secured by this Security Instrument to a sum less than the maximum principal amount set forth in this paragraph.

### [NO FURTHER TEXT ON THIS PAGE]

## EXHIBIT A

### LEGAL DESCRIPTION

Lots 25 and 26, and the South one-half of Lot 24, PLAT OF STAR ISLAND, according to the Plat thereof, as recorded in Plat Book 5, Page 52, and as corrected by CORRECTED PLAT STAR ISLAND, recorded in Plat Book 31, Page 60, of the Public Records of Miami-Dade County, Florida.

The South one-half of said Lot 24 is more particularly described as follows:

Beginning at the Southwest corner of Lot 24 of STAR ISLAND, according to the Plat thereof, as recorded in Plat Book 5, Page 52 of the Public Records of Miami-Dade County, Florida; thence East along the South line of said Lot 24 for a distance of 400 feet to the Southeast corner thereof; thence Northerly along a curve to the left, measured along the arc of a circle of a radius of 500 feet and subtending a central angle of 12°51 '26" for a distance of 112.2 feet to a point; thence Southwesterly along a radial line of a circular of 500 feet radius for a distance of 400 feet to the West line of said Lot 24; thence Southerly along a circle of 100 feet radius measured along the arc and subtending a central angle of 12°51'26", for a distance of 22.44 feet to the Point of Beginning.

ny-1184023

15047814v1 0961855

IN WITNESS WHEREOF, THIS SECURITY INSTRUMENT has been executed by Mortgagor as of the day and year first above written.

WITNESS:

Name:

Name:

GARDEN ISLANDS INTERNATIONAL, LLC, a Florida limited liability company

By:
  Name: Steven Carlyle Cronig
  Title: Assistant Manager

**ACKNOWLEDGMENT**

STATE OF FLORIDA )
                 :ss:
COUNTY OF MIAMI-DADE )

The foregoing instrument was acknowledged before me this 14th day of April, 2015 by STEVEN CARLYLE CRONIG, the Assistant Manager of GARDEN ISLANDS INTERNATIONAL, LLC, a Florida limited liability company, on behalf of the limited liability company. He is personally known to me or has produced a Florida driver's license as identification.

Signature of person taking acknowledgment

OMAR FIGUERAS
MY COMMISSION # FF 192429
EXPIRES: February 21, 2019
Bonded Thru Notary Public Underwriters

Name typed, printed or stamped

Title or rank

Serial Number, if any

ny-1184023

15047814v1 0961855

Book29580/Page3198   CFN#20150245195                Page 35 of 35

# EXHIBIT F

DIVISION OF CORPORATIONS



Department of State  /  Division of Corporations  /  Search Records  /  Search by Entity Name  /

# Detail by Entity Name

Florida Limited Liability Company
GARDEN ISLANDS INTERNATIONAL, LLC

**Filing Information**

| | |
|---|---|
| **Document Number** | L08000076109 |
| **FEI/EIN Number** | 98-0591623 |
| **Date Filed** | 08/08/2008 |
| **State** | FL |
| **Status** | ACTIVE |
| **Last Event** | LC AMENDMENT |
| **Event Date Filed** | 09/10/2008 |
| **Event Effective Date** | NONE |

**Principal Address**

C/O STEVEN C. CRONIG
2525 PONCE DE LEON BOULEVARD, FOURTH FLOOR
CORAL GABLES, FL 33134

Changed: 11/01/2012

**Mailing Address**

C/O STEVEN C. CRONIG
2525 PONCE DE LEON BOULEVARD, FOURTH FLOOR
CORAL GABLES, FL 33134

Changed: 09/12/2019

**Registered Agent Name & Address**

CRONIG, STEVEN C
2525 PONCE DE LEON BOULEVARD
FOURTH FLOOR
CORAL GABLES, FL 33134

Name Changed: 11/08/2011

Address Changed: 11/01/2012

**Authorized Person(s) Detail**

**Name & Address**

Title Manager

Cronig, Steven Carlyle
2525 PONCE DE LEON BOULEVARD
FOURTH FLOOR
CORAL GABLES, FL 33134

Title MGR

SIDENIA LTD.
DUFOURSTRASSE 42
ZURICH 8008 CH

**Annual Reports**

| Report Year | Filed Date |
|---|---|
| 2019 | 04/01/2019 |
| 2020 | 03/23/2020 |
| 2021 | 04/05/2021 |

**Document Images**

| | |
|---|---|
| 04/05/2021 -- ANNUAL REPORT | View image in PDF format |
| 03/23/2020 -- ANNUAL REPORT | View image in PDF format |
| 09/12/2019 -- AMENDED ANNUAL REPORT | View image in PDF format |
| 04/01/2019 -- ANNUAL REPORT | View image in PDF format |
| 03/02/2018 -- ANNUAL REPORT | View image in PDF format |
| 01/24/2017 -- ANNUAL REPORT | View image in PDF format |
| 01/28/2016 -- ANNUAL REPORT | View image in PDF format |
| 04/13/2015 -- AMENDED ANNUAL REPORT | View image in PDF format |
| 01/29/2015 -- ANNUAL REPORT | View image in PDF format |
| 02/10/2014 -- ANNUAL REPORT | View image in PDF format |
| 01/24/2013 -- ANNUAL REPORT | View image in PDF format |
| 11/01/2012 -- ANNUAL REPORT | View image in PDF format |
| 01/04/2012 -- ANNUAL REPORT | View image in PDF format |
| 11/08/2011 -- ANNUAL REPORT | View image in PDF format |
| 01/05/2011 -- ANNUAL REPORT | View image in PDF format |
| 01/06/2010 -- ANNUAL REPORT | View image in PDF format |
| 04/27/2009 -- ANNUAL REPORT | View image in PDF format |
| 09/10/2008 -- LC Amendment | View image in PDF format |
| 08/08/2008 -- Florida Limited Liability | View image in PDF format |

Florida Department of State, Division of Corporations

# EXHIBIT G





## Steven Carlyle Cronig

Partner

Miami, Florida
New York, New York

Email        305-428-5122

vCard        Share

For four decades, Steven Carlyle Cronig has represented developers, borrowers and commercial and private lenders in a variety of commercial real estate development transactions. His practice also includes advising individuals and businesses on the effects of climate change and rising sea levels on real estate development and lending.

Mr. Cronig works with developers and international investors on matters involving: acquisitions and dispositions of property; creation of development entities such as joint ventures, limited partnerships and REITs; preparation of plats, subdivision covenants, homeowners' association documents, condominium and fractional/timeshare declarations, and prospectuses. He also represents borrowers in closing construction and commercial loans; preparation of construction contracts; lien administration; and closing sales to end purchasers.

Mr. Cronig advises commercial and private lenders in connection with the structuring of new asset-secured loans, construction financing, mezzanine financing, the purchase of existing portfolio assets from other lenders, and participation agreements among consortia of lenders. He also advises on the administration of lender portfolio assets, including: negotiation and preparation of initial loan commitment letters, the review of title on behalf of lenders, the preparation of loan documentation and the closing of loan

### Practices

Business & Commercial Transactions

Real Estate & Lending

Education

Admissions

transactions, lender due diligence activities, construction loan administration and loan workout and disposition activities.

Prior to joining Hinshaw, he was a partner at a national firm in Miami. Mr. Cronig has co-chaired the firm's annual Sea Level Rise and Climate Change Conference since 2017.

## Professional Affiliations

◆ Florida Bar, Board Certified in Real Estate Law, 1990 – 2020

## Honors & Awards

◆ Holds the AV® Peer Review Rating from Martindale-Hubbell, its highest rating for ethics and legal ability

◆ Named "Dealmaker of the Year" by *ALM Miami Daily Business Review*, 2014

## Representative Matters

**Acquisitions and Dispositions**

◆ Represented a borrower in $125 million refinancing of commercial development property in Austin, Texas and additional collateral property in Edmonton, Alberta.

◆ Represented an international real estate development group in $54 million purchase of 2.5 acre monastery property located on Biscayne Bay in the Edgewater Section of Miami from an order of the Catholic Church, including $31.5 million institutional funding.

◆ Represented trust investor purchaser in $12 million acquisition of condominium development property in Palm Beach County, Florida.

◆ Represented an international real estate development group in $48 million acquisition of all units in a 1970s era condominium located on 2.5 acres of property located on Biscayne Bay immediately north of the Rickenbacker Causeway in Miami and subsequent termination of condominium regime.

◆ Represented purchaser group in $13.4 million purchase of the One Bal Harbour development, consisting of five oceanfront acres in Bal Harbour, Florida together with the $1 billion structure in which are located 185 privately owned luxury condominium units and 124 privately owned luxury hotel condominium units; subsequent redrafting of property governing documents to create a commercial

condominium consisting of the hotel facilities at the property, as well as the sale of the commercial condominium to a hotel investment group for $12 million. Resulted in a net acquisition cost of $1.4 million for Hinshaw's client.

◆ Represented an international real estate development group in $47 million assemblage and acquisition of one city block located on Biscayne Bay in Miami.

◆ Represented a developer in $115 million acquisition and financing of the former Trump International Hotel and Tower in Fort Lauderdale. The financing component included a $120 million construction loan.

◆ Represented the seller in an $85 million sale of two large hospitals to a health care organization.

◆ Represented a well-known national real estate development client in its sale of two landmark New York buildings.

◆ Represented a Florida developer in the acquisition, financing, conversion and sale of 10,000 apartment units in three states.

◆ Represented a major domestic developer in an acquisition of outparcel leased to commercial bank involving issues on access, maintenance and usage restrictions with adjoining shopping center parcel and drafting necessary agreement and negotiating revisions with shopping center parcel owner and its lender.

◆ Represented a major multi-national developer in the acquisition of a $21.5 million major downtown Miami development parcel out of bankruptcy, where the entire transaction was effected within a ten day period from inception to closing and subsequent development of that property.

◆ Represented a major multi-national developer in the acquisition of a $44 million seven parcel waterfront assemblage and subsequent development of the property.

## Lending/Financing

◆ Represented a national lender in $500 million aggregate portfolio of real estate secured loans in a three year period.

◆ Represented a European portfolio lender in the United States portion of a $1.1 billion refinance package involving three landmark hotels.

◆ Represented a national hedge fund in $30 million loan portfolio in Mississippi.

- Represented a Pennsylvania-based lender in $300 million aggregate portfolio of real estate secured loans and equity positions extended during a two year period.

- Represented a European merchant bank in the United States portion of $1.1 billion refinance of three landmark hotels in London and New York City.

**Leasing**

- Represented a major national bank as tenant in the ground leases on over 300 build to suit development sites.

- Represented a developer of newly constructed Coral Gables high-rise office tower in the creation and implementation of a LEED-compliant master lease program and subsequent tenant leases.

**Development**

- Represented an association in the amendment and restatement of governing documents for a $500 million luxury property located in Bal Harbour, Florida, which included creation of new commercial condominium within the property and creation of new resident owner paradigm for hotel/residential condominium projects.

- Represented a developer of a major waterfront mixed use project in its preparation of master development documents.

- Represented a major national bank in preparation of master development program documents which created co-development standards and practices for its expansion of more than 300 branch banks across the US using third party contractors.

- Represented a multi-national marketing company in the negotiation and consummation of an agreement provided for marketing and sales of resort condominiums in eight countries.

**Workouts and Distressed Properties**

- Represented an investment group in an acquisition out of bankruptcy of control of a $20 million common element asset and the subsequent restructuring of the governing documents for that asset.

## Publications

- Co-Author, "Condominium Associations' Power to Restrict Access to Areas on the Property," *Daily Business Review*, August 14, 2020

- "What businesses need to know about climate risk and resilience," *Miami Herald*, June 21, 2019

- "How Older Condominium Buildings Become Infill Development Sites," *South Florida Business Journal*, December 18, 2015

## News

- In DBR Byliner, Steve Cronig and Ofonedu-Ime Goodwyn Explore Access Restrictions for Condominiums in Florida
  August 26, 2020

- Hinshaw's Steve Cronig Discusses What Businesses Need to Know about Climate Risk and Resilience
  July 25, 2019

- Hinshaw Successfully Stages Third Annual Climate Change and Sea Level Rise Conference
  April 9, 2019

- Third Annual Hinshaw Sea Level Rise & Climate Change Conference: Digging for Sea Level Rise Solutions
  April 1, 2019
  The Economic Effects of Sea Level Rise on Corporate Decision Making in South Florida

- Hinshaw and Florida International University Successfully Conclude Second Annual Climate Change and Sea Level Rise Conference
  April 24, 2018

- Second Annual Hinshaw/FIU Climate Change Conference to Focus on Economic Impacts to Insurance, Lending and Real Estate Industries
  March 27, 2018
  Full Day Conference to be Held April 11, 2018 at Four Seasons Hotel Miami

- Hinshaw Attorneys Represent OKO Group in $54 Million Bayfront Land Purchase Adjacent to Missoni Baia in Miami's Edgewater Area
  November 23, 2016

- Hinshaw Represents Sellers of One Bal Harbour Hotel
  October 9, 2014

© 2022 Hinshaw & Culbertson LLP

# EXHIBIT H

# FT's How To Spend It: Vladislav Doronin's perfect weekend in Miami - Vladislav Doronin

## The founder of Capital Group counts Aman and the forthcoming **Missoni Baia in Miami** among his hospitality and residential holdings



*Vladislav Doronin with his English bulldog Mozart, off the coast of Miami | Image: Jeffery Salter*

NOVEMBER 24 2017 / CHRISTINA OHLY EVANS

"Miami is such a dynamic place and there is always something to do, from tennis tournaments to Art Basel to the annual boat show. But what I love most is the weather: the sun and the outdoor lifestyle really agree with me, and I think it's a very good, easy-going place to raise children.

Saturday mornings at my home on Star Island begin at 8am with a cup of hot water, followed by Qigong meditation with the Tibetan monks I've been training with for a few years. This time is all about breathing and movement, and it clears my meridians and chakras. Afterwards I'll go for a run on the beach with my trainer, or a long swim.

Breakfast is around 10am, and includes papaya, porridge, avocados and miso soup, plus eggs or turkey for protein. I'll drink green tea and maybe some spicy green juice, which stokes my immune system. Saturdays in Miami are about family, and we always have at least six or seven people around the table, including my parents, plus my partner and children.

Much of the day is spent on the water, and if the weather is really nice we'll head to Bimini or Eleuthera on my Riva Domino for a day in the Bahamas. More often, though, we'll go by tender to Seaspice Restaurant for lunch overlooking the Miami River. The atmosphere is lively and the food healthy – I particularly like the salads and fresh fish. Or I might take my speedboat, a Wider 42, over to Key Biscayne and kite-surf with my trainer. I absolutely love this sport, so if we go, it's at least a two-hour commitment.

I love spending time with my new English bulldog, Mozart, and I often walk him in Bayfront Park, which was redesigned by Isamu Noguchi in the 1980s. If the weather isn't perfect, the afternoon might involve a visit to the Pérez Art Museum or the Bass Museum. I collect contemporary art and love both of these collections. I'll also drop into the Taschen Store to stock up on art books. In the evening we like to eat out, and one of my favourite places is Casa Tua in Miami Beach. The owner, Miky Grendene, always takes good care of us. We'll sit out in the lantern-lit back garden and enjoy simple pasta with tomato and basil, or a risotto with truffles. Another place for a night out is Cipriani, where I'll order sharing plates of baby artichokes and marinated aubergine. The pan-roasted veal with limone is superb too, and I do like a good Tuscan red wine – a Gaia or an Ornellaia. I'm not so much a clubbing guy these days but if I do go out, it might be to the Wall Lounge in the W Hotel. In any case, I am usually in bed by midnight.

Sunday begins the same way, with meditation and exercise – but then I might go for a drive in my 1965 Jaguar E-Type. I love to drive and don't often get the chance in London, so this is a real treat. I'll probably end up having lunch with friends at Kyu in the Wynwood district, where the plant-focused food is light and easy. I like this place so much that it influenced our Japanese restaurant Nama, at Amanpuri. Later on, I'll take the boat out for a cruise around Biscayne Bay and the islands, and do some fishing. You see the most beautiful sunsets from Key Biscayne, where there is less boat traffic and the views are unobstructed. For a drink I like the bar at The Setai –the Asian-inspired atmosphere is very relaxing. Then it's home for dinner, prepared by my chef Fabrizio, which might include the fish we've caught that day. To end the day, I'll watch a film or a TV series like *Billions* or *Marco Polo* in our 4D cinema. Often I fly back to London to arrive on Monday morning, but my Miami weekends give me an amazing energy and after just two days my batteries are fully recharged."

Read more here: https://howtospendit.ft.com/travel/202189-vladislav-doronin-s-perfect-weekend-in-miami

# EXHIBIT I

Case 1:21-mc-23332-BB   Document 13-1   Entered on FLSD Docket 02/28/2022   Page 72 of 240

# MIAMI HERALD: DORONIN NAMES ARCHITECT FOR SECOND MIAMI PROJECT - Vladislav Doronin

October 13, 2016
BY JANE WOOLDRIDGE

OKO Group, the development firm led by Russian billionaire Vladislav Doronin, has named Adrian Smith + Gordon Gill Architecture as design architects for the South Brickell Residential Tower. The 47-story luxury tower will be located on Biscayne Bay at 25th Road, overlooking the Rickenbacker Causeway. It will replace an existing building.

The project is the second announced by Doronin for Miami. The first, Missoni Baia, is located in Edgewater. Negotiation on other prime Miami sites is underway, Doronin said in an interview. He has owned a home locally for more than two decades, on Star Island.

Current AS+GG projects include the Jeddah Tower in Saudi Arabia, slated to become the world's tallest building reaching in excess of 1 kilometer. Partner Adrian Smith also designed the Burj Khalifa in Dubai, currently the world's tallest building, while at his previous firm, SOM Chicago.

Read the full article here: http://www.miamiherald.com/news/business/real-estate-news/article107991302.html#storylink=cpy

# EXHIBIT J

Case 1:21-mc-23332-BB   Document 13-1   Entered on FLSD Docket 02/28/2022   Page 74 of 240

## Miami Herald: Real Estate Mogul Vladislav Doronin Stretches his World from Moscow to Miami - Vladislav Doronin



Vladislav Doronin at Aman Venice

BY JANE WOOLDRIDGE

As a boy growing up in the palatial city of St. Petersburg, Russia, Vladislav Doronin
first visited the Hermitage with his mother. Though the museum is perhaps best known
for its Impressionist paintings, the works that resonated with Doronin were those by the
Russian avant-garde. His early affection for those bold forms and colors has spilled into
a broad passion for the visual that encompasses architecture, design and contemporary
art as he has built a real estate-development empire centered in Moscow and now, Miami
and New York.

After a stint as a commodities trader for Marc Rich's firm in Switzerland, Doronin
returned to Russia in 1993, bringing the expertise of highly regarded international
architects to his office, retail and residential real estate projects. In the years since, his
Russian firm, Capital Group, has developed more than 70 projects encompassing more
than 75 million square feet, working with architects including SOM (formerly Skidmore,
Owings & Merrill), France's Jacques Grange, Spain's Ricardo Bofill Taller de
Arquitectura, Italy's Massimo Iosa Ghini. In 2014, Forbes' Russian-language edition
dubbed Doronin one of the "Kings of Russian Real Estate." In pre-election times, he was
often dubbed "the Russian Donald Trump" – a reference only to real estate; his
spokespeople say he has no political aspirations. He often is called a billionaire, though
he doesn't appear on the Forbes Richest list.

His own Moscow home – he calls it his "biggest extravagance" – was designed by the
late Pritzker Prize-winner Zaha Hadid, whose last condo building, 1000 Museum, is now
rising near the Pérez Art Museum Miami. The two met a dozen years ago when Doronin
hired her to plan an 800,000-square-foot condo building in Moscow that ultimately
failed to win government approval. By then, he says, they had become friends.

"I still wanted to do something with her," he says. The two met in London's tony
Mayfair neighborhood. He explained what he was seeking. "I don't want to see any
neighbors" – even though those along the so-called "tsar's road" in a wooded area just
outside Moscow are not exactly the proletariat. "I want to see blue sky above the trees.
You have to go above the forest. She basically designed it at the table.

'Do you like it?' she asked me. I fell in love with it."



Doronin's private residence, designed by Zaha Hadid. (Photo: D. Fiser/Courtesy Zaha Hadid Architects.)

The result is a 40,000 – yes, 40,000-square-foot house more in the vein of the Starship Enterprise than the typical dacha. It is the only private home designed by Hadid built before her unexpected death earlier this year from a heart attack. (She has designed several others for private clients, but they have not yet been constructed.) "I feel very sad," he says of her death. "She became a close friend of mine. We had dinners together. She came to my house. … It was too early. She was a genius."

For Doronin's 57-story luxury bayfront condo project in Edgewater, Missoni Baia, Hadid recommended Hani Rashid, principal of New York's Asymptote Architecture. The soaring live-in sculpture, says Rashid, invokes the minimalist spirit of Josef Albers, Donald Judd, Sol Lewitt and Jesus Rafael Soto, creating a live-in sculpture. The Italian fashion house of Missoni is defining the interior ambiance in its first real estate collaboration.

Doronin's U.S. firm, OKO, also has announced a 47-story luxury residential tower on Biscayne Bay at 25th Road, to be designed by Adrian Smith + Gordon Gill Architecture, the firm behind Saudi Arabia's gargantuan Jeddah Tower. He also holds property on Brickell Avenue – the result of a previous partnership with Miami developer Ugo Columbo – and says he is actively seeking more Miami sites. He began coming to the city in the 1990s, and in 2008 bought a home on Star Island. When he was younger, he said, "It was my dream to build something in Miami. I love New York; Miami was close

and I would go for the weekend. It has different weather and a different atmosphere.

"I see how it has been growing in the last 10 years. Miami has become a 24-hour city. It is internationally significant,'' he says, ticking off stats about airport traffic. "It is growing with exciting cultural development, with Art Basel and interior design." And then there are the restaurants: Milos, Casa Tua, Zuma come quickly to mind. "What is important for me is it's a nice life. Good weather and a happy life. Also for me, I like in general that America is a safe country. Safe for children, hospitals, education."

Doronin also has homes in London and New York. So much space for the exquisitely designed furniture he collects, by Gio Ponti, Jean Prouvé, Le Courbusier, Charlotte Perriand, George Nakashima, Mies van der Rohe. On his wish list: Isamu Noguchi.

"I like interior design. I love to stay at home. I like the homelike environment, to cook dinner and be with the family," says the father of one. He has both Italian and Japanese chefs but says he sometimes cooks himself. "I love Italian. I do pasta." One can scarcely imagine the 54-year-old – so film-star handsome that his private life, once widely followed, has become an off-limits topic – dicing his own smelly garlic. Grilling steak and fish, yes.

With four homes, Doronin also has plenty of space for his art collection. Along with early purchases of Russian avant-garde masters Kazimir Malevich and El Lissitzky, Doronin collects works by more contemporary giants: Jean-Michel Basquiat; Ed Ruscha; Richard Prince; Urs Fischer; Julian Schnabel; Anish Kapoor; Frank Stella. He encourages young Russian artists and cultural projects through his Capital Group Foundation, founded in 2009. He also has funded restoration of historic Moscow churches and synogues, cancer research, programs for disadvantaged women and children and preservation of tigers in the wild — activities that earned him a place in a 2011 Forbes Russian-language article on business people who have made Moscow a better place.

In shaping his art collection, Doronin works with advisors – reportedly including New York gallerist Tony Shafrazi – but when it comes to furniture or artwork, the decisions about what to buy rest with him alone. "It's like a Faberge," he says, referring to the Russian royal jeweler. "People tell me what is real or not real Faberge. Then I decide if I like it. I'm not only buying because of the name and investment. I'm buying what I personally like."

Recently he has turned his attention to photography. His holdings include a large selection of black-and-white works by the late actor and filmmaker Dennis Hopper; Doronin has loaned it to London's Royal Academy for a retrospective. "I think [Hopper] shows a real America," noting particularly Hopper's series of images from President John F. Kennedy's funeral. "He was part of this movement, of representing America of this period. He was avant-garde in his period."

It's a theme that reverberates. Avant-garde. Ahead of his time.

Given his appreciation for design, it's no wonder that Doronin has often spent vacations at Aman resorts, whose sanctuaries in remote Shangrilas like Bhutan, Phuket and Bali have become jet-set faves for their exquisite architecture and equally polished service. The brand is often listed among the world's best by Travel + Leisure, Conde Nast Traveler and the World Travel Awards.

He first became familiar with the brand when he worked in Hong Kong, in 1990, and visited Amanpuri, on the lush Thai island of Phuket. "I left Russia because love to travel," he says. "I was shocked by the design, service and all amenities [at Amanpuri.]

It has an amazing location." He quickly became an Aman junkie, visiting each new property – in Indonesia, Bhutan, India and then beyond Asia, in Morocco, Montenegro, Turkey and Wyoming. "I go to Aman because it's not only the location, it's the architecture, amazing service, food, interior design. And the peace.''

A few years ago, Doronin was offered the opportunity to buy the brand, and he did so with a partner. "It was a good synergy between me and the best brand in the world," he says. But the partnership soon deteriorated; after a contentious court battle, earlier this year Doronin was awarded sole ownership.

Since Doronin took over, Aman has added four properties, in Japan, China and the Dominican Republic, plus a 170-foot sailing yacht, Amandira. When an Aman near Shanghai opens in late 2017, it will bring the total number of properties to 31, in 20 countries. Doronin wants to expand the brand further into urban markets.

It's a global design, in sync with Doronin's real estate ambitions to expand his real state empire. Last year, he purchased New York's iconic Crown Building at the prestigious corner of 57th Street and Fifth Avenue — an edifice once owned by Phillipine President Ferdinand Marcus and later by former New York Gov. Eliot Spitzer. Partner GGP controls the retail space; Doronin has the rest.

Next in his sights: Europe and Asia. And Miami, where he is seeking a site for an Aman.

To Doronin's way of thinking, Miami is a relative bargain. Creating luxury condos similar to those he is developing in Miami costs three times more in New York and London. And that, he points out, translates into more favorable prices for buyers in a city they've come to know and desire.

"Miami became a very international city," he says. For Doronin, his youthful dream of staking a homestead in tropics has become a reality. "My dream comes true."

Read more here: http://www.miamiherald.com/entertainment/visual-arts/art-basel/article124495419.html#storylink=cpy

# EXHIBIT K

## THE REAL DEAL SOUTH FLORIDA: ON THE SCENE AT BILLIONAIRE VLAD DORONIN'S PRIVATE ART BASEL BASH - Vladislav Doronin



Todd Boehly, Christopher Nickersen, Vladislav Doronin, Jonathan Goldstein and Tony Minella

November 30, 2016 03:45PM

Real estate and art share a special relationship in Miami, especially during the week-long Art Basel event every year, when thousands of the world's wealthy elite come to peruse both art pieces and properties.

To commemorate Art Basel, billionaire Russian developer Vlad Doronin held a bash at his Star Island mansion as part of a marketing campaign for his ultra-luxe Missoni Baia project in Edgewater.

Roughly 200 guests showed up — including Miami Beach Mayor Philip Levine — to hob knob with real estate bigwigs and local tastemakers. The night was capped off by a throng of speeches from Doronin himself, Miami power broker Alicia Cervera, Cain Hoy Enterprises Chief Executive Jonathan Goldstein and Ottavio Missoni Jr. of the Missoni family.

The night was interrupted when Miami's notoriously temperamental weather threw down a 20-minute rainstorm that sent Doronin's guests running for cover.

Miami's Urban Development Review Board recently gave design approvals for the 57-story Missoni Baia, which is slated rise at 700 Northeast 26th Street with 146 units. Prices at the tower average $900 per square foot, with units ranging from two to four bedrooms. — Sean Stewart-Muniz and Katherine Kallergis



Ottavio Missoni, Vladislav Doronin and Jonathan Goldstein



Ottavio Missoni, Mayor Philip Levine, Vladislav Doronin, Jonathan Goldstein



Jonathan Goldstein, Vladislav Doronin



Vladislav Doronin, Jonathan Goldstein, Alicia Cervera and Ottavio Missoni at the launch of Missoni Baia Miami Residences



Alexie Elfmont, Jonathan Goldstein and Christopher Nickersen of Cain Hoy Enterprises and Tony Minella of Security Benefit



Dionne Palandjian, Paul Palandjian

Read the full article here: http://therealdeal.com/miami/2016/11/30/on-the-scene-at-billionaire-vlad-doronins-private-art-basel-bash-photos/

# EXHIBIT L

# VLADISLAV DORONIN HOSTS MISSONI BAIA MIAMI RESIDENCES LAUNCH EVENT AT STAR ISLAND HOME

On November 28th, at an event to launch Missoni Baia, the 57-story luxury condominium tower branded by Italian fashion house Missoni, Vladislav Doronin hosted 200 guests at his Star Island Home. The event was dramatically interrupted by a torrential downpour lasting approximately 20 minutes when guests hurried to find shelter under pergolas and cabanas in the garden of the international businessman and real estate magnate. Speeches were made by Alicia Cervera of Cervera Real Estate, Vladislav Doronin, Chairman and CEO of OKO Group, Jonathan Goldstein, Chief Executive of Cain Hoy Enterprises and Ottavio Missoni Jr. from the Missoni family. Following the speeches pianist, ELEW gave an entertaining performance in which he played his own versions of Nirvana "Smells Like Teen Spirit", Coldplay "Fix You" and The Killers "Mr. Brightside" amongst others. Food and drink was provided by Casa Tua.

*tags* / Vladislav Doronin, Jonathan Goldstein, Ottavio Missoni, Mayor Philip Levine, Paul Palandjian, Todd Boehly, Alicia Cervera, Cervera Real Estate, ELEW,Dan Mikesell, Kathryn Mikesell, Tony Minella, Missoni Baia

# EXHIBIT M

After Action                          October 14, 2020                    City of Miami Beach
                                Virtual Commission Meeting

Handouts or Reference Materials:
1.  Ad 10142020-06 published in Sunday's Neighbors in The Miami Herald September 27, 2020.
2.  Ad 10142020-06 published in Sunday's The Miami Herald September 27, 2020.
3.  Miami Beach United Resolution in opposition of Items R5 J, R5 K, and R5 L.


**4:25:15 p.m.**
R5 M  FAENA DISTRICT OVERLAY
        AN ORDINANCE OF THE MAYOR AND CITY COMMISSION OF THE CITY OF MIAMI BEACH,
        FLORIDA, AMENDING THE LAND DEVELOPMENT REGULATIONS OF THE CODE OF THE CITY
        OF MIAMI BEACH, BY AMENDING CHAPTER 142, ENTITLED "ZONING DISTRICTS AND
        REGULATIONS," ARTICLE III, ENTITLED "OVERLAY DISTRICTS," AMENDING DIVISION 10,
        ENTITLED "FAENA DISTRICT OVERLAY," TO AMEND THE PARKING REQUIREMENT FOR
        PLACE OF ASSEMBLY USE; AMEND THE ALLOWABLE HEIGHT FOR RM-3 OCEANFRONT
        LOTS GREATER THAN 70,000 SQUARE FEET IN SIZE, WHICH ALSO CONTAIN A
        CONTRIBUTING HISTORIC STRUCTURE; AND AMEND THE ALLOWABLE SETBACKS AND
        REQUIRED YARDS FOR RM-3 OCEANFRONT LOTS GREATER THAN 70,000 SQUARE FEET IN
        SIZE, WHICH ALSO CONTAIN A CONTRIBUTING HISTORIC STRUCTURE; AND PROVIDING
        FOR REPEALER, SEVERABILITY, CODIFICATION, AND AN EFFECTIVE DATE.
        **3:00 p.m. Second Reading Public Hearing**

                                                                            Planning
                                                              Commissioner Ricky Arriola
                                                       First Reading on September 16, 2020 - R5 T


        **ACTION: Ordinance 2020-4366 adopted.** Title of the Ordinance read into the record. Public Hearing
        held. Motion made by Commissioner Arriola to adopt the Ordinance on Second Reading; seconded
        by Commissioner Richardson; Roll Call: 5-2; Opposed: Commissioners Meiner and Steinberg.
        **Thomas Mooney to handle.**

        Thomas Mooney, Planning Department Director, introduced the item, approved at First Reading by
        the City Commission on September 16, 2020. The proposal is to amend the Faena District Overlay.
        There was a lengthy presentation at First Reading and there was a great deal of public comment.
        There is much controversy surrounding this and a great deal of the neighbors do oppose the proposed
        Ordinance change. The Ordinance change had two components, the height and modifying setbacks
        specific to this property. The opposition appears to be related to the proposed increase in overall
        height. On September 16, the City Commission directed the Administration to bring the matter to the
        Historic Preservation Board meeting on October 13, 2020, to get an advisory opinion. It is important
        to know that if this legislation is adopted today, the actual application still requires Certificate of
        Appropriateness from the Historic Preservation Board. The presentation was made at Historic
        Preservation Board by the proposer and the neighbors to the south. The Historic Preservation Board
        recommended by a 6-0 vote that the City Commission not adopt the proposed Ordinance but leave
        the height limit where it is. On a separate motion, they recommended that any future changes to the
        LDR pertaining to height, massing, or scale, should come to the Historic Preservation Board.
        Regarding public benefits, the Aman Group has met with City staff, and a letter was transmitted that
        states they are willing to do certain resiliency improvements on the property as a condition of Historic
        Preservation Board approval should this be adopted. The Administration recommends approval of
        the Ordinance with no changes. In answering Mayor Gelber, he added that if adopted today, the
        applicant will be going before the Historic Preservation Board for review of the development
        application, and the Historic Preservation Board under a Certificate of Appropriateness criteria could
        potentially require a lower height, such as it happened with the Raleigh.

        Mayor Gelber introduced the Akerman team.

                                        Page 56 of 116

Neisen Kasdin, Esq. and Matthew Barnes, representing Faena, asked Mayor Gelber to promote expert witness Professor Alex Garvin, and for brevity of time he started on Page 10 of the presentation. Click here to view. This was recommended for approval by the Planning Board. The



Board under the City Code and in accordance with State Law is the designated local Planning Agency, which is advisory to the City Commission on any matters involving rezoning or land use plan amendments. They support it the project and it is their role to be advisory board to the City Commission on that. He explained that the yellow lines on the image to the left indicate that without the Overlay amendments, which both increase height but also significantly decrease the setbacks from the north to the south side of the property, there is no room to build additional construction without jamming it up against the historical structure. The Faena received a series of variances to push that building north to the 31st parking lot. If this amendment passes and there is more than 50% destruction of the Faena House building, they would be able to rebuild without taking variances. He added that in connection with the site plan approval they have proffered to pay for the construction of nine injection wells in the Indian Creek basin as identified by the Public Works Department as top priority for the neighborhood, as well as pay for the restoration and placement on City property of the previously discussed mural. He introduced Professor Alexander Garvin, one of the most eminent planners and authors on planning in the United States. He has taught Urban Planning at Yale for 54 years, he served on the New York City Planning Commission for ten years. He was the head of Design, Development, and Construction for the rebuilding of Lower Manhattan after 911. He has authored numerous books on Urban Planning, which went into a third edition with reference to the City. He introduced Professor Garvin to give his opinion on the Faena Overlay amendments.

Professor Alexander Garvin stated that as he has practiced, researched, taught, and wrote about Urban Planning over the course of his 54 year career, it has been his experience that the key to good urban planning, especially in the context of planning for new construction next to historic structures is to provide flexibility from what are often rigid zoning frameworks that do not relate to the context of the historic structure. He reviewed the characteristics of the Faena District and the Collins Waterfront Historic District and he believes the proposed Ordinance provides the necessary flexibility for better urban planning solutions for the District. In addition, the additional height, which will be imperceptible to people on the ground, will allow for a better distribution of the mass of the new building next to historic structures providing the opportunity for better views towards the historic structure. In his estimation, the worse planning outcome would be to suppress the height of the new construction next to a historic structures to a height that is lower than the historic structures; doing that would force the mass of the new building to spread out throughout the property blocking more view of the historic

buildings from more angles than if a taller or compact building were thoughtfully designed and



planned. Historic preservation does not occur in an economic vacuum. The expense to preserve historic buildings is paid for by the ability to develop new buildings around the historic buildings at a profit. The City Commission should not view this Ordinance solely through the lens of preservation, but also what is best for the success and vitality of its neighborhoods, citizens, and fiscal and economic health, including promoting investment, job growth, growth of tax revenue and enhancement of the image of the City. Not only does preservation of a historic building benefit from new construction, the local government receives fiscal benefits in the form of new and permanent jobs, new annual property, and resort taxes, and building permit fees. In this case, this would generate large fiscal benefits and elevate the profile of the City.

Neisen Kasdin, Esq., introduced Historic Preservation Architect eminent in South Florida Richard Heissenbottle for brief remarks.

Richard Heissenbottle, Historic Preservation Architect, continued the presentation and urged the City Commission to vote in support of these legislative changes.

Neisen Kasdin, Esq., added that there is one testimony from Fran Scola, CFO of the Aman Hotels and on the Board of Directors.

Frank Scola, CFO Aman Hotels, thanked the City Commission for letting them present. He explained that Vladislav Doronin is 100% owner of Aman Hotel and OKO Group, the developer of the project. Vladislav is a City resident, he lives on Star Island, and where his family is growing. This is a passion project for him and not one of the most profitable projects due to the indication of what is involved; the cost per hotel room is predicted to be just under $5 million or each hotel room. That is the level of commitment and luxury they want to bring to Miami Beach. If he does not lose money because of its location and if the project does not damage the Aman image, he wants to do the project, but certain things need to happen. He needs to be able to have a project that he will not lose money on and a project that does not damage the brand. They need those needed elements to be successful.

City Clerk Granado called the first caller Daniel Ciraldo.

Daniel Ciraldo, on behalf of Miami Design Preservation League, stated that The Raleigh Hotel was at a maximum height of 200 feet, and this site already has that allowance of 200 feet. They have an approval from 2016, a beautiful project at 203 feet, but this is the third time they are getting a proposal, and the first time that it is a major height increase. Faena is a wonderful brand, they were recently named No. 2 hotel in the U.S.A., and they did it all at 200 feet. Aman is an expensive brand, but they are going into a City that has a brand to protect, one of scale and sensibility. The Historic Preservation

Board unanimously did not like the height, and they want to welcome Aman under the zoning allowed, and hope they vote no on this height increase.

City Clerk Granado called Tucker Gibbs.

Tucker Gibbs, Esq., representing the King David Towers Condominium, located adjacent and immediately to the west of the Faena District on Indian Creek Drive, stated that his client's opposition to the applicant's proposed amendments center on two things: 1) the requested increase to permitted height of 250 feet and 2) the proposed decrease in the required minimum parking for a place of assembly from one space per 60 square feet to one space per 80 square feet. The height increase should be rejected because it is out of scale with the Faena District, which was not created with such a height in mind. The closest property was a building over 203 feet five blocks to the south and seven blocks to the north, and the three buildings referenced by the applicant are not in the District. Given the community testimony at the Planning Board on First Reading there is no necessity for the proposed reduction in parking. The applicant is presenting a specific project, but the decision of the City Commission is about changing the District regulations that could allow several different projects. He urged the City Commission to defer the item until they get a building envelope drawing that shows the maximum project that can be built under those amendments to understand the development possibilities under the amendments. They are requesting that the City Commission reject the provision that allows the maximum height of. 250 feet, the parking reduction to one space per 80 square feet and require the building drawing.

City Clerk Granado called Jack Finglass.

Jack Finglass stated that they are in Miami Beach and not in New York or Sunny Isles where most development Mr. Kasdin is used to taking place. Lowering height of a new incompatible building does not require fattening of the building's footprint. The Versailles is the centerpiece jewel of the District and must not be overshadowed by this monstrous megalith as proposed at 250 feet. In 2020 attitudes and planning objectives are and should be different from planning attitudes from half a century ago. They are the citizens and taxpayers that live here 24/7. Remember that just because it is an Aman registered trademark, may not be so in a few years, it could end up being a Hilton; it happens all over the country. Please vote against this proposal.

City Clerk Granado called Steven Gombinski.

Mr. Gombinski stated that the Caribbean Condominium Association along with the Mosaic and Beach House Condominium Association, collectively located a few blocks from the Versailles property to the north, they strongly endorse and support the proposed amendment and approve of the design, as it would significantly enhance the quality of their neighborhood. The proposed Aman project will allow the Versailles to be restored and add a beautiful residential tower that will bring significant property tax resorts and sales tax to the City but will also provide significant amenities to neighbors particularly restaurants. The proposed residential tower not only aesthetically enhances the neighborhood and eliminates the eyesore but increases property value to condominium units and the City's tax base during this challenging time.

City Clerk Granado called Tom Stern.

Tom Stern stated that Attorney Andrew Dickman and Architect Steven Avdakov were on the line.

Vice-Mayor Samuelian allowed them to be connected.

Tom Stern, President of the Board of the Faena Condominium Association south of the Aman property appreciates the City Commission for referring the proposed amendments to the Historic Preservation Board for their opinion. At the outset, they still remain strongly opposed to the zoning Code amendments, and are particularly opposed to the proposed increase in height to 250 feet and to the Collins Avenue setbacks change, which would limit bringing any future building closer to Collins Avenue. The City's esteemed entrusted Historic Preservation Board voted unanimously yesterday to reject the proposed Faena District Overlay amendments in their entirety, and also voted unanimously that they be entrusted to review all future Code amendments affecting historic resources prior to such legislation going to the Planning Board. The Historic Preservation Board's unanimous vote focused on some key issues. An increase in height to 250 feet is entirely incompatible with and negatively impacts the Historic Overlay District and the Versailles Hotel. Second, the additional variances in the Code amendments are unanalyzable and potentially harmful without the specific context of a discrete project. Forcing these variances on the Historic Preservation Board through codification of new zoning would undermine their ability and flexibility to fully do their job. Three, the concern that Miami Beach's unique world renown historic architecture would be meaningfully compromised by the proposed amendments allowing for a 250 feet new tower in the Collins Waterfront Historic District and the Faena District Overlay. Continued Code amendments of this type could transform the City forever impacting the compatibility and relationship of new towers and historic resources. It is the public reliance upon the City Commission to entrust the Historic Preservation Board in keeping the character and integrity of the City's Historic District. At yesterday's Historic Preservation Board hearing, there was overwhelming public opposition by members of the public deeply concerned about these and future amendments involving oceanfront amendments throughout the City. The legislation voted on today could set an unnecessary precedent and open the door to a wide array of applications for oversize developments in Historic Districts. He urged the City Commission not to let this happen. Aman has all it needs to complete a magnificent project that is consistent with the original intent of the Faena District Overlay Code and the historic preservation portion of the Code of the City. The developers are sophisticated knowing the Code. Their association, Historic Preservation Board experts, neighbors, and members of the public are strongly opposed to this legislation allowing for a 250 feet tower next to the Versailles Hotel and believes it will set a terrible precedent for Miami Beach. He urged for the City Commission to reject this legislation.

Andrew Dickman, Esq., amplified that the Historic Preservation Board unanimously spoke out not in favor of this amendment and if the project were to go to them, he reminded them that if this Ordinance is approved, there is no going back. What concerns him is that the Aman representative mentioned that the property owner is willing to breakeven on this; that is a situation of concern, the Historic Preservation Board is not going to approve it and the City Commission will still approve the zoning not knowing what the City is going to get. This is the first public hearing he has participated in. During this process he has been confused regarding why so much attention has been placed on the Aman tower and restoration of the Versailles Hotel on a single parcel of land. The developer's team has been treated as the applicant and the term legislation is used. The nature of this proceeding appears quasi-judicial, but the rules and laws pertaining to such hearings are not being followed. There are no ex parte disclosures, no oaths are being administered, no ability to examine witnesses, and there have been no mail notices to surrounding property owners. He added that Mr. Kasdin has asked to reserve time for rebuttal, which is a quasi-judicial step, and he does not believe that this is what is happening. If it were a true legislative process, there would be zero focus on the Aman proposal. Rather, the focus would be on the City's criteria and process for a Code amendment. Even if the City claims that this is legislation, it is clearly tailored made for only the Aman property. There is no other property in the Faena District Overlay that meets the criteria for the up zones contained in the amendments. The Saxony Hotel on a different parcel and his client's parcel does not qualify for this zoning classification, only one parcel qualifies for this, and that is spot zoning and violates the equal protection. This is a special law benefitting one property in the District. The Ordinance before the City Commission is nothing more than an attempt to approve a development project by granting multiple

variances in the form of legislation. Section 118-161 states "*the City Commission may from time to time amend these land development regulations or change the zoning District boundaries. All amendments shall be consistent and compatible with the Comprehensive Plan and shall be enacted according to the provisions of this article.*" There has been no discussion of the City's Comprehensive Plan and procedures have not been followed. Section 118-162 pertaining to petition for changes to amend the land development regulations, clearly states, "*upon receipt of a complete application the Planning Director shall transmit the application along with the Planning Director's analysis and recommendations regarding proposed amendments to the Planning Board for review.*" Nothing has been submitted except four pages of an eight-page application executed by Eric Carpenter, Assistant City Manager, only after they pressed the issue of who initiated the zoning amendment. This criterion has never been discussed at any hearing. Instead, it is on the Aman project and brand. Section 118-120(12) states, "*The Historic Preservation Board shall review any and all amendments to this Code affecting historic preservation issues.*" The fact that it was sent to Historic Preservation Board after First Reading violated due process and the City's Code. The intent and purpose of all zoning districts carries the weight of law. The express purpose and intent of the Faena District Overlay at Section 142-867 states, "*the purpose of this Overlay District is to allow limited flexibility of uses and limited increases in height because of the common ownership and operation of the properties within the District.*" Section 114-1(4) states that words in terms of the Code "*shall be interpreted in a court with their normal dictionary meaning and customary uses.*" The up zoning before this Commission is contrary to the intent and purpose of the Faena District in the normal dictionary meaning and customary uses of the word limited, and certainly does not mean an increase of 50 feet to 250 feet. He added that he was unable to prepare for this meeting because the City has failed to comply with his public records made on August 13. He alerted the City Attorney on October 7 and he has not acknowledged his letter. The Commission Memorandum itself for this item supports all his arguments, it mentions the specific property and it talks about variances and the proposer. This is nothing more than a special law and a customized law; it is spot zoning and it is violating equal protection. He asked them to think about not passing this, because once they pass it, it will be forever enacted into their Code.

Steve Avdakov, Principal, Heritage Architectural Associates, has lived in the City for the past 26 years and is a qualified expert in historic preservation. He presented his opinions and stated that their esteemed Historic Preservation Board voted 6-0 in opposition of this Ordinance. The maximum height of existing buildings along the oceanfront corridor does not exceed 203 feet from 42 to 27 Streets. This section of the Historic District contains the greatest concentration anywhere of the work of Roy France, so it clearly is going to be a non-compliance with the Secretary of Interior of Standards, which says, "new additions, exterior alterations or related construction shall be compatible with the massing, size and scale to protect the historic integrity of the property and its environment." This development team has presented a misguided interpretation of the City's existing Ordinance that govern the development of Historic Districts. They argue with flexibility when what is required is compatibility. The 250 feet height and the site placement of the proposed tower lacks the compatibility component, but they need to hear from the experts. He mentioned comments made by Historic Preservation Board members against the amendments at the meeting yesterday. It is time to go back and look at what Historic Preservation Board is all about, and the Historic Preservation Board verdict was rendered, and it was loud and clear. The Historic Preservation Board sent the City Commission an equivocal message that enough is enough. These Code amendments are to be rejected by the City Commission and he hopes they listen to the Historic Preservation Board.

City Clerk Granado called the following individuals:

Liliana Pinto-Torres stated that the developer will keep the rhythm and harmony of the area. Making the base of the building lighter will preserve the views to the historic site and will provide a good face to the Versailles Hotel. Aman will elevate the tourism that comes to Miami Beach and will beautify the

area. Aman will provide jobs, taxes, and revenues, and bring the City to a new level. She is in support of the project and asked the City Commission to approve development.

Mick Duchon stated that this District has become one of the most incredible cultural areas in the City. What the developer is trying to do with the preservation of the Versailles building will only enhance the area. In addition, the new structure would be incredible for the City bringing in tax dollars and amazing residents. The Aman brand will create incredible tourism and will also be another amazing place for residents to visit. He is in support of the project.

Kristen Rosen-Gonzalez stated that first, she loves Michael Góngora, he is in her thoughts and prayers; be strong during the cancer treatments. She teaches Communications and they always discusses passionate empathy. This discussion requires empathy for fellow residents. The dollar sign must be pushed away because resident's views will be blocked. Resident's sunshine will be taken away. It is another middle finger to the residents. They must put themselves in their shoes; it is their duty. Let these billionaires build their resort but at 203 feet. They do not need the eyesore of an atrium. The Marina and Ocean Terrace are suing the City; what are the developers giving them? This amendment is spot zoning. Miami Beach will lose. Do the right thing and say "no to the height.

Luis Revuelta, local architect for the project, stated that this property is isolated from surrounding neighbors by two municipal parking lots, which is a unique condition not typical in an urban City. He is concerned how the overwhelming emotional public opinion is steering in opposition and negatively influencing and preventing the Historic Preservation Board from what he believes is an open-minded, pragmatic analysis of compelling architectural uniquely urban in natural condition concerning the request is based on exchanging a more solid volume at the first 50 feet from the ground scale environment to the top of the building currently allowed to 200 feet, which would allow the sensibly shaping and opening of monumental architectural podiums to create potentially one of the most unique open transparent pedestals in Florida. The request will not use additional Floor Area Ratio, but it will be the lowest intensity in the City. In this architectural exchange, the solution would provide much greater benefits. With a substantial increase of the view corridors to the historic Versailles Hotel, providing much greater setbacks from Collins Avenue, a greater separation from the King David Condominium in the west, a footprint mass as compared to previously approved projects on the side with better views of all sites.

Nancy Liebman is here to reinforce what the Historic Preservation Board did yesterday, which was a total denial of the Faena Overlay. The fallacy of the Faena Ordinance is that it allows Floor Area Ratio and height to drive the project; the developer has lost concept of what it is to be in a Historic District. It is a Historic District with regulations developed 30 years ago to control development and save historic places, and that is being ignored. The compatibility concept died when the Floor Area Ratio drive became popular in the City to make it a high-rise City. The project is outrageous, as if the City is hungry for high-rises, because they think that is going to save the economy. She has never heard of such a concept that it would make a City better. It is the Historic District that made Miami Beach great and it is time that they stop the nonsense and go back to the concept of preservation, which includes an overview of the project by the Historic Preservation Board.

Paula King stated that they are stewards of their historic architecture and she thinks this project would dwarf anything around it and should not happen. The Historic Preservation Board voted against it and she is in complete agreement with them. It is happening in North Beach and she thinks the City uses their existing height limits as a starting point with developers. Developers come to Miami Beach and expect to be given additional to that. They need to change that plan.

Mayor Gelber closed the Public Hearing.

Commissioner Arriola explained that they have a tough job and they are never going to make everybody happy. They have heard from both sides and now they have to decide whether they are going to trade a shorter building that takes up more space and will obstruct view corridor for a more slender building setback further away and increase view corridor. Height in this case is consistent with the neighborhood and it will not dwarf other buildings. It is a high-quality brand for Miami Beach consistent with what has already been created in the Faena District. He is supportive of this. The team reached compromises and there has been some impasse, but he wants to move forward.

Motion made by Commissioner Arriola to adopt the Ordinance on Second Reading.

Commissioner Góngora likes this project because in his mind having the Aman brand in Miami Beach elevates the Faena District and therefore elevates the City. There are some people whom he respects that are opposed to this project and he respects their opinions. He knows the Historic Preservation Board will reject height, but they are not here to approve a design and there is a precedent of height reduction at Historic Preservation Board such as with The Raleigh. To him this is one of the more minor height requests that gives something back to the community. He asked the Administration what the proffers are for public benefits and if they are going to pay for injection wells in the community as identified priority by the Public Works Department.

Mr. Mooney explained that they received a letter today and asked Mr. Kasdin to confirm what they have proffered.

Neisen Kasdin, Esq., added that as a condition of the Historic Preservation Board approval, they will pay for the installation of nine injection wells in the Indian Creek basin, as identified by Public Works for resiliency improvement. In addition, in the letter they memorialized as part of the approval process paying for the restoration and installation of the Jack Stewart Mural that was in the old Annex at the Versailles at the City's discretion.

Commissioner Góngora stated that although he wants to preserve the Jack Stewart mural he did not feel it was enough of a public benefit, but the injection wells are very interesting to him because in Mid Beach they have a great deal of sustainability projects that need that. That is an important public benefit. He usually is against blanket height increases, but he supports the project.

Commissioner Richardson heard that there may be an issue with the weight of the mural on the 17th Street Parking Garage; exactly what are they proffering if they are unable to install it there?

Neisen Kasdin, Esq., added that what is being proffered, as a condition of the approval of the zoning project itself, is repair and installation of the mural at any location dedicated at their expense. They suggested through their own research and looking at sites, that the 17th Street Parking Garage would be a good location for that, if the City agrees, as it is a prominent location and it will be a considerable expense to restore, repair it, and mount it in a way that ultimately can be removed.

Discussion continued.

Commissioner Richardson stated that on First Reading they asked about trying to avoid a bait and switch on the brand and asked him to speak on that issue.

Neisen Kasdin, Esq., stated that they sent a letter to the City Commission from the counsel of Aman and OKO, the developer, who said that the purpose of this venture is to build and create an Aman Hotel Residence. The cost of doing the 56 rooms of unusual size and extraordinary amenities, is $5 million per room. This is not going to become a Holiday Inn, and the restoration of the Versailles and the recreation of the Gulfstream Dining Room cannot happen without the passage of the Faena

Overlay, because the historic building sits in this required north side setback. Without that the restoration and recreation of the Gulfstream Room cannot take place. The letter was sent from the Counsel from Aman and OKO, and that the design proposed and in for approval from the City specifically is for a hotel of standards that only an Aman has.

Discussion held.

Commissioner Richardson added that if they were to move forward with this and allow for the height increase, and for any reason, the project does not move forward, would this land have a blanket increase in height, or is the height request specific to this project.

Mr. Mooney explained that the height is specific to the land and if the project does not go forward, they still have a 250 feet height limitation.

Commissioner Richardson asked if there is a way to move forward conditional upon this project or would that invalidate what they are trying to accomplish. His concern is having this greenlight this and for whatever reason it falls apart and the land has the height increase set there and then another project could buy it that would not be what they are entertaining.

Neisen Kasdin, Esq., explained that this is an amendment to the Faena Overlay District; it would not be proper to tie a zoning text change for the District to a specific project. However, what they did is they know who the ownership group, sponsor, and the brand is, and it is not whether they look at this specific property or any of the other properties in the Collins Waterfront Historic District or the Faena Overlay District, expert planners have said that when a property is within an important historic building, to provide a greater flexibility in terms of design for new structures, which includes allowing additional height. A condition of rezoning would not be appropriate, but plans are filed with the City specifically about an Aman Hotel and Residences and that is the only reason the plan is moving forward at this time.

Mayor Gelber asked City Attorney Aguila to comment.

Raul J. Aguila, City Attorney, echoed what Mr. Kasdin said. He would not recommend that they do anything in the amendment that would tie the zoning changes to the project.

Commissioner Richardson expected that answer but wanted validation. He asked what they can do to make sure the intent is to make it an Aman. He if there is more the Commission can do to tie their hands together, so they have less of an opportunity for a change.

City Attorney Aguila stated regarding the legislation, the Commission must be comfortable with the proposed zoning changes and not base their approval on the project. He is reluctant to recommend they do anything that would tie the approval of the legislative matter to a project.

In answering Commissioner Richardson's questions, Neisen Kasdin, Esq., stated they would, as part of the side plan approval process is say that this is expressly for Aman Hotel and Residences and would have to be built as such. If it changes, it must come back for approval. This is at the site plan, not involving the City Commission, but they can include that with respect to the site plan approval; that is exactly what the intent to do.

Commissioner Richardson added that the concern is the slight chance that the height increase remains with a new owner if there were changes. He supports the project with the changes mentioned and with the mural. He seconded Commissioner Arriola's motion.

Commissioner Góngora appreciates the affirmation on the record and he is ready to vote.

Mayor Gelber stated that they are going back to the Historic Preservation Board, and they are making a zoning change that is tied to a specific proprietor. He thinks with the height increase without Floor Area Ratio they are saying they like the slim buildings rather than the massive ones and that has happened in areas of Collins Avenue. The Urban Land Institute (ULI) has told them to get bigger setbacks and thinner buildings, as they are better for view corridors. There is a rationale from experts and urban policy personnel that it makes sense. He is not concerned that this will become a different project. This will be an Aman Hotel/Residence and he is excited about the brand and this District, which has become a cultural anchor. He appreciates the neighbors' concerns, but this is a very modest change that carries a great deal of benefit for the community consistent with what the ULI has advised to try to create more ground views and vistas at ground level of our beautiful beaches.

Mayor Gelber asked for a vote.

Commissioner Meiner asked to be recognized and stated that he watched the Historic Preservation Board meeting and he knows it is an advisory opinion vote, but on the height, the Historic Preservation Board will have the final say. It sounds to him that the Commission can vote to approve this, but the Historic Preservation Board can shoot it down.

Planning Director Mooney stated that potentially the Historic Preservation Board could modify the height, but that depends on the Certificate of Appropriation (CA) application with details and renderings. But yes, the Historic Preservation Board could potentially require a lower height under the CA criteria. Mr. Mooney is certain that the Historic Preservation Board members would be objective about it.

Commissioner Meiner also feels uneasy that the Commission is considering approving a height increase that will stay in perpetuity without any certainty that this is the project that is going forward.

Raul J. Aguila, City Attorney, responded that the matter before the City Commission is a zoning matter, legislative, and not based on a specific project going forward or not. The Commission needs to be comfortable with the amendment in front of them, and not base it on whether it is going to be an Aman property.

Discussion held.

Commissioner Steinberg does not believe this is going to be a bait and switch. However, when they voted to create the Faena Overlay there were a set of guidelines approved for the entire neighborhood, and they heard from neighboring properties who are obviously concerned, and the Historic Preservation Board is required to review any application that will be submitted. Based on the Historic Preservation Board's result yesterday, they were unanimous in their recommendation. She would be comfortable approving it without the height increase. That is her personal preference and wished the project and the Overlay success.

Vice-Mayor Samuelian asked if the Historic Preservation Board engages on specific project details including the flags of a hotel.

Planning Director Mooney stated that oftentimes the flag or operator would be included, but the Historic Preservation Board approvals are not flag specific. Historic Preservation Board approvals are not specific to a flagship hotel.

# EXHIBIT N

# Vlad Doronin Opposes Robert Pera's Miami Beach Home Plans

*By Erik Bojnansky*



Vlad Doronin and renderings of Robert Pera's 23 Star Island home. (Getty, Choeff Levy Fischman)

A Miami Beach board meeting became heated as a dispute between developer Vlad Doronin and his billionaire neighbor, Memphis Grizzlies owner Robert Pera, was aired out in public.

Doronin, through his attorney, was opposing his Star Island neighbor's plans for a roughly 28,000-square-foot waterfront mansion at the Miami Beach Board of Adjustments meeting on Friday morning.

Pera, founder of Ubiquiti Networks and chairman of the NBA team, was seeking a number of variances for the 1.9-acre property at 23 Star Island Drive that Pera purchased from Lennar Company founder Stuart Miller for $25 million in 2019.

Doronin, the developer behind Una Residences in Brickell and the Aman hotel and condo in Miami Beach owns the neighboring home of 26 Star Island, which he purchased from basketball player Shaquille O'Neal for $16 million in 2009.

Pera sought six variances for his future mansion designed by local architecture firm Choeff Levy Fischman, including a height variance for 31 feet where height is capped at 28 feet. That would have allowed Pera to construct a "professional grade indoor basketball court," according to his attorney, Tracy Slavens.

"This is a hobby of the owner. He likes to play at all hours," Slavens said.

Other asks from Pera included the right to build an elevator bulkhead exceeding 13 feet above the roofline where only 10 feet in height is allowed, a 10-foot-tall perimeter wall where seven feet is permitted, and a roof deck that is less than 10 feet away from an exterior wall.
Slavens argued that such variances are commonly sought by the builders of new homes on Star

Island due to the unusual shape of the properties.

As for the elevator bulkhead, Slavens said it's needed to power a lift strong enough to transport furniture and Pera's father, who has "mobility issues." Slaven added that the elevator bulkhead of a recently completed home at 22 Star Island is also 31 feet above the roof line.

But Doronin's attorney, former Miami Beach mayor Neisen Kasdin, said the variances that Pera sought violated the privacy rights of his client. The elevator bulkhead and the rooftop deck is on the south side of Pera's house, overlooking Doronin's family residence, and the variances would not be needed if it wasn't for the height change Pera desired for his indoor basketball court, Kasdin charged.

Kasdin further charged that Pera's desired mansion wasn't really a home at all – but a professional basketball complex within a residential neighborhood.

"This looks like, smells like, and quacks like a professional basketball facility," Kasdin said, alleging that the design for Pera's house includes 12 lockers and only three bedrooms. Kasdin claimed that Pera's future home will be able to "hold an entire basketball team and its entourage" as well as rooftop parties.

"We have made multiple attempts through the owner's attorney… to contact and reach the owner to discuss what he's seeking [to build] and see if there's a way to mitigate or modify it," Kasdin said. But Pera has refused to meet with Doronin, Kasdin claimed.

Slavens, who insisted that Pera's future home has seven bedrooms, said Doronin has threatened to sue Pera if he didn't comply with the developers demands. "He [Doronin] has tried to redesign this home on his personal whims," Slavens said, including how Pera should landscape his property, lay out his driveway, or locate his pool equipment.

At one point, when Pera's team used a drone to survey his property, Doronin's security personnel came out and "threatened us," Slavens said.

"There came a point where we felt that any negotiation was not a negotiation at all, but was strong arming," Slavens told the board. "This is a pattern of behavior. He [Doronin] wants what he wants and gets what he wants."

Slavens also felt it was hypocritical to object to Pera's variances, when Doronin received his own variances needed to construct the 221-foot-tall Arman-branded tower.

Kasdin objected to Slavens attacks, especially on Doronin's project. "My client is creating one of the most beautiful and important projects in the city of Miami Beach," Kasdin said. "He should be thanked."

Slavens withdrew requests related to the 31-foot height variance, the rooftop deck, and the perimeter wall on behalf of her client.

"We are doing this to avoid a fight with the neighbor," she said.

However, Slavens insisted that the 31-foot top elevator bulkhead was needed and promised it would be shielded by a "green wall." Slavens also asked for a variance that would allow for an FPL substation on the property and an 11-foot-long balcony. As a precondition to the variances, the city will require Pera to plant vegetation on the south of the property.

Ignoring Kasdin's objections about the elevator, the board unanimously approved variances for the bulkhead elevator and FPL substation. The variance for the balcony, which overlooks Pera's own property, was approved by a vote of 5 to 2.

# EXHIBIT O

# akerman

People



## Neisen O. Kasdin

Co-Office Managing Partner

Miami
T: +1 305 374 5600

neisen.kasdin@akerman.com
vCard

**Connect With Me**

Neisen Kasdin serves as co-office managing partner of Akerman's Miami office. A former mayor of Miami Beach and leader in the revitalization of South Beach, he brings extensive civic experience to his work on urban revitalization and the development of complex, large-scale, multi-use projects.

Respected as a leader in urban development, he served as vice chair of the board of directors for the Miami Downtown Development Authority and was responsible for leading the creation of Miami's Downtown Master Plan. Many of his clients' projects – from Brickell City Centre to Miami's Design District and the Faena District – have been groundbreaking, transforming Miami's urban spaces with a blend of retail, office, and residential properties. In addition to large-scale projects, Neisen has represented clients in developments in emerging Miami neighborhoods such as Little Haiti and Wynwood.

Neisen is recognized by *Chambers USA* and *The Legal 500* as a leading land use and zoning lawyer in Florida. Clients value his attention to detail and thorough knowledge of building codes and government agencies, as well as his deep understanding of what a neighborhood needs, what is achievable, and what challenges may arise in the future.

### Notable Work

**Brickell City Centre**: Represented Swire Properties in development of the Brickell City Centre project in downtown Miami, a $1.5 billion, 5.5 million square foot mixed-use development in the city's financial district. The project includes office space, retail, residential units, hotel, and underground parking. A model of large-scale mixed-use projects, it is the first Special Area Plan built under the Miami 21 Zoning Code.

**Miami Design District**: Represented Miami Design District Associates in the development of an unprecedented one million square foot retail, residential, and arts district. Handled all aspects of development approvals, including vacating rights of way, re-plating and zoning, and site plan approvals as a Special Area Plan built under the Miami 21 Zoning Code.

**Faena District**: Represented Faena Group in the acquisition, approval process, and environmental work for an approximately $1 billion, three-block, mixed-use oceanfront development, including hotels, condominium apartments, retail, restaurants, arts and cultural center, and underground parking.

### Published Work and Lectures

- *Commercial Observer,* Quoted, "Q&A With Akerman's Neisen Kasdin on Miami's Rising Star," March 31, 2021

- *RE Miami Beach,* Quoted, "The Future of Commercial Real Estate in Miami Beach," March 13, 2021

## Areas of Experience

Real Estate
Economic Development and Incentives
Florida Land Use and Entitlements
Land Use and Development
Local Government Advocacy
Public-Private Partnerships
Transportation Regulation and Policy
Hospitality Regulatory Compliance
Hospitality
Hospitality Acquisition and Development
Real Estate and Construction
Qualified Opportunity Zones

## Education

J.D., University of Florida Levin College of Law, 1979
B.A., Northwestern University, 1976

## Admissions

## Bars

Florida

## Courts

U.S. District Court, Southern District of Florida

## Related Content

Akerman Sponsors the Real Estate Impact Conference
February 25, 2022

Akerman Partner Neisen Kasdin Joins Roundtable Discussion on Leadership During COVID-19
December 03, 2021

Akerman Partner Neisen Kasdin Named Among "Florida 500" by *Florida Trend* Magazine for the Second Consecutive Year
October 26, 2021

- *RE Miami Beach,* Quoted, "Aman Residential Tower Approved for Miami Beach," February 13, 2021

- *GlobeSt,* Quoted, "Neisen Kasdin on Miami 21's Special Area Plans," January 4, 2021

- *Law360,* Quoted, "New Census Data May Trigger Rethink Of Opportunity Zones," October 30, 2020

- *South Florida Business Journal*, Quoted, "South Florida's Distressed Real Estate Market Attracts Vulture Investors," October 9, 2020

- Neisen Kasdin has spoken and written extensively on urban revitalization, public-private projects, land use, and historic preservation for the Urban Land Institute (ULI) and other organizations.

- 2019 Akerman U.S. Real Estate Sector Report, Contributor

- 2018 Akerman U.S. Real Estate Sector Report, Contributor

- 2017 Akerman U.S. Real Estate Sector Report, Contributor

- Daily Business Review's 2nd Annual South Florida Real Estate Conference, Panelist, "Opportunities in South Florida Commercial Real Estate," October 22, 2015

- *Guide to Doing Business in Florida*, Co-Author, "Land Use: Easements and Zoning," September 2013

- Urban Land Institute Charles F. Shaw Forum, Faculty Co-Chair, "Innovative Public-Private Partnerships," 2012

- *Guide to Doing Business in Florida*, Co-Author, "Real Estate Regulation," August 2011

- Growth Management and Environmental Permitting Short Course, Speaker, "Traditional Neighborhood Development: from Downtown to Greenfields," Daytona Beach, Florida, February 2007

- Bring Back New Orleans Committee, Urban Land Institute, Speaker, New Orleans, Louisiana, November 2005

- Asociacion de Constructores de Hogares de Puerto Rico, Annual Conference, Speaker, "Creating Value: The Miami Beach Story," Dorado Beach, Puerto Rico, October 2005

- International Council of Shopping Centers (ICSC), Florida Conference, Speaker, "Public-Private Partnerships," Orlando, Florida, August 2005

- Japan Development Bank, Mayor's Forum, Speaker, "Creating Value: The Miami Beach Story," Tokyo, Japan, July 2005

- Florida Chamber of Commerce, Growth Management and Environmental Short Course, Speaker, "Successful New Urbanism Projects," Orlando, Florida, February 2004 and March 2005

- Barcelona Meeting Point, Speaker, "Principals of Urban Revitalization," Barcelona, Spain, September 2004

- The Urban Land Institute Latin American Conference, Speaker, "Urban Revitalization," Sao Paolo, Brasil, July 2003

- Americas Meeting Point, Speaker, "The South Beach Story: Key Elements in the Revitalization of South Beach," Buenos Aires, Argentina, May 2000

## Affiliations

- City National Bank of Florida, Board Member

- Miami Downtown Development Authority, Past Vice Chairman of the Board of Directors

- Urban Land Institute (ULI), Governor, Trustee and Southeast Florida/Caribbean District Council, Past Chair

- New World Symphony, Member and Past Chairman of the Board of Trustees

- Beacon Council, Past Chair

- University of Miami School of Architecture, Masters in Real Estate and Urbanism Advisory Board Member and Past Chair

- Faena Art Center, Board Member and Secretary

- Miami-Dade County Bar Association, Member

- The Florida Bar, Member

- South Florida Regional Transportation Authority, Past Board Member

- Miami-Dade County Metropolitan Planning Organization, Past Board Member

- Greater Miami Chamber of Commerce, Transportation Committee, Past

Chair; New World Center Committee, Past Chair

## Honors and Distinctions

- *Daily Business Review*, Professional Excellence Awards, "Distinguished Leader," 2021
- *The Best Lawyers in America* 2015-2022, Listed in Florida for Land Use and Zoning Law
- *South Florida Business Journal* 2021, Listed as a "Power Leader" in South Florida
- Florida Trend, Recognized as Being Amongst the 500 Most Influential Executives in the State of Florida, 2020
- *South Florida Business Journal*, Ultimate CEO, 2020
- *Chambers USA* 2009-2021, Ranked in Florida (South Florida) for Real Estate: Zoning/Land Use
- Urban Land Institute, Lifetime Achievement Award, 2019
- *South Florida Business Journal* 2017, 2014, Listed as a Power Leader in South Florida Commercial Real Estate
- *Daily Business Review* 2015, Lifetime Achievement Award for Professional Excellence
- *South Florida Legal Guide* Top Lawyers 2012, 2014-2019, Listed for Real Estate
- *The Legal 500* 2019-2021, Recommended in Florida for Land Use/Zoning
- *The Legal 500* 2008-2009, 2019, 2020, Recommended in Florida for Real Estate and Construction - Land Use and Zoning
- *The Legal 500* 2013, 2015-2017, Recommended for Real Estate and Construction - Real Estate
- *Super Lawyers* Magazine 2014, 2016-2021, Listed in Florida for Land Use/Zoning
- *Business Leader* Magazine 2009 and 2012, Recognized as a "Power Player" in South Florida
- *South Florida Business Journal* 2011, Listed as Heavy Hitter in South Florida Commercial Real Estate
- Shining Star Award, Arts & Business Council of Miami, 2011
- *Florida Trend's* Legal Elite 2007-2008, Listed for Environmental and Land Use
- Dade Cultural Alliance, Elected Official of the Year
- Miami Design Preservation League, Chairman's Award
- Florida Redevelopment Association, Florida Redevelopment Official of the Year
- Dade Human Rights Foundation, Special Citation
- Miami Beach Chamber of Commerce, Distinguished Service Award
- American Institute of Architects, Miami Chapter, Government Official of the Year
- Bring Back New Orleans Committee, Urban Land Institute, New Orleans, Louisiana, November 2005
- Greater Miami Chamber of Commerce, Bill Colson Award
- Martindale-Hubbell, AV Rated

# EXHIBIT P

OKO





"At its best, property development uses the language of architecture to embody the spirit of the times, the spirit of the city, and the aesthetics of a given urban environment."

**Vladislav Doronin,** Chairman and CEO

**ABOUT VLADISLAV DORONIN**

Vladislav Doronin is an accomplished international investor and real estate developer focused on luxury residential, commercial and hospitality properties. As founder of Russia's leading real estate development firm, Capital Group, and Chairman and CEO of the world's most prominent hotel brand, Aman, Mr. Doronin's global business portfolio spans Europe, Asia, the United States and the Caribbean. He has developed 71 large-scale, high-end projects, which total more than 75 million square feet.

Through his work in real estate and hospitality over the last quarter century, Mr. Doronin has collaborated with leading architects such as Pritzker Prize–winning architect Dame Zaha Hadid, Skidmore, Owings & Merrill, innovative design firm NBBJ, Hani Rashid of Asymptote Architecture, Adrian Smith + Gordon Gill Architecture, Tom Kundig of Olson Kundig, Jean-Michel Gathy of Denniston, and Kerry Hill Architects.

Mr. Doronin has also worked with distinguished designers such as the acclaimed Paris-based Jacques Grange, Italy-based Massimo Iosa Ghini of Iosa Ghini Associati, Canadian firm Yabu Pushelberg and New York–based Paris Forino.

Under the leadership of Mr. Doronin, Aman continues to set the benchmark for luxury hospitality with its uncompromising, bespoke approach and rigorous attention to detail—which are equally applied to every aspect of the guest experience in the brand's 31 resorts, hotels and residences in 20 countries.

Mr. Doronin's passion for excellence and vision for real estate development have effortlessly translated into his strategy to grow and nurture Aman. Recent openings include Aman Tokyo—the first urban Aman hotel; Amandayan in Lijiang, China; Amanera in the Dominican Republic; Amanemu on the eastern coast of Japan; and the expedition vessel Amandira. A pipeline of development opportunities is in place.

Mr. Doronin's US real estate venture, OKO Group, is currently developing sites in Miami, including the world's first residential collaboration with Missoni, the legendary Italian fashion brand. OKO Group is also redeveloping New York's landmark Crown Building on the corner of 57th Street and 5th Avenue. OKO Group brings not only considerable financial strength to the US market, but also a passion for working with the very best architects and designers in the world.

In addition to his business activities, Mr. Doronin is an active philanthropist and patron of the arts.



2      Capital Hill Residence      Boutique Private Residence                    Total Area: 30,139 sq ft  /  2,800 sq m      3









Vladislav Doronin commissioned Dame Zaha Hadid to design his private residence, located on the north-facing hillside in Barvikha, where pine and birch trees grow up to 20 meters high. The residence is divided into two components—one merges with the hillside while the other floats above the treetops. The residence emerges from the landscape with fluid geometries and dynamic views of the forest.

Comprising entertainment spaces, an indoor swimming pool, fitness and massage areas, sauna and hammam, as well as guest rooms and exterior terraces, the residence is an expression of Mr. Doronin's health-centered lifestyle and passion for both wellness and hospitality.

Capital Hill is the only private residence designed and built by Dame Zaha Hadid during her lifetime.



Capital Hill Residence          Boutique Private Residence                    Total Area: 30,139 sq ft  /  2,800 sq m





























Built at 730 Fifth Avenue—and designed by Warren & Wetmore, architects of Grand Central Terminal and the Helmsley Building—the Crown Building is one of the finest examples of Beaux-Arts architecture in the United States.

Completed in 1921, it became the first home of the Museum of Modern Art—from 1929 to 1932. Under the guidance of Abby Aldrich Rockefeller and founding director Alfred H. Barr Jr., some of the most influential exhibitions in the museum's history were staged during this three-year tenure within the Crown Building, including the prominent "Modern Architecture" exhibition.

As it embarks on a new chapter ahead of its centenary in 2021, the Crown Building will undergo a monumental transformation, which will see it fully restored to its original splendor and imbued with the spirit of Aman. Aman New York will comprise not only 83 guest rooms and suites, but will also house the first urban Aman Residences, a collection of just 19 incomparable private homes and a one-of-a-kind, five-story penthouse at the building's pinnacle.

Aman New York will offer amenities to calm the soul and rejuvenate the spirit in the midst of the world's most dynamic city. A 2,000-square-meter Aman spa will fill three stories, with a dramatic 25-meter indoor swimming pool. Dining, drinking, and relaxing spaces, including a subterranean Jazz Bar, a wraparound Garden Terrace overlooking Central Park, a Cigar Bar, a Wine Library, and multiple restaurants will offer the unrivaled, intuitive service for which Aman is celebrated. This new urban sanctuary, together with its fully serviced Aman Residences, will open in 2020.









"The Missoni Baia tower that we've designed
really celebrates the qualities of light and form,
producing a very beautiful, minimal, sculptural
object on Biscayne Bay."

—Hani Rashid











Missoni Baia          Luxury Residences                    Total Area: 837,985 sq ft  /  77,851 sq m                                    Cantilevered pool overlooking Biscayne Bay



Elevated tennis court



Amenities deck



Fitness center



Children's splash pad








The Capital City complex comprises two mixed-use buildings: the Moscow Tower and the St. Petersburg Tower. Boasting not only a combined total of 141 stories of retail, office and residential spaces, the development also includes an impressive 2,200 parking spaces in Moscow City. With floor-to-ceiling windows offering panoramic views across the sprawling city, the Moscow Tower residences span floors 18 to 72, while the St. Petersburg Tower residences are located on floors 18 to 61. Apartment layouts feature open-plan living, kitchen and dining spaces, as well as spacious lobbies, comfortable en suite bedrooms, walk-in wardrobes and office space. The two buildings connect on the first 19 floors, with office, retail and spa spaces throughout. The retail floors occupy an extensive, naturally lit atrium on the lower three floors.



Capital City          Mixed-Use High-Rise                    Total Area: 3,107,326 sq ft  /  288,680 sq m                              View from Capital City Penthouse









Sculpture by Tatlin

Capital City
Residential Lobby        Mixed-Use High-Rise                                Total Area: 3,107,326 sq ft  /  288,680 sq m







Capital City
Penthouse

Mixed-Use High-Rise

Total Area: 9,149 sq ft  /  850 sq m







Legend of Tsvetnoy     Mixed-Use Complex                    Total Area: 1,210,262 sq ft / 112,437 sq m





Walking distance from the Kremlin, the Legend of Tsvetnoy multifunctional complex is an exclusive architectural project of American firm NBBJ. Spacious residential apartments, designed for city professionals, float above the city—with walk-through living and kitchen areas, offering residents breathtaking panoramic views of Moscow's historical center and most prominent landmarks. The luxurious lobbies, designed by Massimo Iosa Ghini, are notable for their homely atmosphere and use of high-end finishing materials, with snow-white leather and wood paneling, backlit glass walls and unique hardwood floors. The complex faces the park opposite Tsvetnoy Boulevard and houses street-level boutiques, banks, cafés and exclusive restaurants, including the newly opened Buddha-Bar Moscow.

"Vladislav's personality is reflected in this duality; he expressed himself through highly celebratory working places using brave shapes, dynamics and technological elements. On the other hand, in the residential areas he softened the shades warmed by rich materials and decorative textures combined in a contemporary way."

— Iosa Ghini





A luxurious mansion in the early modern style, Mon Cher is one of the most sophisticated buildings in the center of Moscow. Located next to Yakimanka Square, just a five-minute walk from the Kremlin, and comprising 26 one- and two-level boutique residential key-ready suites, Mon Cher offers a sense of French chic and exclusivity right in the heart of the city.

The lobby and glass-roofed atrium with panoramic elevators, as well as the interiors of the suites themselves, are the work of acclaimed French designer Jacques Grange. Grange's elegant neoclassical style uses soft tones and antique elements to create the warmth and charm of a family home—with color accents provided by furniture pieces from renowned designers such as Dame Zaha Hadid, Mattia Bonetti, Patrice Dangel and Vincent Corbiere.











With its monumental Victorian style, palatial interiors and exclusive location in the very heart of historical Moscow, the imposing Imperial House on Bolshaya Yakimanka Street across from the Tretyakov Gallery, is a landmark in modern Russian real estate, combining multifunctionality, innovative architecture and the best in technical equipment and services.

The 65 apartments have been developed by top designers in line with latest trends in deluxe-class properties, and boast panoramic windows offering beautiful views over the Moskva River, the Kremlin, the Cathedral of Christ the Saviour, Gorky Park, Muzeon Park and Vorobyovy Gory.

Residents enjoy a unique range of amenities, including a business center with modest office space and conference halls, a private cinema, a sports complex with a swimming pool, a vintage wine collection, a cigar-smoking room and a library.



44

Imperial House
Apartment View

Residential Complex

Total Area: 471,460 sq ft  /  43,800 sq m

45



This four-story office block is located in the unique historic district of Ostozhenka, a quiet area in downtown Moscow. In the immediate proximity are the Kremlin, the Cathedral of Christ the Saviour, and a number of business centers and embassies.



The office building is in historic downtown Moscow—the Boulevard Ring Road. Here, next to Pushkin Square and Tverskaya Street, is where high-end hotels, luxury housing, restaurants, salons and shops are located. The favourable location gives convenient access to all major thoroughfares of the capital, including Sadovoye Ring Road and Leningradsky Prospekt.





The modern housing complex of Tricolor sits in one of Moscow's greenest districts, just outside the urban forests of Losiny Island and Sokolniki, the park belt of the VVTs (All-Russian Exhibition Center) and the Main Botanical Garden. Thanks to the visionary architecture of Vladimir Plotkin—Russia's "Architect of the Year 2010"—and a symbolic color scheme of the façades, it has become a new landmark for the Prospekt Mira neighborhood and all of northeastern Moscow.

Tricolor   Three Towers   Total Area: 2,826,625 sq ft / 262,602 sq m





OKO Tower is part of the thriving Moscow City mixed-use district—centrally located within the sprawling Russian metropolis—the design of which was loosely based on London's Canary Wharf and Paris's La Défense. An 85-story skyscraper and a 49-story office tower soar from a 7-story transparent crystalline base, gradually tapering away from each other as they rise. Designed by US-based architectural and engineering firm Skidmore, Owings & Merrill—renowned for its iconic towers, including Burj Khalifa, the world's tallest building—the OKO Tower complex laid the groundwork for a new era in contemporary Russian development. At 1,150 feet high, and with a total area of 4,300,000 square feet, the OKO Tower is not only the largest skyscraper in Moscow, but also the highest residential tower in Europe. The complex also has the biggest parking area in Moscow, with 15 levels for 3,500 parking spaces.

Residential and office lobbies have elegant interiors by Italy-based designer Massimo Iosa Ghini. With leading engineering solutions and security systems, 24/7 services, restaurants and bars, a private cinema hall, a luxurious spa and fitness center, and a private landscaped park, OKO Tower offers the ultimate in comfort and activity. The key-ready residential apartments boast designer interiors and stunning panoramic views of the Moskva River, the Vorobyovy Gory (Sparrow Hills) park, the Kremlin and the skyscrapers of Moscow City.











The residential lobby has splendid interiors
by the Italian designer Massimo Iosa Ghini.
The spacious lobby has highly polished surfaces
and luxurious paneled walls.











At the entry point to the 49-story OKO Tower offices is a wide and airy lobby with soaring 8-meter high ceilings. The lobby was designed by Italian architect and designer Massimo Iosa Ghini.











OKO Tower          Mixed-Use High-Rise                    Total Area: 4,305,565 sq ft  /  400,000 sq m

# INDEX

2–13   **Capital Hill Residence**
*Boutique Private Residence*

14–17   **Crown Building**
*Aman New York*
730 5th Ave,
New York, NY 10019

18–25   **Missoni Baia**
*Luxury Residences*
700 NE 26th Terrace,
Miami, FL 33137

26–33   **Capital City**
*Mixed-Use High-Rise*
8 Bld 1, Presnenskaya
Embankment, Moscow, Russia Date of
completion: 2009

34–37   **Legend of Tsvetnoy**
*Mixed-Use Complex*
2, Tsvetnoy Blvd,
Moscow, Russia
Date of completion: 2010

38–41   **Mon Cher**
*Boutique Residences*
15, Bolshaya Yakimanka,
Moscow, Russia
Date of completion: 2015

42–45   **Imperial House**
*Residential Complex*
6, Yakimansky Lane,
Moscow, Russia
Date of completion: 2010

46   **Flagman**
*Residential Complex*
13A, Dmitrovskoye Highway,
Moscow, Russia
Date of completion: 2003

47   **Pushkinskiy Dom**
*Business Center*
6 1/2 Bld 8, Shepkina Street,
Moscow, Russia
Date of completion: 2012

48–49   **Tricolor**
*Three Towers*
188B, Prospekt Mira,
Moscow, Russia
Date of completion: 2010

50–59   **OKO Tower**
*Mixed-Use High-Rise*
21 Bld 2, 1st Krasnogvardeysky
Lane, Moscow, Russia
Date of completion: 2015



OKOGROUP.COM

# EXHIBIT Q

DIVISION OF CORPORATIONS



# Detail by Entity Name

Foreign Limited Liability Company
OKO GROUP LLC

### Filing Information

| | |
|---|---|
| **Document Number** | M15000009033 |
| **FEI/EIN Number** | 81-1282898 |
| **Date Filed** | 11/10/2015 |
| **State** | DE |
| **Status** | ACTIVE |
| **Last Event** | REINSTATEMENT |
| **Event Date Filed** | 04/17/2017 |

### Principal Address

4100 NE 2ND AVE, SUITE 307
MIAMI, FL 33137

### Mailing Address

4100 NE 2ND AVE, SUITE 307
MIAMI, FL 33137

### Registered Agent Name & Address

Scola, Francis
4100 NE 2 Avenue
Suite 307
MIAMI, FL 33137

Name Changed: 01/31/2022

Address Changed: 04/17/2017

### Authorized Person(s) Detail

**Name & Address**

Title MGR

Scola, Francis
4100 NE 2ND AVE, SUITE 307
MIAMI, FL 33137

### Annual Reports

| Report Year | Filed Date |
|---|---|
| 2020 | 03/17/2020 |
| 2021 | 01/13/2021 |
| 2022 | 01/31/2022 |

### Document Images

| 01/31/2022 -- ANNUAL REPORT | View image in PDF format |
| 01/13/2021 -- ANNUAL REPORT | View image in PDF format |
| 03/17/2020 -- ANNUAL REPORT | View image in PDF format |
| 04/02/2019 -- ANNUAL REPORT | View image in PDF format |
| 03/27/2018 -- ANNUAL REPORT | View image in PDF format |
| 04/17/2017 -- REINSTATEMENT | View image in PDF format |
| 11/10/2015 -- Foreign Limited | View image in PDF format |

Florida Department of State, Division of Corporations

# EXHIBIT R

MISSONI baia





# ART.
# INNOVATION.
# JOY.

These are the qualities that have defined Missoni, the legendary Italian fashion house, whose colorful, one-of-a-kind style has been recognized around the world since its early days. Inspiring a way of living as much as a way of style, Missoni has always been guided by visionary design and innovative craftsmanship, its styles infused with a tangible sense of joyfulness and relaxed luxury. Now for the first time in its history, Missoni is giving physical form to this unique sensibility through a residential property: Missoni Baia.

Missoni Baia's 146 bayfront residences celebrate the timeless appeal of waterfront living in relaxed, modern style. With an impressive 200 feet of waterfront on Biscayne Bay and amenities worthy of a luxurious resort, Missoni Baia is like no other residential tower in Miami.

Welcome to Missoni Baia.
Welcome to the sweet life.



P5 — MISSONI BAIA

# MISSONI

The Missoni brand is very much synonymous with the Missoni family. Angela Missoni, the founding couple's daughter, took over from Rosita as the firm's creative director in 1997 and now leads the legendary label. As the creative force behind the entire house of Missoni, Angela has taken the company in new directions while remaining true to its heritage. She developed a new way to approach the Missoni image and communications, establishing a new position for the brand in the world of fashion.

Angela has initiated new and important collaborations with talents like Carine Roitfeld, Mario Testino, Edward Enninful, Mario Sorrenti, Mert and Marcus, and Juergen Teller. Most recently she has worked with Oscar-winning Italian director Paolo Sorrentino and actress, model and philanthropist Elisa Sednaoui to launch the latest Missoni fragrance worldwide.

Through the decades, Angela has been involved in projects that focus on reinforcing global awareness of the brand, and the growth of the family business. Amid that work emerged the study of the latest concept for the Missoni boutiques worldwide. For this, Angela worked closely with world-famous architect Patricia Urquiola. Together they created an organic environment that plays on various tones and textures, in order to give maximal visibility to the strong aesthetic of all the Missoni collections, elements of which ultimately become protagonists in a space.

The influential magazine Women's Wear Daily has praised Missoni's designs under her creative direction: "Angela Missoni is the scion of a decades-old family dynasty, but she's still breaking new ground." Now Angela and OKO Group have come together to bring the singular Missoni style to life in the brand's first-ever residential development.



**Angela Missoni**
Creative Director of Missoni

The Building

# LIFE, LIVED BEAUTIFULLY.

·

The tower's visionary design, by the internationally acclaimed New York firm Asymptote Architecture, captures the Missoni spirit of innovation and imagination with its forward-thinking, high-performance design. Like a luminous three-dimensional fabric, its shimmering, prismatic skin refracts the bright Miami sun into an ever-changing play of light.

P.7 — MISSONI BAIA

P 9   —   M I S S O N I   B A I A

E N T R A N C E

As with Missoni, Asymptote's design draws inspiration from the world of art. The building's precision and restraint speak to the influence of the Minimalist and Kinetic art movements, particularly the works of Donald Judd, Sol LeWitt, and Jesús Rafael Soto. Every element of the architecture is an immersive artistic experience.

The palette of the lobby's reception area plays luminous, etched, dichroic glass against cool, honed white-pearl marble.



JOSEF ALBERS



JESÚS RAFAEL SOTO



P 11  —  M I S S O N I   B A I A

LOBBY

Amenities

# LIFE, LIVED ACTIVELY.



Joyfully engaging the outdoors in relaxed, carefree luxury is a hallmark of the Missoni family's philosophy of living. Missoni Baia offers an unparalleled range of both indoor and outdoor amenities that appeal to both body and soul.

P.13 — MISSONI BAIA

Within the image the following labels appear:

- ELEVATED TENNIS COURT
- CHILDREN'S PLAY LAWN
- KIDS' SPLASH-PAD WATER PLAY AREA
- OUTDOOR DECK
- POOLSIDE LOUNGES
- DAYBEDS
- DINING & PARTY ROOM
- BAYSIDE TERRACE & POOL
- BARBECUE & BAR
- OLYMPIC POOL
- BRIDGE
- INDOOR LOUNGE
- LOBBY-LEVEL BAYSIDE TERRACE
- DAYBEDS
- VALET PARKING
- LOCKER ROOMS
- GAME ROOM
- LOUNGE POOL
- WHIRLPOOL SPA
- OUTDOOR DECK
- BAYWALK ACCESS

## Amenities Program

On the fifth and sixth floors of the tower, amenities include a bayfront lounge with a pool overlooking the water; a media room; a beauty salon; a children's playroom; a pet spa; an expansive gym overlooking the bay; and one of Miami's largest residents-only spas. An outdoor bridge connects the sixth floor's indoor amenities suite to the flow-through pool deck, which includes cabanas, an Olympic-sized lap pool, plunge pools, children's water features, and an elevated tennis court. The bridge also connects to a minimum of two parking spaces for each residence, and two premium private garages.

**LOBBY LEVEL**

- Valet parking service
- Outdoor bayside terrace for use by residents and their guests only
- Access to baywalk along the water
- Personal concierge and 24-hour front-desk attendant
- Package room for deliveries
- Indoor bayside residential lounge

**5TH FLOOR**

- Enclosed sky bridge connecting tower to parking garage
- On-site building manager's office
- Private screening room
- Hair and nail salon
- Kids' club / indoor play area
- Pet spa

**6TH FLOOR, POOL DECK**

- Outdoor bridge connecting the 6th-floor amenities building to pool deck
- Olympic-sized lap pool
- Lounge pool
- Outdoor whirlpool spa
- Poolside daybeds
- Kids' splash-pad water play area
- Children's play lawn
- Outdoor barbecue and bar cabana
- Two poolside resident lounges
- Men's and women's locker rooms
- Elevated tennis court

**6TH FLOOR, BUILDING**

- Wraparound outdoor deck with multiple lounge-seating areas
- Bayside terrace with cantilevered pool overlooking the bay
- Indoor bay-terrace lounge with double ceiling height
- Residents' game room with billiard table, bar, large video screen and lounge seating
- Residents' private dining and party room

**7TH FLOOR**

- 1,700 square-foot gym with 180° views of the bay
- Private yoga studio
- Private training room
- Men's and women's locker rooms
- Expansive residents-only spa with men's and women's sauna and steam rooms, and private massage treatment rooms with showers

P17 — MISSONI BAIA

CANTILEVERED POOL AND FITNESS CENTER

ELEVATED TENNIS COURT

P19 — MISSONI BAIA

Residences

# LIFE, LIVED SOULFULLY.

·

Missoni Baia was thoughtfully designed so that every one of its two- to four-bedroom residences, ranging in size from 2,400 to 3,672 square feet (222 to 341 square meters), would open onto expansive, shaded terraces—conceived as open-air rooms—overlooking Biscayne Bay.

P 2 1

Every one of Missoni Baia's 146 residences faces the water, with deep, shaded balconies enclosed by fritted-glass railings that conceal the edges of the concrete slabs without interrupting the sweeping water views—thus conveying the building's architectural integrity.



EAST RESIDENCE



P23 — MISSONI BAIA

EAST RESIDENCE LIVING ROOM

Outdoor
Amenities

SOUTH RESIDENCE



P 2 5 — M I S S O N I B A I A

SOUTH RESIDENCE LIVING ROOM







EAST PANORAMIC VIEW

SOUTH PANORAMIC VIEW

P 27  —  MISSONI BAIA

NORTH RESIDENCE MASTER BEDROOM

The kitchens boast a serene palette of Blue de Savoie marble counters, dark mirrored backsplashes, and matte white lacquer cabinets. All with Gaggenau appliances.



P 3 1 — M I S S O N I  B A I A

SOUTH RESIDENCE KITCHEN

A cool, calming palette of Dolomite mosaic and wall tiles, Calacatta Ice marble counters, his-and-hers water closets, and polished chrome fixtures graces the master bath.

P 3 3  —  M I S S O N I  B A I A

MASTER BATHROOM

Neighborhood

# LIFE, LIVED TASTEFULLY.

.

Located at the nexus of the city's most creative, culturally rich neighborhoods, East Edgewater speaks to the passion for art and the embrace of the carefree, casually luxurious good life that are at the core of the Missoni philosophy.

P 36 — MISSONI BAIA

BISCAYNE BAY

Miami
International
Airport

DESIGN
DISTRICT

I-195

36th Street

MIDTOWN

North Miami Avenue

I-95

26th Terrace

Biscayne Boulevard

MISSONI *baia*

MID-
BEACH

Alton Road

Collins Avenue

EAST
EDGEWATER

WYNWOOD

Adrienne
Arsht Center

15th Street

I-395

PERFORMING
ARTS DISTRICT

Venetian Causeway

Julia Tuttle Causeway

Lincoln Road

SOUTH
BEACH

Miami Central
Station

Museum
of Science

Pérez Art Museum

Mega Yacht
Marina

Children's
Museum

STAR
ISLAND

ATLANTIC
OCEAN

Freedom
Tower

DOWNTOWN
MIAMI

American
Airlines Arena

Port Boulevard

MacArthur Causeway

Miami River

Dodge
Island

BRICKELL

Brickell City
Centre Shops

PORT
OF MIAMI

FISHER ISLAND

**From Missoni Baia...**

| To... | By Car... |
|-------|-----------|
| Midtown | 5 min. |
| Design District | 7 min. |
| Wynwood | 7 min. |
| Downtown | 9 min. |
| Brickell | 15 min. |
| South Beach | 15 min. |
| Airport | 15 min. |

P37 — MISSONI BAIA


PÉREZ ART MUSEUM MIAMI


CHROME HEARTS


FENDI


SUGARCANE RAW BAR GRILL


MUSEUM OF SCIENCE


AMERICANAIRLINES ARENA


WYNWOOD


PANERAI


HERMÈS


MANDOLIN AEGEAN BISTRO


CYPRESS TAVERN

**Culture**

East Edgewater is nestled between Biscayne Bay and the dynamic Design District and Wynwood Art District, where cutting-edge art galleries mingle with luxury boutiques. It's also close to the Adrienne Arsht Center for the Performing Arts, the Pérez Art Museum Miami, the Patricia and Phillip Frost Museum of Science, the Rubell Family Collection, the Cisneros Fontanals Art Foundation, the Margulies Collection, and the architectural landmarks of Downtown Miami.

**Leisure**

Stroll or cycle along the boardwalk on Biscayne Bay, all the way to Downtown Miami, or take in a sporting event at the AmericanAirlines Arena or Marlins Park baseball stadium. East Edgewater is close to so many of Miami's most engaging recreational activities.

**Shopping**

The world's most iconic luxury brands have set up shop in the art-filled environs of the Design District. Hermès, Louis Vuitton, Marc Jacobs, Burberry, Loewe, Panerai, Rolex, Tom Ford, Dior, and Christian Louboutin are just a few of the internationally renowned boutiques in Miami's most exciting shopping destination.

**Dining**

Miami has emerged as a global culinary destination, with world-class chefs and pioneering restaurants consistently elevating the city's flourishing restaurant scene. East Edgewater is surrounded by many of Miami's top eateries, including Mandolin Aegean Bistro, Michael's Genuine Food & Drink, Cypress Tavern, Wynwood Kitchen & Bar, Blackbrick, and Sugarcane Raw Bar Grill.

# Team

DEVELOPER
## OKO Group LLC

Established by Chairman and CEO Vladislav Doronin, the real estate development firm OKO Group builds on the expertise of Doronin, one of Europe's most successful developers, who has built more than 75 million square feet of world-class commercial, retail, and luxury residential space. As Chairman of the property and development firm Capital Group, Doronin has overseen 71 projects. OKO Group brings considerable financial strength to the US market, as well as a passion for working with renowned architects and designers, including Jacques Grange, Skidmore, Owings & Merrill, and Zaha Hadid.
okogroup.com

DEVELOPER
## OB Group

OB Group is a real estate development firm founded by entrepreneur Oleg Baybakov. Previously, Baybakov served as Chief Administrative Officer of Norilsk Nickel, the world's largest nickel producer, where he oversaw major real estate projects. Baybakov's flagship real estate venture is the Moscow International Business Center, known as Moscow City, a 148-acre financial district with more than a dozen class-A office towers on par with London's Canary Wharf. Baybakov is recognized as one of the world's top art collectors and is an active philanthropist. In 2008, Baybakov endowed Baibakov Art Projects, an organization led by his daughter Maria Baibakova that engages in exhibiting and supporting the arts in Russia, the US and the UK.

DEVELOPER
## Cain Hoy

Cain Hoy Enterprises is a global real estate investor led by Chief Executive Jonathan Goldstein, with offices in London, New York and Greenwich, Connecticut. Founded in 2015, it has invested over $1 billion of capital, representing 5.2 million square feet of residential and mixed-use real estate projects. With particular expertise in residential development, Cain Hoy was named Residential Financier of the Year at the RESI Awards in 2016, and voted Financier of the Year at the Property Awards in 2015.
cainhoyenterprises.com

DESIGN ARCHITECT
## Asymptote Architecture

Founded in 1989 by Hani Rashid and Lise Anne Couture, New York–based Asymptote Architecture is an international practice distinguished by intelligent, visionary designs informed by cutting-edge technologies. The firm's recent projects include the Yas Viceroy Hotel in Abu Dhabi, the ARC Multimedia Museum in Daegu, South Korea, and the luxury residences of 166 Perry Street in New York City. Asymptote is presently designing the Hermitage Modern Contemporary Museum in Moscow. Asymptote's work is included in the collections of the Museum of Modern Art, the Centre Pompidou, and the Solomon R. Guggenheim Museum, among others.
asymptote.net

EXECUTIVE ARCHITECT
## Revuelta Architecture International

Established by principal Luis Revuelta, Miami-based Revuelta Architecture International has designed some of the tallest and most complex residential buildings in the southeastern United States. Among them are several of the area's most prestigious luxury condominiums, including the Santa Maria, Epic Residences & Hotel, Bristol Tower, the Bath Club, Azure, Jade Residences, and Grovenor House. Over the years the firm has partnered with respected local and national development teams on successful high-end residential, commercial, and hospitality projects throughout South Florida.
revuelta.com

INTERIOR DESIGN
## Paris Forino Interior Design

New York–based Paris Forino Interior Design, launched in 2012 by Australian-born Paris Forino, is a full-service international design firm specializing in luxury residential real estate, hotel, and restaurant projects. Forino brings 15 years of experience, including tenures with Tihany Design and CetraRuddy Architecture, to complex, high-end commissions, which currently include more than 40 projects in the United States, Canada, and Europe. Forino has been published in Elle Décor and the New York Post, which ranked hers as one of the top four firms "designing New York City" in 2015.
parisforinodesign.com

LANDSCAPE ARCHITECT
## Enea Garden Design

Since establishing his firm in 1993, renowned Swiss landscape architect Enzo Enea has completed more than 1,000 gardens for private residences, hotels, resorts, residential buildings, and parks around the world, including projects in Russia, Greece, France, Italy, Spain, Germany, Austria, China, Brazil, Colombia, the Bahamas, and the United States. Based near Zürich, the firm opened a second office in Miami in 2005 and is adding a New York office in 2016. Enea's work has received numerous international awards, including honors from the American Society of Landscape Architects and the RHS Chelsea Flower Show in London.
enea.ch

EXCLUSIVE SALES & MARKETING
## Beauchamp Estates Ltd

Privately owned prime Central London agent with nearly forty years of experience in marketing some of the most exclusive and expensive properties in Central London as well as internationally. With experience in both the residential and commercial market, Beauchamp Estates specialises in acquiring and selling prime houses, apartments and developments in a discrete and confidential manner. With an established international client base, they have successful offices in Cannes, Florence, Mykonos, New York and Herzliya, Israel. As one of only a handful of London based firms who dominate the top end of the residential market, they now occupy one of the top positions in terms of number of deals concluded in excess of £1 billion per annum.
Beauchamp.com

BRANDING & ADVERTISING
## And Partners, NY

Since 1999, And Partners has helped brand and market over $6 billion of residential properties. Their approach integrates branding, design, innovation, and technology—along with deep experience outside of the real estate industry—to design every detail of the customer experience. The result is a more robust and more intelligent turnkey offering for real estate projects of all kinds.
andpartnersny.com

ON-SITE SALES GALLERY

777 N.E. 26th Terrace
Miami, FL 33137
+1 305 800 7000
missonibaia.com



All plans, features and amenities depicted herein are based upon preliminary development plans, and are subject to change without notice in the manner provided in the offering documents. No guarantees or representations whatsoever are made that any plans, features, amenities or facilities will be provided or, if provided, will be of the same type, size, location or nature as depicted or described herein. The sketches, renderings, graphics materials, plans, specifications, terms, conditions and statements contained in this brochure are proposed only, and the Developer reserves the right to modify, revise or withdraw any or all of the same in its sole discretion and without prior notice. All improvements, designs and construction are subject to first obtaining the appropriate federal, state and local permits and approvals for same. These drawings and depictions are conceptual only and re for the convenience of reference. They should not be relied upon as representations, express or implied, of the final detail of the residences. The developer expressly reserved the right to make modifications, revisions and changes it deeded desirable in its sole and absolute discretion.

# EXHIBIT S

# Hinshaw Attorneys Represent OKO Group in $54 Million Bayfront Land Purchase Adjacent to Missoni Baia in Miami's Edgewater Area

November 23, 2016

Miami FL – November 23, 2016 – A team of Hinshaw & Culbertson LLP attorneys led by veteran real estate attorney Steven Carlyle Cronig, a partner in the Coral Gables office of the national law firm Hinshaw & Culbertson LLP, represented an OKO Group subsidiary in the $54 million purchase of a four acre parcel of property fronting Biscayne Bay in the Edgewater District of Miami. Steven Bassin of Greenberg Traurig advised OKO on organizational and tax matters. The seller was ACU Holdings, Inc., which was represented by Alberto Delgado of Akerman LLP. Acquisition financing was extended by Security Benefit Life Insurance Company, which was represented by a team from Gibson Dunn & Crutcher LLP led by New York attorney David Nulsen. The closing occurred Monday, November 21, 2016.

The property is located on the Bay immediately north of OKO Group's Missoni Baia, a 57 story, 146 unit luxury condominium, currently under construction. The real estate brokers involved were Holliday, Fenoglio Fowler, LLP, Fairchild Partners, Inc., Global Investments Realty, Inc. and Shelton & Stewart Realtors, LLC.

According to Cronig, negotiations to purchase the property took in excess of two years. "Although the transaction was complex, all of the parties worked well together to reach final agreement on documentation and the closing occurred on the closing date originally agreed," added Cronig.

Members of the Hinshaw team assisting Cronig on the purchase transaction were attorneys Ofonedu-Ime Goodwyn and Maria Calderon.

**Deal Media Coverage Summary**

*Miami Herald*: "With $54 million land deal, Russian billionaire makes another big bet on Miami"
*Daily Business Review*: "Deal on 'Very Short Fuse' Leads to $54 Million Waterfront Sale"
*The Real Deal*: "Vlad Doronin adds to Edgewater assemblage with $54M purchase"
*Attorney at Law Magazine*: "Miami's Edgewater Area"
*South Florida Business Journal*: "Billionaire developer snags waterfront site in Miami's Edgewater for $54M"

# EXHIBIT T

# Oko Group showcases plans for Aman Hotel and condo in Miami Beach

*Brian Bandell*

By
 –  Senior Reporter, South Florida Business Journal

Nov 5, 2020, 12:55pm EST

Oko Group unveiled more details about its plans for the Aman Hotel & Residences in Miami Beach, the first U.S. location for its global brand.

The project at 3425 Collins Ave. is a partnership between Oko Group, led by billionaire Vladislav Doronin, and Access Industries, led by Len Blavatnik, who helped develop much of the surrounding Faena District in the city.

New condos in the Faena District sold at high prices several years ago, and the developers are hoping to once again tap into the luxury market for the new condo.

The developers announced plans for the Aman in Miami Beach in late 2019, but more details haven't been released on the size and design of the project until recently. The City Commission previously moved forward plans to increase the maximum height on the site by 47 feet, to reach 250 feet.

The city's Historic Preservation Board will consider the application for the Aman on Nov. 10. The existing 16-story Versailles Hotel would be renovated, an addition from 1955 would be demolished, and a 16-story condo tower would be constructed. The new condo would have 41 units, averaging 2,450 square feet, plus a restaurant on the ground floor.

The renovated hotel building would have 56 hotel rooms and 23 condos. There would be a rooftop deck with a restaurant, bar and a big terrace.

The project would total 221,426 square feet, including 80,904 square feet of new construction, and have 91 parking spaces. There would also be a new pool and spa.

The Aman was designed by Revuelta Architecture and RJ Heisenbottle Architects.

"The proposed project will continue the patter that has made the Faena District a special place for residents a visitors alike – the preservation of important and invaluable historic buildings while injecting new life into the historic buildings and introducing new architecture and new uses that buoy the vibrancy and property values," Akerman attorney Neisen Kasdin stated in the company's application.

# EXHIBIT U

# The**Real**Deal
### SOUTH FLORIDA REAL ESTATE NEWS

# Three big projects, including 50-story Brickell office tower, breeze through Miami design board

*Together they would add 207 hotel rooms, 252 rental units and nearly 500K sft of office space*

Miami                                                          June 21, 2019 12:30 PM

By Francisco Alvarado



*Vlad Doronin and a rendering of 888 Brickell Plaza*

A trio of major projects in the Arts & Entertainment District, Edgewater and Brickell had no problem sailing through Urban Development Review Board. On Thursday, board members voted 7-0 to approve Edgewater Hotel, 17th Street Tower and 888 Brickell Plaza with some minor design tweaks.

**The Edgewater Hotel**

Previously conceived   (https://therealdeal.com/miami/2018/10/30/bentley-edgewater-reborn-as-holiday-inn-after-heafey-partnership-sours/) as the Bentley Edgewater

Hotel & Residences, the new Kobi Karp-designed project would be an eight-story hotel with 207 rooms, 139 valet-only parking spaces and a pool and amenity deck on the third floor.

Karp said the façade will be comprised of a mixture of glass and undulating aluminum louvers to cover the second-floor parking.

The review board authorized design waivers related to loading docks, parking and lot coverage. Located at 410 Northeast 35th Terrace, the project has reverted to developer Amaury Martinez. The Heafey Group is no longer involved.

### 888 Brickell Plaza

A proposed 50-story building   (https://therealdeal.com/miami/2019/01/16/wework-inks-lease-at-oko-groups-830-brickell-project/) with 940,000 square feet for primarily office use was granted waivers for upper level setback reductions, an increase in lot coverage and a minor reduction in the driveway width, among others. The applicant, Watson Brickell Development LLC, is an affiliate of Russian developer Vlad Doronin's OKO Group.

Carlos Lago, an attorney for OKO Group, said the property, at 888 Southeast Brickell Plaza, near Brickell City Centre, will be the first major office building in the urban core during the last 10 years.

The tower, designed by Adrian Smith of Adrian Smith + Gordon Gill Architecture, would have about 15,000 square feet of retail space, 490,000 square feet of office space, and a restaurant on the 53rd floor.

### 17th Street Tower

Designed by Zyscovich Architects, 17th Street Tower is the latest residential project by NR Investments   (https://therealdeal.com/miami/2018/11/19/give-affordable-housing-in-miami-get-density-bonuses/) in the A&E District. The board approved waivers allowing micro units, one commercial loading berth instead of two residential berths, to extend the parking garage above the first floor and the primary frontage, and to reduce the number of required parking spaces by 30 percent.

The proposed 29-story building, at 90 Northeast 17th Street, would be the first NR Investments project with micro units, said Iris Escarra, a lawyer for NR Investments. The developer would also include more than 38,000 square feet of office space,

4,500 square feet of commercial space, and 224 parking spaces. The new building would rise on land rise immediately north of Canvas, a 37-story condominium tower recently completed by NR Investments, led by principals Ron Gottesmann and Nir Shoshani.

Manny Del Monte, an architect with Zyscovich, said the site poses several design challenges that required the waivers to the garage and for one loading berth.

# EXHIBIT V



# V I S I O N

"I find it very relevant and interesting to design a building that really fits in a place — in terms of not only the site, but also the culture and the character of the environment."

— GORDON GILL, PARTNER AS+GG



**830 BRICKELL**

# Shaping a New Generation of Buildings

Designed by internationally acclaimed Adrian Smith + Gordon Gill Architecture, the firm behind the Jeddah Tower and the Burj Khalifa, the tallest towers in the world, 830 Brickell brings a premium commercial offering to the heart of Miami's financial center — as the area's first office building to be built in over a decade.

A truly unique addition to the Miami skyline, this iconic tower offers unparalleled accommodation and amenities to the world's leading companies.

**ARCHITECTURAL FEATURES**

57 stories

724 feet in height

LEED Silver certification

Energy-efficient building envelope:

- Full-height insulated glazing
- Low-E tinted glazing
- Hurricane-impact glazing system

3-zoned elevator system

8 stories of parking wrapped in a dynamic kinetic wall



**ENTRANCE**

The 8-story parking garage at 830 Brickell acts as the
tower's podium and is wrapped in a kinetic wall, a sprawling
sheet of aluminum squares that move in the wind as they
reflect neighborhood movement and light.





**LOBBY**

Italian design firm Iosa Ghini Associati's remarkable vision for the lobby, floored with white marble and paneled in black slats, sets an elegant and highly professional tone. Lining the 20' ceilings, LED lighting illuminates the expansive foyer and the reception area's breathtaking furnishings.

# AMENITIES

A forward-thinking culture of service is central to the elite catalogue of world-class amenities, providing work-life comfort worthy of today's top global talent and executives.

**SKY LOBBY**

The Sky Lobby is home to the exclusive fitness and wellness center, conference rooms, common area with light shopping, and café with healthy refreshment options — serving as a collaborative space that accommodates all workday necessities.







AMENITIES

# Built for Tomorrow

Designed specifically to promote the health and wellness of its inhabitants, 830 Brickell's amenities are without parallel in the city.

The rooftop restaurant and bar, open workspace area, café, conference facilities, and fitness center all have panoramic skyline and water vistas.

**AMENITIES**

Covered tenant parking, with self-parking spaces

EV charging stations

Pet-friendly environment

Bike-friendly environment:

- Secure bike storage
- Changing rooms
- Lockers
- Private showers

Wi-Fi in all common areas

First-class rooftop restaurant and bar

Sky Lobby:

- Lounge seating and workspace area
- Conference room facilities
- Café with bay and city views
- Full-service fitness center
- Locker rooms
- Yoga room
- Sundry
- Private showers

**SERVICES**

24-hour concierge service

Valet parking for guests

Dry cleaning with on-demand pickup and delivery service

24-hour building security

Shoeshine stations



FITNESS CENTER

LOCKER ROOMS

CAFÉ

OPEN SEATING AND WORKSPACE AREA

CONFERENCE CENTER





**FITNESS CENTER**

The fitness center maximizes space and views to bring in natural light everywhere. Here tenants can get reenergized on state-of-the-art equipment while enjoying unobstructed views of Downtown Miami and Biscayne Bay.



**ROOFTOP RESTAURANT & BAR**

The luxurious rooftop restaurant and bar boasts
sublime 360-views of Downtown Miami and
Biscayne Bay.

As Brickell's first Class A office building in over 10 years, the tower arrives at a pivotal moment in Miami's history to facilitate the city's evolving role as a cultural powerhouse and global business destination.

# LOCATION



**MIAMI SKYLINE**

Inspired by the Brickell environment, both
natural and built, the materials palette
comes to life in the warm Miami sun.

LOCATION

# Heart of Miami,
# Gateway to the World

Brickell's high-end residential and lively business landscape is home to a diverse culture of dining, nightlife, and entertainment, alongside some of the city's best green spaces, walking paths, cycling lanes, and bay access points.

**ATTRACTIONS**

Adrienne Arsht Center for the Performing Arts

AmericanAirlines Arena

Bayfront Park

Bayside Marketplace

CMX Cinemas

Frost Science Museum

Pérez Art Museum Miami

**WELLNESS**

Equinox Brickell

Equinox Brickell Heights

Icon Brickell Spa

The Spa at Mandarin Oriental

The Spa at Conrad Miami

**DINING & NIGHTLIFE**

Bazaar Mar

Capital Grille

Casa Tua

Edge Steak & Bar at Four Seasons

Fi'lia

Il Gabbiano

Katsuya

La Petite Maison

Novikov

River Oyster Bar

Sugar

Quinto La Huella

Zuma

**SHOPPING**

Brickell City Centre

Design District

Mary Brickell Village

**TRANSPORTATION**

Virgin Trains/Brightline Station

Eighth Street Station

Government Center Station connecting to the Metrorail

**HOTELS**

Aloft

East

Four Seasons

JW Marriott Marquis

Kimpton Epic

Mandarin Oriental

SLS

**BANKS**

Bank of America

Citibank

Regions Bank

SunTrust

TD Bank

Wells Fargo



KEY:
- ☀ 830 BRICKELL
- ○ DINING
- ○ TRANSPORTATION
- ■ HOTELS
- ▲ BANKS
- + SHOPPING
- ✦ ATTRACTIONS
- ♥ WELLNESS
- ▮ PARKS



↑  DOWNTOWN MIAMI

→  MARY BRICKELL VILLAGE

↓  PÉREZ ART MUSEUM MIAMI

↳  FROST SCIENCE MUSEUM







↓  ADRIENNE ARSHT CENTER
   FOR THE PERFORMING ARTS





↑  SUGAR, ROOFTOP BAR AT THE EAST HOTEL

→  AMERICANAIRLINES ARENA

↓  BRICKELL CITY CENTRE





With floor plates offering multiple orientations and a variety of city and bay views, each space promotes an incomparable work-life experience that is defined by calmness, comfort, and relaxation.

# SPACES & VIEWS



NORTHEAST      EAST      SOUTHEAST



SOUTHEAST      SOUTH      SOUTHWEST



NORTHWEST      NORTH      NORTHEAST

830 BRICKELL

# Elevation



**ROOFTOP**
**RESTAURANT & BAR**
FLOOR 54

**HIGH-RISE**
FLOORS 45–53

**MID-RISE**
FLOORS 31–44

**SKY LOBBY**
FLOOR 30

**LOW-RISE**
FLOORS 14–28

**OUTDOOR TERRACE**
FLOOR 14

**PARKING**
FLOORS 2–8

**LOBBY & RETAIL**

**OFFICE FLOOR FEATURES**

13'0" slab-to-slab height

Floor-to-ceiling windows

Column-free spans

High-end finishes in men's and women's restrooms

Zoned air-conditioning system

Wired certification for IT and communications systems

**TYPICAL OPEN LAYOUT: FLOORS 14–28**

# Low-Rise

**FLOOR 14: 12,860 SQ. FT.**
**FLOOR 15: 15,126 SQ. FT.**
**FLOOR 16: 16,065 SQ. FT.**
**FLOOR 17–27: 16,254 SQ. FT.**





**TYPICAL OPEN LAYOUT: FLOORS 31–44**

# Mid-Rise

**FLOOR 31: 17,926 SQ. FT.**
**FLOOR 32: 18,686 SQ. FT.**
**FLOOR 33–39: 18,821 SQ. FT.**
**FLOOR 40–44: 19,039 SQ. FT.**



**TYPICAL OPEN LAYOUT: FLOORS 45–53**

# High-Rise

**FLOOR 45: 18,543 SQ. FT.**
**FLOOR 46: 18,890 SQ. FT.**
**FLOOR 47: 19,480 SQ. FT.**
**48–53 FLOORS: 19,68S4 SQ. FT.**



TYPICAL OPEN LAYOUT: FLOORS 45–53

# High-Rise Multi-Tenant





WEST

NORTH

NORTH

EAST



NORTH

EAST

EAST

SOUTH

With a proven track record and internationally celebrated body of work, 830 Brickell's visionary team sets the new gold standard in Miami for years to come.

T E A M

DEVELOPMENT

# OKO Group

Established by Chairman and CEO Vladislav Doronin, the real estate firm OKO Group builds on the expertise of Doronin, who has built more than 75 million square feet of world-class commercial, retail, and luxury residential space. As chair of the property and development firm Capital Group, Doronin has overseen 71 projects. OKO Group brings considerable financial strength to the US market, as well as a passion for working with renowned architects and designers, including Zaha Hadid Architects, SOM, Hani Rashid / Asymptote Architecture, Kerry Hill Architects, Jacques Grange, and Iosa Ghini Associati.

OKOGROUP.COM



CAPITAL HILL – BARVIKHA, RUSSIA



IMPERIAL HOUSE –
MOSCOW, RUSSIA



CAPITAL CITY –
MOSCOW, RUSSIA



OKO TOWER –
MOSCOW, RUSSIA



AMAN NEW YORK – NEW YORK, USA



LEGEND OF TSVETNOY – MOSCOW, RUSSIA

DEVELOPMENT

# Cain International

Cain International is a privately held real estate investment firm operating in Europe and the United States. Since 2014, the company has invested over $4.7 billion in real estate debt and equity. Cain International also invests in lifestyle & leisure businesses that deliver experiences, services and amenities for modern consumers. The firm's partnership-centric approach and entrepreneurial deal origination have resulted in a portfolio of investments, joint ventures and developments spanning office, residential, logistics, hospitality and mixed-use properties and businesses.

CAININT.COM


THE STAGE – LONDON, UK


RAFFLES BOSTON BACK BAY HOTEL & RESIDENCES – BOSTON, USA


BEVERLY HILTON, BEVERLY HILLS – LOS ANGELES, USA


THE STAGE – LONDON, UK


WALDORF ASTORIA, BEVERLY HILLS – LOS ANGELES, USA

**PARTNERSHIP DEVELOPMENTS BY
OKO GROUP AND CAIN INTERNATIONAL**

# Missoni Baia

Missoni Baia's 249 Edgewater condominium residences celebrate the timeless appeal of waterfront living in relaxed, modern style. It cuts a prominent figure on the Miami skyline and on East Edgewater's waterfront. Missoni Baia soars 57 floors into the air and spans an impressive 200 feet along Biscayne Bay. With its forward-thinking, high-performance design by acclaimed international firm Asymptote Architecture, Missoni Baia's new luxury Edgewater condos capture the Missoni spirit of innovation and imagination. It's like no other residential tower in Miami.

**MISSONIBAIA.COM**











**PARTNERSHIP DEVELOPMENTS BY
OKO GROUP AND CAIN INTERNATIONAL**

# Una Residences

Inspired by classic yacht design and its bayfront setting, Una sets the standard for Brickell Waterfront living, with visionary design, inviting gardens and unrivaled views across Biscayne Bay. Brought to life by Adrian Smith + Gordon Gill Architecture, OKO Group, and Cain International, Una offers 135 luxury condominium residences with floor-to-ceiling glass, expansive terraces, and an array of amenities, including three pools and private boat slips.

**UNARESIDENCES.COM**











DESIGN ARCHITECT

# Adrian Smith + Gordon Gill Architecture

Adrian Smith + Gordon Gill Architecture (AS+GG) is dedicated to the design of high-performance architecture in a wide range of scales, from low- and mid-rise residential, commercial, and cultural buildings to mixed-use supernal towers and new cities. The firm uses a holistic, integrated design approach that explores symbiotic relationships with the natural environment. AS+GG is currently working on projects for clients in the United Arab Emirates, Saudi Arabia, China, Canada, and the United States. The partnership was founded in 2006 by Adrian Smith, Gordon Gill, and Robert Forest.

SMITHGILL.COM

INTERIOR DESIGN

# Iosa Ghini Associati

Iosa Ghini Associati has offices in Bologna and Milan, with teams of international architects, engineers, and designers. Founded in 1990, the firm has acquired particular expertise in the interior design of large-scale global projects, including the Ferrari stores across Europe, the United States, and Asia; a major multipurpose residential project in Budapest; premier luxury hotels in Europe; and Alitalia lounges and check-in counters at leading airports.

IOSAGHINI.IT



CENTRAL PARK TOWER – NEW YORK, USA



JEDDAH TOWER – JEDDAH SAUDI ARABIA



BURJ KHALIFA – DUBAI, UAE



WUHAN GREENLAND CENTER WUHAN, CHINA

FKI TOWER – SEOUL, SOUTH KOREA



CAPITAL GROUP – MOSCOW, RUSSIA



IBM ITALIA – ROME, ITALY



OKO TOWER – MOSCOW, RUSSIA



OKO TOWER MOSCOW, RUSSIA



FERRARI FACTORY STORE – SERRAVALLE SCRIVIA, ITALY

**LANDSCAPE ARCHITECT**

# Enea Landscape Architecture

Since establishing his firm in 1993, renowned Swiss landscape architect Enzo Enea has completed more than 1,000 gardens for private residences, hotels, resorts, residential buildings, and parks around the world, including projects in Russia, Greece, France, Italy, Spain, Germany, Austria, China, Brazil, Colombia, the Bahamas, and the United States. Based near Zürich, the firm opened a second office in Miami in 2005 and added a New York office in 2016. Enea's work has received numerous international awards, including honors from the American Society of Landscape Architects and the RHS Chelsea Flower Show in London.

ENEA.CH



PRIVATE RESIDENCE –
SWITZERLAND



PRIVATE RESIDENCE –
MIAMI, USA



PRIVATE RESIDENCE –
MIAMI, USA



PRIVATE RESIDENCE –
SWITZERLAND

**EXECUTIVE ARCHITECT**

# Revuelta Architecture International

Revuelta Architecture International was founded with a commitment to provide clients with quality designs that are balanced with sustainable and economically feasible solutions, while delivered within stringent time frames. Over the past two decades, that philosophy has been the cornerstone of the firm's success. Revuelta has partnered with top local and national developers in the design and creation of some of South Florida's leading residential, commercial, car dealership, hospitality, and mixed-use projects.

REVUELTA.COM



900 BRICKELL –
MIAMI, USA



EPIC –
MIAMI, USA



GROVENOR HOUSE –
MIAMI, USA



BRISTOL TOWER –
MIAMI, USA

EXCLUSIVE LEASING

# Cushman & Wakefield

Cushman & Wakefield is a leading global real estate services firm that delivers exceptional value for real estate occupiers and owners. Cushman & Wakefield is also among the largest real estate services firms, with approximately 51,000 employees in 400 offices and 70 countries. In 2018, the firm had a revenue of $8.2 billion, primarily across the core services of property, facilities, and project management, as well as leasing, capital markets, and valuation.

CUSHMANWAKEFIELD.COM

# Contact

830 BRICKELL PLAZA, MIAMI, FL 33131
+1 305 371 4411
INFO@830-BRICKELL.COM
830-BRICKELL.COM

BRIAN S. GALE
BRIAN.GALE@CUSHWAKE.COM

ANDREW TRENCH
ANDREW.TRENCH@CUSHWAKE.COM

RYAN HOLTZMAN
RYAN.HOLTZMAN@CUSHWAKE.COM

DEVELOPMENT BY 

All images and designs depicted herein are artists' conceptual renderings, which are based upon preliminary development plans and are subject to change without notice. All such materials are not to scale and are shown solely for illustrative purposes. Renderings depict proposed views, which are not identical from each location within the building. No guarantees or representations whatsoever are made that existing or future views from the project and of the surrounding areas depicted by artists' conceptual renderings or otherwise described herein, will be provided or, if provided, will be as depicted or described herein. Any view may in the future be limited or eliminated by future development or forces of nature, and the Developer in no manner guarantees the continuing existence of any view. The photographs contained in this brochure may be stock photography or have been taken off-site and are used to depict the spirit of the project and the surroundings and are merely intended as illustration of the activities and concepts depicted therein. All fixtures, furniture, and items of finish and decoration are for display only and may not to be included, or if included, be as depicted. Floor plans, ceiling and window heights and all other matters of finish are proposed only and subject to change. This building is being developed by Watson Brickell Development LLC, a Delaware limited liability company ("Developer"), which has a limited right to use the trademarked names and logos of OKO Group and Cain International. Any and all statements, disclosures and/or representations shall be deemed made by Developer and not by OKO Group or Cain International and you agree to look solely to Developer (and not to OKO Group, Cain International and/or any of its or their affiliates) with respect to any and all matters relating to the marketing and/or development of the project and with respect to the leases of space within the project.  Developer may at any time make modifications and/or changes to the design team and no party should rely upon the continued involvement of the described team. Amenities depicted are proposed and use rights (including any fees associated with same) shall be only as set forth in any lease that may be signed.

# EXHIBIT W

# NEWS: VLADISLAV DORONIN IN THE BISNOW 2016 MIAMI POWER 50 THE MOST INFLUENTIAL PLAYERS IN COMMERCIAL REAL ESTATE - Vladislav Doronin

## PEOPLE TO WATCH:

Vladislav Doronin, founder, OKO Group and Capital Group



The Bisnow 2016 Miami Power 50 The Most Influential Players in Real Estate: Vladislav Doronin

A new force is landing in Miami. This Russian billionaire's 85-story OKO Tower in Moscow is Europe's tallest building. He owns the famed Aman resort empire, and is seeking to expand it into city hotels as well. (One potential location: The top 20 floors of NYC's Crown Building at 57th and Fifth, for which he paid $500M last year.) And in 2009, he bought Shaq's house on Star Island. So as he's stepped up plans for a 57-story luxury Edgewater condo, partnering on it with Italian fashion house Missoni, people pay attention. Especially at a time when others are talking condo downdraft and trimming their sails. He also wants to build in Brickell and is said to be eyeing activity on Collins in the 50s, which would be a major neighborhood game-changer.

Read the full article here: https://www.bisnow.com/miami/news/commercial-real-estate/the-bisnow-2016-power-50-the-most-influential-players-in-miami-dade-commercial-real-estate-part-3-no-37-50-62381?utm_source=CopyShare&utm_medium=Browser

# EXHIBIT X

## Miami Herald: Why Vlad Doronin and Jonathan Goldstein are betting billions on Miami - Vladislav Doronin



(L-R) Jonathan Goldstein and Vladislav Doronin

MIAMI (Miami Herald) – How quickly things change.

Nine months ago, most Miami offices remained shuttered. The luxury condo market was stalled, reeling from the double-whammy of a pre-pandemic glut and a collective case of mid-pandemic high-rise cabin fever. Even the region's famously resilient tourism economy was swamped by the lowest occupancy rates since the 9/11 terrorist attacks.

Russian-born developer Vladislav Doronin had reason to concern — at least in the eyes of local real estate watchers. The most ambitious office building in recent memory was under construction at 830 Brickell, a 57-story tower by renowned architects Adrian Smith + Gordon Gill, designers of Dubai's Burj Khalifa. Sales at 249-unit Missoni Baia in Edgewater and 35-unit Una Residences near the Rickenbacker Causeway were, by most accounts, at a standstill. Doronin's Miami-based company, OKO, was mired in the vigorous Miami Beach historic-and-design review processes for a hotel-condo project with the Aman brand — one of the most luxurious names in hospitality and owned by Doronin.

With more three major projects then underway, in June 2020 Doronin's OKO Group spent $62.6 million for 6.7 acres in downtown Fort Lauderdale. Now, in 2021, Doronin and Cain International CEO Jonathan Goldstein, OKO's partner in three of these projects, look downright prescient. Sales are soaring at the two downtown Miami condo projects being co-developed by OKO and Cain. In January alone, says Doronin, OKO booked almost $60 million in sales in Una, where units start at $2 million. At the 57-story bayfront Missoni Baia in Edgewater, the Italian fashion house's first branded residential tower with units from $600,000, OKO's sales team booked about $18 million.

"January is usually an OK month," Doronin said. "Now, we're on fire." Since the influx began this year, he's raised prices by about 5%, he said. Cain and OKO also are partners in 830 Brickell, where the asking price for the best spaces is above $70 per square foot — well over the average Brickell Class A market rate of about $58 per square foot, according to the JLL fourth quarter commercial report.

In addition, OKO has received key approvals for its Aman Miami hotel and residences, co-owned by British billionaire Len Blavatnik. Goldstein also has another Miami project in the works. Eldridge, a Connecticut based company that is co-owned by Goldstein, recently purchased the storied Delano hotel. Goldstein estimated Cain's Miami projects at around $2 billion.

Doronin has had a home on Star Island for several years. Goldstein lives in England has visited Florida frequently.

The Miami Herald spoke separately with Doronin and Goldstein about their Miami real estate investments and the county's future.

*Miami Herald*: What is driving the sudden hunger for Miami's residential real estate?

*Doronin*: First of all, it's a tax situation. It's important for people with these incomes. Now also people are coming because Miami has a nice style of living, not only because of the weather but you can live a normal life here. Many people are sick and tired from what has happened [with the pandemic.] Everyone wants to enjoy life, to go to restaurants, walk on the street, go on the beach. Third, to do business here is much easier than in New York. The government here is pro business. They're not against you, so you can have a dialogue.

*Goldstein*: When Zika came in and then we had a season of hurricanes, people asked 'What are you doing? Why are you there?' Our medium-term view of Miami has put us in the right place at a good time….Look at the migration of people all over the world into Miami. When [co-founder] Todd Boehly and I set up Cain, we had a very simple philosophy. We like to invest in gateway cities. If you look at vast majority of our investments, they are in New York, Boston, Los Angeles, Madrid, London and Miami. I obviously have a lot of respect for Vlad and admiration for what he has done. Miami has been undervalued in terms of the rest of the world. And it has a taxation environment that most people would find desirable.

When I came down with Vlad to look at the locations we now have under development — you can't not fall in love with them. It's not possible to replicate the type of views and locations we're developing.

*MH*: We keep hearing about migration from New York, Chicago and California. Does that jive with what you're seeing?

*Doronin*: Before [the pandemic,] it was mainly South Americans and Europeans. Now I have lots from New York, California Chicago. And from the Midwest, from Michigan. Canadians are also very active. And we still have Mexicans.

***MH***: Your office building, 830 Brickell, is on track for delivery in 2022, which will bring 640,000 square feet of Class A office space to Brickell. Right now, many companies are still operating remotely, and some experts predict that when firms do return to offices, firms will take less space and stagger in-office hours. Yet you're charging premium rates. Is anyone interested?

***Doronin***: We have a lot of clients who closing deals. People arrive, they buy houses and apartments, and then they want to invest in Miami because they see positive growth. (An OKO spokesperson said WeWork has signed for more than 100,000 square feet. 830 has received formal letters of interest for an additional 300,000 square feet in the building.) I believe in camaraderie and energy. Office space is about energy. In Zoom I can get 50% of the business closed; in person it's 90%. …I want a handshake; I want to close the deal. If you want prestige, you have to have your office in Brickell. It's the financial center of Miami, with lot of shops and lot of restaurants…If someone wants to take a boat out in the morning and then go to the office, it's an easy life, a healthy life.

***Goldstein***: I think you're going to find two years from now that while more people will be given more flexiblity and trust, office space will be as important and more important than before. Blackstone and Microsoft are looking for space in the area…one of the mistakes tech companies made is that they were not located in areas where great talent wishes to live. Now they are seeing that great talent wants to be in Miami.

I don't believe you build great companies in your front room. I don't think you develop as a human being through Zoom…I don't think you have great ideas over Zoom. I believe the great ideas develop at the coffee point or over cocktails.

***MH***: Some locals who have seen migration waves in the past are concerned that the newcomers will stay a few years and then move on. What's your view?

***Goldstein***: We believe the trend will continue when we emerge from COVID. Who isn't going to want outdoor space in a warm place?
Miami has every box ticked: the quality of residential real estate, entertainment, sports, business. The only thing historically it did haven't have the best of air connectivity to Asia. There's no direct service. And the airport could do with a bit of a makeover, though that is underway.
I would bet that the change that is currently happening ultimately will show itself to be permanent. Ultimately you have to succeed at the expense of New York or LA; there's enough capacity in the system. Miami will grow to a position that will absolutely begin to rival thos other cities. It won't be seen as a second position, it will be one of the premier cities in America.

***Doronin***: The migration is just beginning. Those who are very clever are coming right now…these people who see the future are moving aggressively. The second and third waves are coming and coming.
The price in Miami is still lower than in New York. At Missonia Baia you get five pools, a gym and even a spa for pets. There's a tennis court. You can't get that in New York. I don't see they are going to lower taxes in California and New York. This is only going to attract more people.

***MH***: You just received key approvals from the Miami Beach Historic Preservation Board to renovate the Versailles Hotel as part of your Aman condo-hotel project. What kind of demand do you anticipate?

***Doronin***: We have a list already of people who want to buy. Some are what I call Aman junkies. Then there other friends who have called me. Some are people who are already here and want to move. They are calling and saying 'we want to reserve.' One of them wanted a penthouse. I never had a response like this … I don't even have marketing materials yet."

***MH***: Climate change is a major issue for Miami. Your buildings are on the water. Are rising seas an obstacle for potential buyers?

***Goldstein***: You can't ignore climate change. [Efforts] have to be led by the government. Ultimately we have to treat the world we live in with care. I think its something we should all treat seriously.

***Doronin***: We've been talking about climate change for 20 years already. … In reality people don't care. Everybody wants to be as close as possible to the water.

***MH***: So what are Miami's major challenges now?

***Doronin***: One thing is they need to build more [high quality] schools. They have some good schools, but Miami needs more [preparatory] schools. I am thinking about building an Aman school, not for money but to help the community.

Read the full article: https://www.miamiherald.com/news/business/real-estate-news/article249094015.html

# EXHIBIT Y

# FORTUNE

SEARCH    SIGN IN    Subscribe Now

Most Popular



India could have treated Bitcoin earnings as capital gains. Instead, it's taxing crypto like horse racing



Amazon more than doubl its maximum base salary $350,000 as it struggles hire and retain talent

FEATURES • AMAN RESORTS

## The global battle for the ultimate luxury hotel chain

BY **STACY PERMAN**

September 4, 2014 7:00 AM EDT



## 1. The Sanctuary

Nestled away on Phuket's west coast in Thailand sits the Amanpuri Resort. Ringed by a lush jungle on one side and magnificent views of the Andaman Sea on the other, its 40 Thai-style villas gently cascade down the hillside of a former coconut plantation, guaranteeing complete privacy for the royalty, celebrities, and tycoons who have been vacationing there for more than a quarter of a century. Amanpuri is the flagship of Aman Resorts, a glittering constellation of 26 properties stretching from Asia to Europe to North Africa and the U.S. Among its habitués is a group of passionate repeat customers who call themselves "Aman junkies." The resorts beguile them with their discreet luxury, exquisite attention to detail, otherworldly service, and breathtaking locales. One is perched on the edge of a national park in Rajasthan, India; another overlooks ninth-century Buddhist temples, surrounded by four

volcanoes, in Java.



An Aman cruise ship near Moyo Island in IndonesiaPhoto: Frederic Lagrange—Trunk
Archive

For aficionados, Aman is much more than a hotel. It's an experience unrivaled
anywhere else. At the Aman at Summer Palace in Beijing, guests have access to a
secret door that opens onto the east gate of the palace gardens. At the Aman Grand
Canal in Venice, they are allowed to visit the Doge's Palace and clock tower in St.
Mark's Square after hours.

The company has long eschewed advertising, relying largely on its elite clientele to
quietly spread the word. Bill Gates has been a guest. In March, Mark Zuckerberg
holidayed at the Amanraya in the Turks and Caicos Islands. Just days after Novak
Djokovic's Wimbledon win, the tennis champion was married at the Aman Sveti
Stefan on the Adriatic Coast in Montenegro.

  

Bill Gates, Sheryl Sandberg, and Mark Zuckerberg have all stayed at Aman Resorts.Photos, from left: Zacharias Abubeker—AFP/Getty Images; Scott Olson—Getty Images; Justin Sullivan—Getty Images

As a business, Aman is considered enticing, in part because it hasn't fulfilled its potential—producing estimated annual revenues of just $202 million and operating profits of around $45 million. Having pursued a strategy of pricey rates (rooms start at $1,500 a night), no seasonal discounting, and deliberately limited capacity, Aman has maintained its exclusivity. But occupancy runs at around 30%, compared with an average of 76% for the rest of the elite-hotel sector. As a result, Aman has seemed like a sterling-but-untapped brand that, with the right investments and strategy, could bring its profits in line with the ardor of its fans.

So last year, when DLF, India's largest commercial real estate developer, signaled its desire to sell Aman, suitors came calling. The luxury conglomerate LVMH Moët Hennessy, the private equity titans Carlyle Group and Blackstone, and a Chinese state-owned enterprise had all made moves. In the end, however, an unlikely pair—Omar Amanat, a 42-year-old American entrepreneur, and Vladislav Doronin, a Russian property mogul in his early fifties—prevailed with a bid of $358 million.

The glow of their triumph wouldn't last. The partnership between Amanat and Doronin imploded with a velocity exceeded only by the speed at which it was put together. Conflict erupted, with allegations of fraud, conspiracy, extortion, intimidation, breach of contract, and an attempted coup. Relations between the two deteriorated so dramatically that at one point, Doronin told Amanat, according to a claim in the latter's legal filings, "If I feel you tried to screw me, I will hunt you down and shoot you." A Doronin spokesperson denies the allegation.

Then came the lawsuits, massing some 30 attorneys in New York and London and featuring an international cast of characters that includes Adrian Zecha, Aman's 81-year-old Singapore-based founder, and Johan Eliasch, the 52-year-old London-based CEO of sporting goods firm Head. A new hearing, following a series of temporary injunctions that were issued in July, was scheduled for Sept. 15 in the London High Court.

With Amanat and Doronin locked in a nasty feud as each vies for control, Aman—the word means "peace" in Sanskrit—is anything but tranquil. At stake is the future of the company. Beyond that, mysteries abound, most particularly: Who, exactly, are the two men brawling for this prize?

## 2. The Trader, The Supermodel, and The Poet

Omar Amanat believed he was perfectly positioned to make a deal when he heard Aman (the resemblance of the resort's name to his surname is coincidental) was up for sale in May 2013. A professed Aman junkie who says he has invested in hotels, he notes, "It was a trophy asset, and I was interested in buying it."

The son of Indian immigrants, Amanat grew up in Queens, N.Y., and later New Jersey. His career originated in his father's basement. As stock trading—including the rapid in-and-out version known as day trading—became a frenzied pastime for some middle-class types in the 1990s, his dad set up a tiny operation downstairs in the family house.

At age 23, Amanat joined Datek, a well-known day-trading outfit, and he says he later helped build a stock-trading platform that let regular investors track every buy and sell order for a specific stock in real time, just as the professionals at the big brokerage houses did. In 1997 he founded Tradescape, a direct-access brokerage firm. By 2000 the company had acquired four subsidiaries, including MarketXT, and was generating estimated annual revenues of $140 million. Amanat says he fielded numerous acquisition offers. "Tradescape was the biggest day-trading company," he boasts.

In 2002, Amanat sold Tradescape to E*Trade for $100 million in stock plus an additional $180 million if the company hit certain targets. It seemed a moment of exultation and riches, but the bubble quickly burst, and Amanat became entangled in lengthy litigation (more on that later).

Despite the turmoil of his court fight, Amanat presented a serene face to the world: a glamorous mix of wealth, elegance, and more than a dollop of substance. He was a man about town, charismatic and dashing—with a trademark scarf draped over his well-cut blazer—the sort who could seduce a supermodel (in fact, he married one: Helena Houdová, his second wife, from whom he is separated). Amanat was also fond of quoting the 13th-century Persian poet Rumi.






Left, Omar Amanat and his wife, Helena Houdová (the couple are now separated),
arrive at a screening of Darfur Now, for which he was an executive producer, in 2007.
Right, Vladislav Doronin and his girlfriend, Luo Zilin, at a Giorgio Armani event last
fall.Photo: Kevin Winter—Getty Images

It's not clear what Rumi said about self-promotion, but Amanat has not been shy about
touting his accomplishments. Among the accolades recorded on his personal website
is being named one of Wall Street's Top 10 Most Influential Technologists and one of
the Top 500 Most Influential Muslims in the World. He sat on the boards of Human
Rights Watch and Malaria No More. And various Amanat-related websites credit him
with co-founding the UN-affiliated Alliance of Civilizations Media Fund and Bridges
TV, a television network aimed at countering negative stereotypes of Islam.

Amanat, who has been occasionally spotted at Cannes, also has his Hollywood side:
He shared executive-producer credits with former eBay president Jeff Skoll on two
films. An investment vehicle that Amanat and his family were part of was once the
largest shareholder in Summit Entertainment, the studio behind the *Twilight* franchise
(and since acquired by Lionsgate).

With Aman in his sights, Amanat would need to call on more than financial resources;
he needed allies too. Adrian Zecha, Aman's founder, was the first person he would
have to woo.

### 3. The Zen Hotelier

Aman Resorts was born by accident. Zecha, the son of a wealthy Indonesian
landowner, had owned magazines before migrating to the hotel business, where he co-
founded the luxury Asian chain Regent Hotels. In 1986 he sold his stake for $30
million and decided to construct a vacation home in Phuket. When banks refused to
lend him the money he needed to build in the inaccessible location, he brought in
friends and investors. To subsidize the costs, he constructed several villas and rented
them out. Thus, in 1988, Aman Resorts was created.





Aman founder Adrian Zecha in 2001 at the company's original resort in Phuket, Thailand.Peter Charlesworth—Lightrocket/Getty Images

Aman brought a new approach to luxury lodgings. Zecha's concept was to create an atmosphere similar to visiting the home of a friend—a very rich one with exquisite taste. His ethos was the spare, Zenlike antithesis of the grand hotel: no chandeliers, no reception desks, and no elevators. Each property was unique—run as its manager saw fit—and each took its design cues from the surrounding environment. "It's almost indescribable how Aman works," says Lyn Middlehurst, editor and publisher of the luxury travel bible *Gallivanter's Guide*. "It comes from the top, and it's Adrian's vision."

Zecha was obsessed with details. He would personally select the bedsheets and reportedly spent upwards of $350,000 on one room. When it came to location, he was single-minded. Miltos Kambourides, whose firm owns the Amanzoe in Greece, recalls that when the two joined forces in 2004, Zecha gave him very specific instructions about how the property should "be off the beaten track, have virgin nature, unobstructed views, access to a great waterfront and beach, and be surrounded by points of interest." When Kambourides brought Zecha to his proposed site two years later, he says, "he got out of the car and simply said, 'This is an Aman site,'" and then left.

Over the years a pattern emerged in Zecha's ownership: He would start selling his shares and even depart the company—but he would always come back. For example, Zecha left after Colony Capital, the real estate investment fund, took a majority position in the '90s and considered expanding the brand. Zecha then returned as chairman in 2007, when DLF, which wanted to expand into ultra-luxury hospitality, bought Aman for a reported $400 million, including debt.

The global economic collapse interrupted DLF's growth plans, and by 2010 it was looking to unload Aman. Zecha attempted to buy the company back but couldn't raise

the financing. When Omar Amanat came calling in 2013, Zecha was negotiating to acquire the resorts in concert with Carlyle. The talks fizzled, and Amanat and Zecha met. "I told him I supported his vision," says Amanat. "I wanted to grow and nurture this company for a lifetime. I had great ideas about how to grow the business in a way that doesn't degrade the brand." The two formed a partnership to pursue Aman.

Amanat says many private equity firms, companies, and individuals were eager to finance the deal. But then he heard about a billionaire named Vladislav Doronin.

## 4. The Billionaire

Little has been published in the English-language press about the businesses of Vladislav Doronin. Indeed, public records and even the Internet are strikingly lacking in records of his commercial interests and interactions. Doronin is often described as a Russian oligarch, a term that suggests dealings tied to political connections—a label his camp resists. "He is a self-made businessman and a gentleman," says one associate. (Doronin declined to be interviewed, but his press and legal representatives answered questions.) The associate did offer that the billionaire is passionate about architecture, real estate, and art, adding, "He's sporty, if you've seen pictures of him." Indeed, Doronin has the muscled presence of a Dolph Lundgren.

Doronin was born in what was then Leningrad in the Soviet Union. He moved to Geneva in 1985 to work as a trader for Marc Rich, the "king of commodities," who was infamous for fleeing the U.S. after a grand jury indicted him on some 50 counts of fraud, racketeering, tax evasion, and trading with Iran. (President Bill Clinton pardoned Rich in a controversial 2001 decision; he died last year.)

Doronin returned to Russia in the early 1990s, just as the country was transitioning to a market economy. Over the next 25 years he amassed an estimated $2.5 billion fortune in Moscow real estate.

The public details of Doronin's transactions may be scant, but the same cannot be said of his personal life. Referred to in the British press as the "Russian Donald Trump," Doronin is perhaps best known as the ex-boyfriend of supermodel Naomi Campbell. Before they split in 2013, the pair were regular figures on the international party circuit, photographed aboard his yacht, as well as in a fashion shoot for Russian Vogue and at his various homes around the world.



Aman Resorts: The nasty battle for the ultimate luxury ...    https://fortune.com/2014/09/04/aman-resorts-nasty-batt...



Inside Aman's property on the Grand Canal in Venice. Most of the company's resorts are spare, but the chain allows each its own unique aesthetic.Frederic Lagrange —Trunk Archive

Amanat and Doronin were introduced through acquaintances on Dec. 11, 2013, at Doronin's apartment at the Mandarin Oriental in New York. An Aman devotee himself, Doronin was enthusiastic about being part of a deal. According to one of his advisers, the billionaire viewed Aman as a jewel of an opportunity. Its private villas (some of which are sold to individuals) are the most lucrative aspect of Aman's business, according to the adviser. Doronin's strategy was to invest more in developing villas for sale and rental, while opening up other hotels in city centers rather than just in resort locations, Aman's traditional focus.

Amanat struck Doronin as a highly successful entrepreneur, one who was well-off. Amanat told him he had made more than $200 million selling shares of Twitter, according to Doronin's legal papers, and had more than $100 million in liquid assets. He said he was ready, the papers contend, to invest tens of millions of his own funds. Amanat was seeking a partner to inject additional financing. (Amanat's vehicle for the investment was Peak Ventures, whose assets include his money as well as that of family and friends.)

Amanat's impression of their first encounter was very different. Upon entering Doronin's apartment, he says, he was greeted by an "inappropriate sexual painting." Amanat claims that Doronin peppered discussion of a potential deal with crude sexual jokes. (A spokesperson denies that Doronin's art is inappropriate; he says the billionaire doesn't recall making sexual jokes.) In retrospect, says Amanat, "it was clearly a foreboding sign, but I didn't know what to make of it." Despite the apparent clash of sensibilities, Amanat liked the idea of joining forces with a deep-pocketed investor; he expected Doronin to play a passive role.

The two Aman junkies apparently craved their objective so intensely that they made only cursory attempts to vet each other. On Dec. 25, just two weeks after they were introduced, Amanat and Doronin sealed their alliance with a 13-page agreement outlining their plan to buy Aman.

Both Amanat and Doronin felt pressure to move quickly. Once they put down their $30 million deposit, they had 30 days to close the deal. Other bidders were waiting. Meanwhile, according to a Doronin attorney, other investors fell through, and the billionaire increased the amount he planned to put in several times. As he upped the number, he decided he would play a more active role in Aman. By the time they finalized the $358 million purchase on Feb. 7, Doronin had proffered cash and a loan for 64%; Amanat, Zecha, and several other investors had committed to the other 36%.

Less than nine weeks had elapsed between Doronin and Amanat's first meeting and the sale. It would take even less time than that for the relationship to sour.

### 5. The Unraveling

Before the deal even closed, red flags began appearing. Doronin noticed something curious. He had paid $20 million of the $30 million deposit to hold the deal while the final particulars were negotiated. He expected Amanat to pay the remainder. But according to Doronin's legal filings, a statement he received in early January revealed that Zecha had contributed the other $10 million. Amanat had provided no cash. In Doronin's view, the man who had instigated the deal faced no financial risk if it fell apart.

Amanat offered shifting explanations to *Fortune* on this point. He first stated that the value of the deal was fluctuating and that the deposit might be increased. (Saurabh Chawla, DLF's executive vice president of finance, says the deposit amount "never changed.") Later one of Amanat's press representatives asserted that Amanat thought another investor might enter and pay part of the deposit.

Either way, Doronin was getting nervous about his partner. But he had put down a lot of money, and he didn't want to back out. Amanat claims that around January and February, Doronin threatened to scuttle the deal. Because of that, Amanat says in his court filings, he acceded to a list of demands from Doronin, including giving up one of his board seats. Amanat also claims that Doronin frisked him before a board meeting in Miami to see if he was wearing a recording device. (A Doronin spokesperson denies that the billionaire threatened to scotch the deal and says Amanat volunteered to give up control as long as Doronin didn't dilute his stake. The spokesperson says Doronin never frisked Amanat.)

Even as that relationship crumbled, Amanat went looking for another backer—only to

see the new alliance shatter equally fast. Amanat was introduced to Johan Eliasch, chairman and CEO of Head. A former deputy treasurer of Britain's Conservative Party, Eliasch is prominent in political and business circles in London, as well as in Europe's jet set. He once dated Sharon Stone and is friends with Prince Andrew.

Eliasch invested $25 million for a 14% stake in Aman and a board seat and loaned the company an additional $25 million. Amanat says he was flabbergasted to discover, soon after, that Eliasch was friends with Doronin. Amanat accuses him of concealing the relationship. (Eliasch, in a letter cited in the litigation, denies being in cahoots with anyone.)

Once on the board, Amanat contends, Eliasch aligned himself with Doronin, and the pair prepared to set a coup in motion. By April the battle had escalated to a full-on war.

### 6. The Founder resigns—or does he?

Zecha was growing increasingly troubled, according to his witness statement, over the rancor between his partner Amanat and Doronin. He was keenly aware that if the pair did not reach a quick rapprochement, Aman's image and business would suffer. He held a private dinner with Doronin and Eliasch on April 21, the night before a scheduled board meeting. Zecha hoped he could broker some kind of peace between the two and Amanat.

During the dinner, at Doronin's mansion in Star Island, Miami, Zecha told the men that he would be compelled to resign if the factions could not cooperate. The following day, at the end of a marathon 10-hour board meeting at the law offices of Greenberg Traurig in Miami, a frustrated Zecha followed through on his threat and told the group he was abdicating his roles as CEO and chairman.

Doronin took over as chief executive, with Eliasch becoming chairman. But the seemingly straightforward handoff instantly turned bizarre and contentious. Zecha, whose tenure was already set to end on July 31 under the terms of the sale, insisted that his resignation was not intended to be immediate and was contingent upon several conditions, including the fate of several of his longtime executives. Zecha's witness statement in the London litigation asserts that he was intimidated into leaving. He says he was presented with a three-page notice of resignation and asked to sign it—while still at the board meeting—which left him "shocked and bewildered." (Doronin's filings contend that Zecha's resignation was purely voluntary.)





Amanyara Resort in Turks and CaicosPhoto: Lisa Romerein—Otto

The mood inside Aman's Singapore headquarters darkened. On April 30, Zecha's statement charges, he was prevented from entering his office. Two weeks later he was given three days to agree to vacate his home—whose lease belongs to Aman—where his family had lived for the previous 15 years. ("This is categorically untrue," says a Doronin spokesperson, who states that "Mr. Zecha and his son continue to live in their luxurious homes.")

Aman was now divided into two warring factions: one led by the newly appointed CEO and chairman, a second led by Amanat and the founder. Each side claimed legitimacy. Directives were issued from one side, according to an employee, only to be invalidated by the other. "We're caught in the line of fire," says this source. Numerous employees were abruptly let go.

Guests were still enjoying the resorts, but managers winced at the bad press. "It's a very sensitive situation," says one resort owner. "I don't want the Aman name to be given the wrong exposure." Meanwhile Aman junkies fretted about Zecha's departure. Would the chain be overdeveloped, with cookie-cutter properties, and then flipped?

The combat between the Amanat and Doronin factions intensified. The two sides pounded each other with almost cartoonish accusations, reflected in their court papers:

*Pow!* Amanat claimed that Doronin fired employees and made decisions without board

Case 1:21-mc-23332-BB   Document 13-1   Entered on FLSD Docket 02/28/2022   Page 228 of
240

approval.

*Slam!* Doronin charged it was Amanat and Zecha who intimidated staffers, blocked emails, and changed the door locks.

*Boom!* Amanat alleged that Doronin used Aman to help his friends, donating Aman vacations to a Leonardo DiCaprio charity auction and setting up Doronin's model girlfriend as the "face of Aman."

*Bam!* Doronin contended Amanat and Zecha made unilateral decisions without board approval, such as creating an advisory board with former FBI director Louis Freeh on it.

It was a dizzying array of beefs and allegations. The only constant was the accused's insistence on his innocence—and that the other party should be expelled.

In July, Amanat and Zecha took the battle to court. Three interim hearings were held before three judges to rule on motions for a series of temporary injunctions. On Sept. 15, the parties were scheduled to return to court, in part so a judge could decide whether a full trial will be held in December.

The first ruling was a victory for team Amanat. On July 14, the High Court provisionally found a "clear breach of contract" in Zecha's removal before his tenure expired on July 31. The judge also found that "Mr. Doronin has no proper basis for calling himself CEO as matters stand," rebuking him for "needlessly and inappropriately aggressive conduct" in locking Zecha out of his office and removing him from his house. The triumph, however, was limited, as it returned Zecha to his roles for only 17 days. Olivier Jolivet, a longtime Aman executive and Zecha protégé, was named interim CEO. Doronin approved the choice. (There was a modicum of good news for the billionaire too: The High Court rejected Amanat's attempt to have Eliasch removed from the board.)

Reached on July 29, two days before his tenure as CEO was to expire, Zecha told Fortune he didn't want to speak, then blurted out, "I'm holding the fort. I'm responsible to 5,000 people all over the bloody place that made Aman what it is today." He declined to discuss the lawsuit but noted that Doronin was "Omar's partner, not mine."

### 7. A "Serial Swindler"?

On July 16, Doronin filed suit against Amanat in New York state court. The suit labels him a "serial swindler" and alleges that he fraudulently misrepresented his finances. It claims that Amanat surreptitiously used Doronin's money to pay millions of Amanat's obligations on the Aman deal. Amanat's conduct, according to the filing, was part of a

long-standing pattern.

To hear Doronin tell it, Amanat's finances were a riddle wrapped in a mystery inside an enigma. Even something as basic as a verification of credit turned into a gothic mystery. The billionaire charged that Amanat forged a crucial document that vouched for the assets in his investment fund. That document, according to Doronin's filings, was "a fraud on fabricated letterhead, with a forged signature." Amanat had provided a letter from a British brokerage firm, Fyshe Horton Finney, certifying that his investment entity had more than $140 million in its account. However, upon investigation (*after* the deal), Doronin's legal papers asserted that Fyshe Horton was in the British equivalent of bankruptcy proceedings at the time of the letter and that its client assets had been transferred to another institution. Moreover, the letter had a logo for Fyshe Horton on it but was signed by Tom Evans, the CEO of a different entity called FHF Securities. The letter claimed that FHF had possession of Amanat's assets. But according to Doronin's filings, FHF was not registered or authorized to hold funds during this period.

Evans turned out to be a tricky person to reach. Fortune's attempts to contact him resulted in…an email from an Amanat representative purporting to confirm Evans's earlier statements. A call to the phone number listed on that email and on Evans's letter landed in the offices of a U.K. solicitor; the person who answered said she hadn't heard of FHF Securities or Tom Evans. After a series of additional emails, a person identifying himself as Evans called *Fortune*. He explained that FHF is a holding company that has several of the old Fyshe Horton Finney assets, Amanat's among them. He stated, "The funds Mr. Amanat had with us in a trading account were in excess of $250 million."

Sal Strazzullo, one of Amanat's attorneys, contends that the London hearings have already settled any question of fraud. "With all due respect to Vlad," he says, "Mr. Amanat has not done anything wrong. He mixed himself up with a bully that thinks he can strong-arm."

Meanwhile, the further Doronin's investigators probed, their filings claim, the more disturbing the discoveries: multiple instances, for example, in which Amanat overstated his roles in deals, some of which raise questions about the extent of Amanat's assets. And Doronin reported a litany of not merely past lawsuits against Amanat—some filed by former business partners who claimed he misled them—but also a number of judgments against him.

Worse, in 2008 the Financial Industry Regulatory Authority (FINRA) permanently barred Amanat "from associating with any FINRA member firm in any capacity" because he "willfully and repeatedly" failed to disclose legal judgments and the

existence of a past SEC investigation. (A spokesperson for Amanat says he was living in Europe at the time of the FINRA proceedings and "did not receive the relevant correspondence," which led to a default ruling.)

Strangest of all, perhaps, Doronin's suit noted that Amanat—the millionaire with the string of apparent successes—had actually been mired in bankruptcy for the better part of the past decade.

## 8. The Chauffeur and the bankruptcy

How did Omar Amanat come to find himself in the distressing straits of personal bankruptcy? Let's allow Allan Gropper, the judge who oversaw the Chapter 7 proceeding, to explain, as he did in a 2012 hearing: "You might certainly be interested in reading how Mr. Amanat started off his Chapter 7 case, which was absolutely extraordinary. He induced his chauffeur to file an involuntary petition against him on the theory that, well, in an involuntary [bankruptcy] he could get an automatic stay against a number of creditors who are going against him, but it wouldn't stop him from engaging in whatever transactions he wanted to…I made no finding there that he had perjured himself…on the first occasion that he appeared before this court. So I'm not saying I make any such finding now, but you can draw your own conclusions."

To understand how Amanat came to be in bankruptcy, you have to go back to the 2002 deal in which he sold Tradescape to E*Trade. As noted, E*Trade bought Amanat's company for $100 million worth of E*Trade stock, along with an additional $180 million if Tradescape achieved certain milestones. That's fairly unremarkable.

What's remarkable is how quickly the transaction melted down. The merger closed on June 10, 2002, and as part of the agreement, Amanat stayed on with E*Trade. A mere six weeks later, according to his own legal filings, he was called unexpectedly into a conference room, where a group of E*Trade executives and attorneys confronted him and fired him on the spot.

E*Trade and Amanat later traded lawsuits. E*Trade accused Amanat of concealing the fact that Tradescape was hemorrhaging money and near collapse when Amanat sold it to E*Trade. According to the suit, one executive emailed Amanat before the deal and said, "We have no money!!!! Zero. Zilch. Nada…We can't pay any of our bills." For his part, Amanat claimed that E*Trade had intentionally sabotaged its own acquisition and committed fraud, in part by not disclosing that it paid its then CEO $90 million in a single year. Amanat's suit also claimed that an investor had threatened the lives of Amanat and his family. (An Amanat spokesperson says Tradescape was "highly successful" and contends that it failed because of a rapid decline in E*Trade stock, which left Tradescape unable to pay a series of employee bonuses.)



The Amanusa Resort in BaliPhoto: Frederic Lagrange—Otto

Those events led to two bankruptcies in 2004, one for Amanat's company MarketXT and one for Amanat himself. They generated a multiyear profusion of hearings, motions, rulings, and at least one appeal. After many detours the court entered a $24.3 million judgment against Amanat, and a final settlement was reached in 2012. Amanat himself asserts that he has paid his settlement. But Lester Kirshenbaum, lead attorney for the creditors, disputes that; he says Amanat has yet to finish paying it off. (E*Trade and Amanat dropped their suits against each other. E*Trade ultimately released $40 million in shares it had held in escrow to the bankruptcy estate of MarketXT.)

Before the case was over, the bankruptcy judge, Gropper, found that Amanat executed fraudulent conveyances, deceived creditors, and backdated documents. For example, in the spring of 2004 a former investor in Tradescape who had won a $6.7 million judgment against Amanat attempted to take legal possession of a house Amanat owned in Queens. He discovered that Amanat had just sold the house to his brother for $10, with the sale document, notarized by Amanat's mother, listing the date of sale as August 2003. Amanat protested his innocence, but ultimately the court nullified the transfer to his brother, and the bankruptcy trustee sold the house—for $390,000—to pay Amanat's debts.

In a separate state case, an appeals court upheld a ruling that Amanat had refused, in a "willful and contumacious" manner, to comply with six court orders to produce

documents. A spokesperson denies Amanat engaged in fraudulent behavior or ignored discovery requests and says he "strongly disagreed with the judge's conclusions in this case." As for the house transfer, the spokesperson says, "Under normal conditions individuals are allowed to transfer anything to anyone for some or no consideration. We could not predict the bankruptcy filings that occurred a year later, and transactions such as this are unfortunately routinely unwound during bankruptcy."

The trustee's final account in Amanat's personal bankruptcy stated that $209 million in claims had been "asserted" against Amanat, of which $39 million were "allowed." Of that figure, $658,350 was distributed to claimants, with another $1.4 million used to pay administrative costs.

**9. "Not intended to be a commitment"**

The Doronin litigation is not the only legal challenge Amanat faces from the Aman acquisition. A second suit alleges that, even as he courted Doronin in late 2013, Amanat was apparently talking to another firm that was going to help him raise capital: Amanat allegedly agreed to an exclusive agreement with New York's Vinland Capital Investments to raise money for the Aman acquisition. Amanat later spurned Vinland, which is now suing him for breach of contract. Amanat's filings contend the claims should be dismissed because, among other reasons, "he did not execute the Dec. 13, 2013, agreement in his personal capacity and thus was not a party to the operative agreement."

Amanat provided a number of documents to *Fortune* to back his assertion that he had several financing commitments before he met Doronin. None of the papers could be independently verified, and many were marked "not intended to be a commitment." None had signatures. Amanat also provided a financial statement with no bank name or logo on it. He repeatedly promised to provide recordings of Doronin threatening him, but never did.

Amanat says he is standing his ground. He has a history of fighting back. Three years ago he sued four publications in Britain, where libel laws favor plaintiffs, after they called him an "imposter" for overstating his relationship to the Summit movie studio. The publications ultimately retracted the articles, apologized, made charitable donations in his name, and paid his legal fees. (A search of legal filings shows no sign that Amanat sued the U.S. website that first revealed a letter written by a Summit lawyer to Amanat. That letter accused him of inflating his connection to the studio. Amanat's lawyer at the time described the claims as "false" and "defamatory.")

Amanat insists Doronin is just maneuvering for position while he himself is motivated by principle. "This is about doing the right thing," he says. "Get the story right. I didn't want to get in a battle with a Russian oligarch. I realized that I needed to do the

right thing by the brand, by Adrian and the customers. Otherwise, I could take the money and run. I could make a fortune on this."

Perhaps he still will. As the warring parties prepare to face off once more in a London court this month, it's unclear who will win. The biggest loser, however, is certain: Aman.

*This story is from the September 22, 2014 issue of Fortune.*

# EXHIBIT Z

# SOUTH FLORIDA BUSINESS JOURNAL: BILLIONAIRE DEVELOPER SNAGS WATERFRONT SITE IN MIAMI'S EDGEWATER FOR $54M

A subsidiary of OKO Group, led by Russian-born billionaire developer Vladislav Doronin, paid $54 million for a 2-acre site along Biscayne Bay in Miami's fast-growing Edgewater.

Doronin launched sales in March for the Missoni Baia condo tower on the south side of the recently acquired site. It appears he wants to follow that up with another major project right next door.

The zoning for the recently-acquired site is similar to that of the site for Missoni Baia, which will have 146 units in 57 stories.

Although condo sales in Miami have declined by double-digits this year and some developers have canceled or delayed projects, Doronin appears to be moving full-speed ahead in Edgewater.

OKO Group said its London- and New York-based private investment firm Cay Hoin was a partner in the deal. Plans for the site will be announced at a later date, the company said.

"The site is well situated to take advantage of increasing development activity and demand in the waterfront residential enclave of Edgewater, which is located between the financial hub of Downtown Miami and the culture-rich Design District and Wynwood neighborhoods," OKO Group said.

Doronin's companies have built 71 projects around the world. He has another condo slated for Brickell. He usually builds for the luxury market and seeks well-known architects and brands for his buildings.

Steven Carlyle Cronig, a partner in the Coral Gables office law firm Hinshaw & Culbertson, represented OKO Group in the acquisition of 614, 717 and 720 N.E. 27th Street and 601, 615, 631, 645 and 701 N.E. 26th Terrace. Attorney Steven Bassin of Greenberg Traurig advised the buyer of organizational and tax matters.

Akerman attorney Alberto Delgado represented seller ACU Holdings, a religious organization affiliated with Agrupacion Catolica Universitaria. The site is used for student housing for the Catholic university.

The real estate brokers for the deal were Holliday, Fenoglio, Fowler, Fairchild Partners, Global Investments Realty, and Shelton & Stewart Realtors. Security Benefit Life Insurance Co. provided the financing and was represented by New York attorney David Nulsen.

Cronig said the negotiation and closing of the deal took over two years.

"Although the transaction was complex, all of the parties worked well together to reach final agreement on documentation and the closing occurred on the closing date originally

agreed," said Cronig, who worked with fellow Hinshow attorneys Ofonedu-Ime
Goodwyn and Maria Calderon on the deal.

# EXHIBIT AA

# Doronin's Capital Group will build a new neighborhood near Mitino

Oct 21, 2014
Author: Anna Deryabina
RBC.ru
Original: https://www.rbc.ru/business/21/10/2014/54465f45cbb20f21ac63b085

Urban Planning Commission of Moscow issued Vladislav Doronin's Capital Group permission to build a new neighborhood near Mitino - almost 1 mln. sq. m of real estate, including 650 thousand sq. m of housing. If the project is realized, it will be one of the largest projects in the history of Doronin's Capital Group, which has erected about 7 mln. sq. m. over its history. So far the developer has built premium-class dwellings, such as apartments in business complex "Moscow-City".

**On the site of a poultry farm**

Moscow authorities issued a land plot development plan for a public residential construction project in Mitino, near Rozhdestveno Village, reported Moscomstroyinvest press-service.

"Poultry Farm "Krasnogorskaya" JSC is named as an investor of the project. This company is affiliated with Capital Group that owns the development, Capital Group's Commercial Director Alexey Belousov told RBC. There is no Master Plan to start the construction and it is impossible to specify the project timeframe, he says.

Nikolay Tsvetkov, owner of Uralsib Corporation, bought up the lands of a former poultry farm in Mitino, informed earlier "Vedomosti". His company Znak was going to build a cottage settlement Rozhdestvenno Hills on this plot which was presented at MIPIM exhibition about ten years ago. According to the newspaper, later "Uralsib" began to look for a buyer for the site, but the deal with the Capital Group was not reported.

Now the land plot is 58,13 hectares free of construction. According to GPZU, 675 thousand sq. m of housing and 282 thousand sq. m of social infrastructure will appear here: kindergarten, policlinic, medical center, two schools, sport and recreation center, as well as shopping and entertainment center with hotel, offices, fitness center, underground and elevated parking lots. The project provides parking lots for 10,3 thousand cars.

**Not only premium class**

1

Capital Group press-service employee said that it was a question of comfortable class residential district erection. Up to now the group was building residential complexes of business, premium and de luxe class, as it is specified on its site, mainly in central districts of Moscow.

According to Maria Litinetskaya, general director of "Metrium Group", Mitino is an unusual place for Capital Group's portfolio. "But from the point of view of investment attractiveness this project is interesting - the area is cleared from construction, it is only 2 km from Moscow, and belongs to Northwestern District, which is important for those buyers who want to have Moscow residency," she said.

The decision to enter mass market looks reasonable against a background of unfavorable economic conjuncture, the head of OPIN analytical center Denis Bobkov agrees. "The segments of comfort and economy classes will be the most liquid on the real estate market in one to two years, - confirms Tatiana Sharova, head of the project consulting department of BEST-Novostroy. - Capital Group expands the range of supply, which, in fact, will help diversify business in a difficult situation.

General Director of Penny Lane Realty George Dzagurov adds that "many companies which were building premium-class housing, in 2008, also went to the economy class".

**We need a billion**

Building density at Mitino will be 19 thousand square meters on 1 hectare, Dzagurov counted, though a usual indicator for such projects is 25-27 thousand square meters on 1 hectare. Apparently, he says, that is what "comfort" means.

According to Elena Rzhavskaya, director of research and consulting company Point Estate, investments may amount to about $1 billion. Capital Group did not disclose the source of financing.

Dmitry Taganov, head of Analytical center of Incom Corporation, asserts that the situation with financing on the construction market is not bad: "Capital Group has a reputation of a reliable borrower, it will not have problems with loans".

"Despite the difficult economic situation, the developer, judging by all appearances, has already invested some money in the pre-project development of the residential complex, so it makes no sense for him to freeze it now," Bobkov says. - So far we do not see a serious crisis on the market, and the demand can be described as moderate. In his opinion, if the developer decides to build the whole project at once, it may take up to seven years.

The project can be built quickly, but the market will not be able to absorb the entire volume at once, Litinetskaya warns. "I think that the overall implementation of the project will be divided into turns, - she says. - The recommended sequence is 50-100 thousand square meters.

Capital Group, founded in 1991 by Vladislav Doronin, Eduard Berman and Pavel Te, ranks 192nd in Forbes magazine's rating of Russia's largest private companies. The 2013 revenue is estimated by the magazine at 27 billion rubles: RBC's source in Capital Group confirms that this data is "close to the real figures". Capital Group's portfolio includes more than 70 completed, under construction and projected projects with a total area of more than 7 million square meters, including expensive housing, class A and B+ office and retail centers. The legendary projects include complex "Legend of Tsvetnoy" on Tsvetnoy Boulevard in Moscow and projects in "Moscow-City" - "City of Capitals" "Eye" - four skyscrapers more than 190 m high.